**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:08-cv-00985-RPM

COORS BREWING COMPANY, a Colorado corporation,

      Plaintiff/Counterclaim Defendant,

v.

JACOBS ENGINEERING GROUP INC., a Delaware corporation, and
JACOBS CONSTRUCTION SERVICES, INC., a Delaware corporation,

      Defendants/Counterclaim Plaintiffs.

---

**Coors' Response in Opposition to Jacobs' Motion for Partial Summary Judgment**

---

      Coors Brewing Company ("Coors") respectfully submits its response in opposition to Jacobs Engineering Group Inc.'s ("JEG") and Jacobs Construction Services, Inc.'s ("JCS," and collectively with JEG, "Jacobs") Motion for Partial Summary Judgment (Doc. No. 27).

**Summary of Argument**

      Jacobs acknowledges disputed issues of material fact as to the merits of Coors' claims, but says these disputes are irrelevant to its motion. It is easy to understand why Jacobs wants to ignore the disputed facts. The contract expressly prohibited Jacobs from billing the cost of rework or correction of design omissions and errors, yet Jacobs billed—and collected from Coors—as much as $50–85 million for fixing design and construction problems. Jacobs hopes to keep the monies it improperly billed and received—or, at a minimum, limit Coors' recovery to a fraction of Jacobs' opportunistic gains.

Ignoring the facts, Jacobs' argument is simple: under its cost-plus-fee, limited-liability contract, no matter what it billed Coors, if Coors paid the bill, Jacobs is entitled *as a matter of law* to keep the money.  If Coors is unhappy about paying tens of millions of dollars too much, its only remedy is to ask for the return of Jacobs' $4.3 million fee.  Fortunately for Coors, neither the undisputed facts nor the controlling law support such a fundamentally unfair outcome.

Even if the limitation-of-liability provision were enforceable—and it is not: controlling law prohibits limitation of an engineer's liability—Jacobs should not be allowed to walk away with $50–85 million that Coors paid on improper bills.  A limitation-of-liability provision does not authorize a party to bill and collect costs expressly prohibited by the contract.  Yet the facts Jacobs wants to ignore, viewed in the light most favorable to Coors, show that is exactly what has happened.

Jacobs not only wants a free pass on its over billings, it wants to avoid responsibility for cost overruns that were the inevitable result of Jacobs' woefully inaccurate estimate, inadequate cost controls, and deficient construction administration.

Jacobs' motion should be denied because:

(1)     The parties did not agree to limit Jacobs' liability for improper billings.

(2)     Virginia law prohibits the contractual limitation of an engineer's liability.

(3)     The Construction Services Agreement's limitation-of-liability provision is unenforceable under Virginia's *Kocinec* test.

(4)     The Alliance Agreement's exclusive remedy provision fails of its essential purpose and is unenforceable.

(5)     Jacobs' actions violated inherent limitations on contractual limitation-of-liability provisions.

(6)     The economic loss rule does not apply because Jacobs owed Coors an independent duty of care.

(7)     Jacobs was unjustly enriched by its material and opportunistic breach, and it is unjust for Jacobs to keep Coors' money.

Each of these seven arguments presents a separate and independent basis for denial of Jacobs' motion.

## Standard of Review

Summary judgment must be denied unless Jacobs demonstrates its entitlement beyond a reasonable doubt.  *Madison v. Deseret Livestock Co.*, 574 F.2d 1027, 1037 (10th Cir. 1978).  Pleadings and documentary evidence must be construed liberally in Coors' favor.  *Harman v. Diversified Medical Instruments Corp.*, 488 F.2d 111, 113 (10th Cir. 1973), *cert. denied*, 425 U.S. 951 (1976).  Summary judgment is a drastic remedy, to be granted with caution and only upon a clear showing that no triable issue exists.  *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n.1 (10th Cir. 1981); *Conway v. Smith*, 853 F.2d 789, 792 n.4 (10th Cir. 1988).  Factual inferences must be viewed in the light most favorable to Coors, and to the existence of triable issues.  *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168, 171 (10th Cir. 1974).

Jacobs cannot meet its burden and its motion should be denied.

## Counter-Statement of Material Facts

The following facts are either undisputed or have support in the record, and must be taken as true for purposes of this opposition.

***Coors-Jacobs Business and Professional Relationship***

1.      Coors and Jacobs have a long-standing business relationship of trust, confidence, and reliance.  Puffer Aff. ¶¶ 4, 9 (attached as Exhibit 1).

2.      Coors and Jacobs have a long-standing professional relationship under which Jacobs performs engineering and related services for Coors.  Puffer Aff. ¶¶ 5-8.

3.      Jacobs performed engineering services for Coors in Virginia and Colorado among other places.  Puffer Aff. ¶ 6.

4.      Jacobs performed engineering, project management, estimating, procurement, and administrative services for Coors, and advised Coors on the cost of capital projects.  Puffer Aff. ¶¶ 6-7.

5.      Coors trusted Jacobs to perform these services based upon Jacobs' past performance.  Puffer Aff. ¶¶ 8-11.

6.      Coors, in reliance upon Jacobs' expertise, reduced the size of its engineering department.  Puffer Aff. ¶ 12.

7.      Jacobs performed engineering, project management, estimating, procurement, and administrative services for Coors' Shenandoah Brewery in Elkton, Virginia (the "Project"). Puffer Aff. ¶¶ 10-11, 13-15.

8.      Jacobs was responsible for all of the engineering, project management, estimating, procurement, and administrative services on the Project.  Puffer Aff. ¶ 15.

9.      Coors decided to go forward with the design and construction of the Project based upon Jacobs' cost representations.  Puffer Aff. ¶ 14.

*The Alliance Agreement*

10.     The Engineering Services Agreement (the "Alliance Agreement") between Coors and JEG had an effective date of May 17, 1999.  Compl. Ex. A (Alliance Agreement).

11.     Under the Alliance Agreement, JEG performed an appropriation grade estimate (nominal +/- 10%) for design, procurement, construction, and start-up of the Project. Stonebraker Aff. ¶ 4 (attached as Exhibit 2, Tab A to Ex. 2 describes basis of estimate).

12.     JEG estimated the total Project cost to be $210.5 million (nominal +/- 10%). Stonebraker Aff. ¶ 5 and Tab B.

13.     JEG also performed a Project Risk Analysis that specified with 100% probability that the total Project cost would not exceed $222.932 million.  Stonebraker Aff. ¶ 6 and Tab C.

14.     Coors approved the implementation of the design and construction of the Project based on JEG's total cost estimate, which included JEG's Project Risk Analysis, and entered into an engineer-procure-construct contract (the "Construction Services Agreement") with JCS. Puffer Aff. ¶ 14.

15.     The total cost of the Project exceeded $330 million.  Stonebraker Aff. ¶ 7.

16.     Under the Alliance Agreement, JEG procured goods and sold them to Coors. Stonebraker Aff. ¶¶ 16-19 and Tab G.

17.     Amendment Number Five added "Miscellaneous Jacobs procurement activities" to the Alliance Agreement, with JEG earning a fee of 1% of the value of procured goods.  Tab G to Exhibit 2 (Amendment No. 5).

18.     The goods JEG procured included: dry goods; malt weighers; brewing vessels; lauter tun; Delta V; CO2 recovery system; and No. 5 Boiler.  Stonebraker Aff. ¶ 16 and Tab G to Exhibit 2 (ASR Rev. 4).

19.     JEG had these goods shipped to the Project site, and title to the goods transferred to Coors upon their incorporation into the Project.  Stonebraker Aff. ¶ 17 and Tab G; Compl. Ex. B (Article 18).

20.     The cost of the goods procured by JEG exceeded the cost of JEG's services, with the cost of goods being more than 50% of the amended contract price.  Stonebraker Aff. ¶ 19.

21.     JEG's purchase orders for goods include express references to the Uniform Commercial Code.  Gaudion Aff. ¶ 7 (attached as Exhibit 3 and Tab A to Ex. 3).

22.     JEG agreed to provide performance of "the highest professional quality," but failed to do so.  Compl. Ex. A (Alliance Agreement § 3.1); Sarsten Aff. ¶ 14 (attached as Exhibit 4).

### *The Construction Services Agreement*

23.     The Construction Services Agreement between Coors and JCS had an effective date of April 11, 2005.  Compl. Ex. B (Construction Services Agreement).

24.     The Construction Services Agreement was negotiated and drafted through the combined efforts of Coors' and Jacobs' in-house counsel.  Goldman Aff. ¶ 4 (attached as Exhibit 5).

25.     Coors did not understand or intend that Article 23, § 23.2 would exculpate JCS from its own negligence.  Goldman Aff. ¶ 5.  (Article 23, § 23.2 is quoted on page 4 of Jacobs' Motion).

26.     Coors did not understand or intend that Article 23, § 23.2 would allow JCS to bill Coors as much as $50 million for rework, work activities, and resources for which JCS had agreed not to bill Coors under the Construction Services Agreement, and that if Coors paid such bill, Coors' only remedy would be to seek a refund of JCS's fee.  Goldman Aff. ¶ 6.

27.     Coors did not understand or intend that Article 23, § 23.2 would relieve JCS from its contractual obligation of accurate billing.  Goldman Aff. ¶ 7.

28.     Coors understood and intended that JCS retain liability for its own negligence (e.g., Article 6, § 6.2(g) of the Construction Services Agreement).  Goldman Aff. ¶ 8.

29.     JCS expressly agreed that it would not bill Coors for engineering rework.  Compl. Ex. B (Article 6, § 6.2(g)); Gaudion Aff. ¶ 11; Sarsten Aff. ¶ 11.

30.     JCS should have had adequate cost controls in place to track engineering rework, but did not.  Sarsten Aff. ¶ 10; Stonebraker Aff. ¶ 8.

31.     JCS's billings for engineering, construction management, and administration included a mark-up for overhead, which contributed to its overall profitability.  Sarsten Aff. ¶ 9.

32.     Jacobs' V.P. of Greenville Operations sent an email to Coors' Project Manager with a subject line, "Causes Database," which details reasons for subcontractor cost increases totaling approximately $83.97 million.  The email attached explanatory bar charts, a pie chart, and spreadsheets.  Stonebraker Aff. ¶ 9 and Tab D.

33.     Jacobs' V.P. sent a follow-up email with the definitions for the data for the charts regarding the Causes Database and the reasons for subcontractor changes.  Stonebraker Aff. ¶ 10 and Tab E.  Jacobs' definitions point out that the cost increases were due to work required to fix

problems that were the result of Jacobs' design errors, and the errors of its subcontractors, fabricators, and suppliers.  Tab E to Ex. 2.

34.     Jacobs' pie chart revealed that Jacobs had billed Coors more than $6 million for Project "Design Omission, Revision, and Additions."  Stonebraker Aff. ¶ 11 and Tab D.

35.     Jacobs' pie chart revealed that Jacobs had billed Coors more than $10.4 million for Project "Schedule Recovery" efforts.  Stonebraker Aff. ¶ 12 and Tab D.

36.     Jacobs' pie chart revealed that Jacobs had billed Coors more than $10.2 million for Project "Field Conditions."  Stonebraker Aff. ¶ 13 and Tab D.

37.     Jacobs' pie chart revealed that Jacobs had billed Coors more than $29.2 million for "Rework," which was defined by Jacobs as "work required to fix a problem that was a result of a subcontractor, fabricator, or equipment supplier error."  Stonebraker Aff. ¶ 14 and Tabs D and E.

38.     Jacobs should not have billed Coors for all the costs associated with "Design Omission, Revision, and Additions," "Schedule Recovery," "Field Conditions," and "Rework." Gaudion Aff. ¶ 11; Sarsten Aff. ¶ 11.

39.     Jacobs' major trade subcontracts prohibited its subcontractors from billing for rework.  Stonebraker Aff. ¶ 14 and Tab F; Gaudion Aff. ¶¶ 10-11.

40.     Jacobs' overhead recovery from its mark-up on its engineering rework and additional construction administration to deal with the field impact of engineering errors may well have exceeded the amount of JCS's fee.  Sarsten Aff. ¶ 13.

**Argument and Legal Authority**

Part I confirms that JCS is obligated to repay Coors for money it improperly billed.  Part II explains that Virginia law prohibits JCS from limiting its liability.  Part III explains that the limitation-of-liability provision in the Construction Services Agreement is unenforceable under Virginia's *Kocinec* test.  Part IV demonstrates that the exclusive remedy provision in the Alliance Agreement, governed by Colorado law, fails of its essential purpose and is unenforceable.  Part V examines the inherent limitations on the enforcement of limitation-of-liability provisions in Virginia and Colorado.  (Parts I through V respond to Part II of Jacobs' Motion).

Part VI explains that Coors' tort claims are not barred by the economic loss rule in Virginia or Colorado because Jacobs owed Coors a duty separate and independent of the contracts.  Part VII, examining Virginia and Colorado law, explains that Jacobs should disgorge unjust profits gained through its opportunistic breach.  (Parts VI and VII respond to Part I of Jacobs' Motion).

The parties agree that Virginia law governs the Construction Services Agreement between Coors and JCS (Compl. ¶ 49; Ans. ¶ 49), and that Colorado law governs the Alliance Agreement between Coors and JEG.  (Compl. ¶ 11; Ans. ¶ 11); (Jacobs' Mot. at 4-5).

**I.      Under the Construction Services Agreement, JCS is obligated to repay money improperly billed and collected.**

The facts, viewed in the light most favorable to Coors, show that JCS billed Coors millions of dollars for rework, design omissions, and errors for which JCS was not entitled to payment.  Stonebraker Aff. ¶¶ 9-15 and Tabs D and E; Gaudion Aff. ¶¶ 8-11; Sarsten Aff. ¶¶ 9-

13.   Jacobs now argues that, because Coors failed to catch these improper billings before they were paid, Coors' only remedy is to seek a refund of Jacobs' fee.  Jacobs' interpretation of the Construction Services Agreement is contrary to Virginia law.

Under Virginia law, the court's primary goal in construing written contracts is to determine the parties' intent.  *Pocahontas Mining LLC v. CNX Gas Co., LLC*, 666 S.E.2d 527, 531 (Va. 2008).  Intent is determined, whenever possible, from the words used.  *Id.*  Words are given their plain meaning.  *Id.* at 531.  No reasonable word or phrase will be treated as meaningless and the contract will be read as a whole.  *Id.*  At the end of the day, the interpretation adopted should be reasonable, and "absurd results" avoided.  *Transit Cas. Co. v. Hartman's, Inc.*, 239 S.E.2d 894, 896 (Va. 1978).

Jacobs' argument, if accepted, would render meaningless three important provisions of the Construction Services Agreement:

### Article 6, § 6.2(g)

Responsibility of Parties: Errors/Accuracy. CONTRACTOR shall, without additional compensation, correct or revise any errors or deficiencies in the designs, drawings, or specifications provided pursuant to this Agreement ("Error Corrections"). Within fifteen (15) calendar days of identifying the need to address Error Corrections, CONTRACTOR shall provide written notification to COORS requesting COORS' approval of the Error Corrections.

Neither COORS['] review or acceptance of, nor payment for any of the services required under this Agreement shall be construed to operate as a waiver of any rights under this Agreement or of any course of action arising out of the performance of this Agreement, except in the event where CONTRACTOR brings a change or substitution of specific Work to COORS' attention and COORS grants its prior approval for such change or substitution of the specific Work, and CONTRACTOR shall be and remain liable to COORS for the negligent performance of any of the services furnished as set forth in Exhibit B, as provided for under this Agreement and for the length of the warranty periods as set forth in Article 17.

Compl. Ex. B, Construction Services Agreement Article 6, § 6.2 (g) at 7-8.

\* \* \*

**Construction Services Agreement**
**EXHIBIT A**
**CONTRACT SUM – PAYMENT PROVISIONS**
[…]
**BILLING AND PAYMENT CONDITIONS**
[…]
If errors in CONTRACTOR'S invoices are found after the invoices are paid, and
COORS notifies the CONTRACTOR, then CONTRACTOR must adjust the
future invoice to rectify such error found.

Compl. Ex. B, Construction Services Agreement, Exhibit A at 29.

\* \* \*

**Construction Services Agreement**
**Exhibit B**
**Part 3.3 Supply Management Plan, § 15.10 Applications for Payment**

Applications for Payment [AP] - Subcontractors shall be instructed to submit a
draft application for payment to the Site Manager following that month in which
the work was performed.  The Site Manager will pre-review the AP and advise
the subcontractor of any comments. The formal AP will then be submitted [to]
Site Manager for approval, and upon the Site Manager's approval, will be
forwarded to Accounts Payable for payment. The FCA [Field Contracts
Administrator] will also review the AP's for contractual compliance, and will
facilitate these reviews and approvals with the Site Manager and his designee.
[AP's] not in strict compliance will be rejected and returned to the subcontractor
with an explanation.

A copy of Part 3.3, § 15.10 of the Construction Services Agreement's Exhibit B is attached

hereto as Exhibit 6.

Read as a whole, these provisions prohibit JCS from invoicing for its own rework—and

entitle Coors to a credit if JCS does invoice for rework and the invoice is paid.  Additionally,

JCS's major trade subcontracts prohibited its subcontractors from billing for rework.

Stonebraker Aff. ¶15 and Tab F; Gaudion Aff. ¶¶ 10-11.  Part 3.3, § 15.10 obligated JCS to

- 11 -

reject any improper subcontractor pay applications.  That did not happen.  JCS's subcontractors improperly billed for rework, and JCS passed these improper costs on to Coors.

Jacobs argues that because it charged Coors a low fee, Coors agreed to limit Jacobs' potential liability for claims.  Even if this argument were correct, it makes no sense to apply the limitation-of-liability provision to billings over which JCS had complete control.  Compliance with its known contract obligations did not increase JCS's risk.  Risk is a function of control. The more control one has over an activity, the less risk there is of an unforeseen outcome.  In this case, JCS had complete control over its billings and those of its subcontractors.  JCS needed to institute the cost controls expressly or impliedly demanded by the contract, but failed to do so. Sarsten Aff. ¶ 10; Stonebraker Aff. ¶ 8.

JCS's billings to Coors for its design and construction administration staff included a mark-up for overhead.  Compl. Ex. B (Construction Services Agreement, Attachment A.1, Schedule of Values – Costs).  This mark-up contributed to the overall profitability of Jacobs. Sarsten Aff. ¶ 9.  It is likely that JCS's increased overhead recovery from billing for engineering rework and for administering the field consequences of its uncorrected engineering errors exceeded its $4.3 million fee.  Sarsten Aff. ¶ 13; (Jacobs' Motion at 2).

Thus, under its reading of the limitation-of-liability provision, JCS could, with impunity, increase its contract revenue, beyond what Coors had agreed to, by failing to adequately track and account for—and improperly bill and get paid for—its own rework and that of its subcontractors.  That is exactly what JCS did.  By its own admission, JCS billed Coors as much as $49.8 million for errors, rework, and other services, all of which should not have been billed

under the Construction Services Agreement.  Stonebraker Aff. ¶¶ 9-15 and Tabs D-E; Gaudion

Aff. ¶¶ 8-11.

Jacobs now argues it can keep the almost $50 million it improperly billed and was paid,

with Coors' recovery limited to Jacobs' $4.3 million fee.  Acceptance of that argument would

render meaningless the Construction Services Agreement's provisions on rework and billing

accuracy, and thereby produce an absurd result.  It would also contravene Virginia law on

contract construction.

The Construction Services Agreement, properly construed, does not allow JCS to

improperly bill and get paid millions of dollars, and hide behind a limitation-of-liability

provision when Coors asks for its money back.

**II.     Virginia law prohibits limitation of an engineer's liability.**

Virginia statutory law prohibits architects and engineers from limiting their liability by

contract.  Va. Code Ann. § 54.1-411.  The statute provides:

> A.  Nothing contained in this chapter or in the regulations of the
> Board shall prohibit the practice of architecture, engineering, land
> surveying or the offering of the title of certified landscape architect
> or certified interior designer by any corporation, partnership, sole
> proprietorship, limited liability company, or other entity provided
> such practice or certification is rendered through its officers,
> principals or employees who are correspondingly licensed or
> certified.  **No such organization shall *limit the liability* of any
> licensee or certificate holder for damages arising from his acts
> or *limit* such corporation, partnership, sole proprietorship,
> limited liability company, or other entity from *liability* for acts
> of its employees or agents**.  No such corporation, partnership, sole
> proprietorship, limited liability company, or other entity, or any
> affiliate thereof, shall, on its behalf or on behalf of any such
> licensee or certificate holder, be prohibited from (i) purchasing or
> maintaining insurance against any such liability; (ii) entering into

- 13 -

> any indemnification agreement with respect to any such liability;
> or (iii) receiving indemnification as a result of any such liability.

Va. Code Ann. § 54.1-411(A) (emphasis added).

In Virginia, the practice of engineering, which is governed by the above section, includes by statutory definition "responsible administration of construction contracts." Va. Code Ann. § 54.1-400.

In contravention of this statute, Jacobs asks this Court to limit the liability of its engineers and the corporation to the amount of its fee.

Because the statute allows engineers to buy liability insurance and enter into indemnity agreements, Jacobs concludes that it also allows engineers to limit their liability. (Jacobs' Mot. at 25). The plain language of the statute says otherwise. The fact that Jacobs can buy errors and omissions liability insurance, or contract for indemnity, does not mean that Jacobs can also limit the liability of its engineers or the corporation in direct contravention of the statute's plain language.

The Virginia Supreme Court has not addressed this question. Thus, this Court's task is to predict how Virginia's highest court would rule. *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir. 1984).

## A.     The statutory language is plain and unambiguous and should be applied as written.

Virginia courts are bound by the plain meaning of statutory language, and must apply that plain language. *Lynchburg Div. of Social Servs. v. Cook*, 666 S.E.2d 361, 368 (Va. 2008). "If the language is plain and unambiguous, there is no need for judicial construction; the language

will be applied as written." *Gillespie v. Commonwealth of Virginia*, 636 S.E.2d 430, 432 (Va.

2006).

      Here, the statutory language could not be more plain:

> No such [engineering corporation] shall limit the liability of any licensee or
> certificate holder for damages arising from his acts or limit such corporation …
> from liability for acts of its employees or agents.

Va. Code Ann. § 54.1-411(A).

      Jacobs' suggested interpretation would require the Court to add language to the statute—

something it cannot do. *Young v. Commonwealth of Virginia*, 643 S.E.2d 491, 494 (Va. 2007)

(holding that courts cannot, by judicial interpretation, add language to a statute that the Virginia

General Assembly did not include). Jacobs' statutory construction would require this Court to

discount the unambiguous phrase, "No such organization shall limit the liability of any licensee,"

and effectively replace that language with the phrase, "No such organization shall limit the

liability of any licensee except in cases where two commercially sophisticated parties bargain to

do so." Such an interpretation violates Virginia's principles spelled out in *Young*.

**B.     Because the statutory language is unambiguous, legislative intent must be
determined from the words used.**

      When the Virginia General Assembly "uses words that are clear and unambiguous, courts

may not interpret them in a way that amounts to a holding that the legislature did not mean what

it actually expressed." *Horner v. Dept. of Mental Health*, 597 S.E.2d 202, 204 (Va. 2004).

      Jacobs relies on two nine-year-old affidavits from a Chesterfield County, Virginia circuit

court case to support its argument that the Virginia General Assembly's legislative intent was

different from the plain language of the statute. (Jacobs' Ex. A-2, affidavit of Clifton A.

Woodrum, former legislator; and Ex. A-3, affidavit of Robert Nebiker, former legislative liaison).  The Court should give no weight to these affidavits.  No one legislator has sufficient personal knowledge to declare the overall intent of the Virginia General Assembly.  *See Bread Political Action Comm. v. Fed. Election Comm'n*, 455 U.S. 577, 582 n.3 (1982) (expressly refusing to give probative weight to after-the-fact affidavit of amendment sponsor regarding legislative intent); *Quern v. Mandley*, 436 U.S. 725, 736 n.10 (1978) ("*post hoc* observations by a single member of Congress carry little if any weight").  Instead, the Court should conclude that the Virginia General Assembly meant exactly what it said.

**C.    The statute's pertinent language has been uniform for many years.**

The statute, enacted in 1982, was amended most recently in 2000 to add certified interior designers and make other minor stylistic changes.  *See* LEXSTAT VA. CODE SEC 54.1-411 History & Notes.  (attached as Exhibit 7).  If the General Assembly did not mean what the plain language of the statute says, it has now had more than a quarter of a century to change it—but has not done so.

Woodrum states in his affidavit that the statute's "language, in retrospect, may be subject to ambiguity."  Woodrum Aff. ¶ 6.  The statute is not ambiguous—it says engineers cannot limit their liability.  Neither Woodrum, Nebiker, nor anyone else has convinced Virginia's General Assembly to change the statute's prohibition against an engineering firm limiting its liability.

**D.    A contract provision that violates a statute is void.**

Jacobs' principle argument is that the limitation-of-liability provision should be enforced because Coors and Jacobs are sophisticated parties.  (Jacobs' Mot. at 27).  However sophisticated

they may be, Coors and Jacobs cannot undo by contract what the Virginia General Assembly has determined to be the public policy of the Commonwealth. *Blake Constr. Co., Inc./Poole & Kent v. Upper Occoquan Sewage Authority*, 587 S.E.2d 711, 718 (Va. 2003); *Shuttleworth, Ruloff and Giordano, P.C. v. R.J. Nutter, II*, 493 S.E.2d 364, 366 (Va. 1997) (holding that a contract provision that violates Virginia public policy is void and of no legal effect).

Jacobs relies upon *Estes Express Lines, Inc. v. Chopper Express, Inc.* for the proposition that Virginia "courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain." 641 S.E.2d 476, 478 (Va. 2007). Here, Virginia public policy is clearly and certainly expressed: "No [engineering corporation] shall limit the liability of any licensee or certificate holder for damages arising from his acts or limit such corporation … from liability for acts of its employees or agents." Va. Code Ann. § 54.1-411(A).

The Construction Services Agreement has a severability clause under which an unenforceable provision is severed without affecting the validity or enforceability of the rest of the contract. Compl. Ex. B (Article 26, § 26.11). The limitation-of-liability provision, Article 23, § 23.2, is unenforceable and should be severed.

**E.     Shifting liability is not the same as limiting liability.**

Indemnity agreements and insurance policies shift risk from one party to another for a fee or other consideration—but they do not extinguish liability. Limitation-of-liability provisions do extinguish liability. Virginia makes no distinction between clauses that limit recovery and those that completely extinguish it—both are exculpatory clauses. *Kocinec v. Public Storage, Inc.*, 489 F. Supp. 2d 555, 559 (E.D. Va. 2007) (diversity case applying Virginia law). Unlike exculpatory clauses, indemnity provisions "do not bar or even diminish an injured party's ability to recover."

*Estes Express*, 641 S.E.2d at 480.  Indemnity provisions do not jeopardize the damaged party's ability to recover, and do not invoke the same public policy concerns as exculpatory clauses.  *Id.* at 479-80.

Thus, it is unsurprising that Code § 54.1-411 treats indemnity provisions and insurance policies differently than limitation-of-liability provisions.  Risk shifting by engineers through indemnity and insurance is allowed under Virginia law—limitation of liability by contract is not.

**III.    The Construction Services Agreement's limitation-of-liability provision is unenforceable because Jacobs cannot satisfy the *Kocinec* test.**

Under Virginia law, "[e]xculpatory clauses are typically evaluated using a three-part test." *Kocinec*, 489 F. Supp. 2d at 559.  Contract provisions that limit liability and those that completely foreclose liability are both viewed as "exculpatory" clauses.  *Id.*  Jacobs, in order to limit its liability to the amount of its fee, must show that § 23.2 of the Construction Services Agreement passes Virginia's test by proving that the provision:

(1)    Does not contravene Virginia public policy;

(2)    could be readily understood by a reasonable person in Coors' position; and

(3)    clearly and unequivocally releases JCS from precisely the type of liability alleged by Coors.

*Kocinec*, 489 F. Supp. 2d at 559, *citing*, *Hiett v. Barcroft Beach, Inc.*, 18 Va. Cir. 315, 318 (1989), *rev'd on other grounds*, *Hiett v. Lake Barcroft Cmty. Ass'n, Inc.*, 418 S.E.2d 894 (Va. 1992).  Jacobs cannot satisfy even one of *Kocinec's* prongs, much less all three—and the limitation-of-liability provision is therefore void and unenforceable.

A.   **The Construction Services Agreement's limitation-of-liability provision contravenes Virginia public policy.**

Virginia's public policy is reflected in the Commonwealth's statutory law. *Doss v. Jamco*, 492 S.E.2d 441, 443 (Va. 1997).  It is the declared public policy of Virginia that no engineering corporation "…shall limit the liability of any licensee or certificate holder for damages arising from his acts or limit such corporation … from liability for acts of its employees or agents." Va. Code Ann. § 54.1-411(A).  Because the limitation-of-liability provision violates Virginia statutory law, it contravenes Virginia public policy—and fails the first prong of *Kocinec*.

Jacobs argues that the provision satisfies the first prong of *Kocinec* because Jacobs is neither a quasi-public entity, a monopoly, nor a supplier of inherently dangerous products, and because the contract at issue concerned a private brewing facility and did not therefore affect the public interest. (Jacobs' Mot. at 28-29).  Jacobs' argument fails to recognize that Virginia regulates the practice of engineering for the primary purpose of promoting public health, safety, and welfare. 18 Va. Admin. Code 10-20-690 (2007) (titled "Responsibility to the public").  "The primary obligation of the professional is to the public." *Id.*

Public policy is defined in Virginia case law as "the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *Doss*, 492 S.E.2d at 443.  Virginia regulates the practice of architecture and engineering, and the primary purpose of that regulation is to promote public health, safety, and welfare. 18 Va. Admin. Code 10-20-690.  Construction of the Project may have been a "purely private matter" (Jacobs' Mot. at 29), but the practice of engineering—whether on a private or public project—is not.

The cases Jacobs relies upon in arguing that the limitation-of-liability provision does not violate public policy are either inapplicable or unpersuasive.  For example, Jacobs cites *Ripley Heatwole Co., Inc. v. John E. Hall Electrical Contractor, Inc.* for a list of examples of the kinds of parties that might not be permitted to use contractual exculpatory clauses: public utilities, monopolies, and suppliers of inherently dangerous products.  69 Va. Cir. 69, 2005 WL 4827398, at *3 (Va. Cir. Ct. 2005).  *Ripley Heatwole*, however, does not stand for the proposition that professional engineers may use contractual limitation-of-liability provisions.  The fact that engineers were not listed by the court as examples of business entities that might not be permitted to use such clauses, does not mean they are allowed to do so.

Jacobs cites *C&O Ry. Co. v. Clifton Forge-Waynesboro Tel. Co.* for the proposition that, so long as the parties are acting in a private rather than a public or quasi-public capacity and "neither public welfare nor public policy [is] involved," an arms-length agreement to relieve a negligent party of liability is enforceable.  224 S.E.2d 317, 322 (Va. 1976).  (Jacobs' Mot. at 24).  In *C&O*, the court held that because C&O was acting in a private capacity and neither public welfare nor public policy was involved, the contract's exculpatory clause was valid and enforceable.  224 S.E.2d at 322.

Jacobs, unlike C&O, is a publicly regulated professional engineer—regulated for the purpose of protecting the public health, safety, and welfare of Virginians.  *See* 18 Va. Admin. Code 10-20-690.  Thus, public welfare and public policy *are* involved, and *C&O* is inapposite.

Jacobs points out that under Virginia law, a plaintiff suing a construction company for breach of contract cannot recover more than the contract's liquidated damages provision allows.  *Fidelity & Cas. Co. of N.Y. v. Copenhaver Contracting Co., Inc.*, 165 S.E. 528 (Va. 1932).

- 20 -

(Jacobs' Mot. at 22-23).  Jacobs' reliance on *Copenhaver* is misplaced.  Copenhaver, unlike

Jacobs, was not responsible for project engineering, and therefore the public policy concerns

regarding an engineering corporation limiting its liability did not exist in *Copenhaver*.

According to Jacobs, the Virginia Supreme Court has approved enforcement of contract

provisions that entirely absolve a party from liability for negligence, where the negligence causes

property damage but no personal injury.  (Jacobs' Mot. at 23).  Jacobs, however, cites no case

involving a contract absolving an engineer or other regulated design professional.

Jacobs also cites two Colorado cases, one involving skydiving and the other commercial

construction.  (Jacobs' Mot. at 28-29).  Whatever light those Colorado cases might shed on

Virginia public policy, if any, they are of no application here because neither involved the

regulated profession of engineering.

Jacobs cannot meet its burden of showing that the Construction Services Agreement's

limitation-of-liability provision does not contravene Virginia public policy and therefore cannot

satisfy the first prong of the *Kocinec* test.

**B.      The Construction Services Agreement's limitation-of-liability provision could not be
readily understood, by a reasonable person in Coors' position, to limit JCS's
liability for improper billings.**

Coors did not understand § 23.2 to relieve Jacobs from its contractual obligation of

accurate billing.  Goldman Aff. ¶ 7.  (Article 23, § 23.2 is quoted on page 4 of Jacobs' Motion).

Coors did not understand § 23.2 to allow Jacobs to bill and get paid nearly $50 million for

rework and other services that Jacobs expressly agreed not to bill, with Coors' only remedy a

refund of Jacobs' $4.3 million fee.  Goldman Aff. ¶ 6.  Would any reasonable person in Coors'

position have understood § 23.2 to lead to such an outlandish result?

**C.      The Construction Services Agreement's limitation-of-liability provision does not clearly and unequivocally release JCS from the claims brought by Coors.**

Coors alleges, among other things, that JCS breached the Construction Services Agreement and that JCS breached its independent duty to provide engineering services that met the applicable standard of care.  Compl. ¶¶ 48-71.  The limitation-of-liability provision does not clearly and unequivocally release JCS from these claims; it is too broad and generalized to do so.

Under Virginia law, "broad and generalized" disclaimers of liability do not "automatically insulate" a party from all liability.  *Ash v. All Star Lawn and Pest Control, Inc.*, 506 S.E.2d 540, 542 (Va. 1998); *see also Wenzel v. Boyles Galvanizing Co.*, 920 F.2d 778, 781 (11th Cir. 1991) (a clause simply disclaiming liability in general terms is insufficient to exculpate a party from its own negligence).

In *Kocinec*, the court held that an exculpatory clause that clearly released the defendant from liability for losses from any cause, unless such loss was caused by the defendant's fraud, willful injury, or willful violation of law, was adequate under part three of the test.  489 F. Supp. 2d at 561.  An exculpatory clause that stated that the defendant was liable "only for losses caused by gross negligent management or actual wrongdoing" was adequate under part three of the *Kocinec* test.  *Trumball Invs., Ltd. v. Wachovia Bank, N.A.*, No. 1:05cv15 (GBL), 2005 U.S. LEXIS 7195, at *12 (E.D. Va. April, 2005), *aff'd*, 436 F.3d 443 (4th Cir. 2006).  Those exculpatory clauses passed the third prong of the *Kocinec* test because they were specific instead of broad and generalized.

Here, Jacobs argues that § 23.2 should be enforced because it applies "broadly" to all claims.  (Jacobs' Mot. at 29).  But just the opposite is true: because the limitation is "broad and generalized," it fails the third prong of *Kocinec*.

In Virginia, the key is not whether an exculpatory clause is in a contract of adhesion or a contract freely negotiated between sophisticated parties, but whether the clause can pass all three prongs of the *Kocinec* test.  Jacobs cannot meet its burden of showing that each prong of the test is satisfied.  Therefore, the Construction Services Agreement's limitation-of-liability provision is unenforceable.

**IV.    The Alliance Agreement's exclusive remedy provision fails of its essential purpose and should not be enforced.**

Coors asserts that JEG is liable under the Alliance Agreement for negligent misrepresentation.  Coors' claim is based on the defective estimate performed by JEG and relied on by Coors in making its decision to build the Project.  Compl. ¶¶ 34-47.  Jacobs argues that Coors' negligent misrepresentation claim is governed by the Construction Services Agreement. This argument fails because JEG's defective estimate is not covered by the Construction Services Agreement's merger clause.

Alternatively, Jacobs argues that § 3.2 of the Alliance Agreement provides that Coors' exclusive remedy for JEG's defective performance is that JEG "shall without additional compensation correct or revise any errors or deficiencies in its designs, drawings, specifications or other services" during performance and up to 12 months after completion.  Jacobs refers to this clause as the "Reperformance Clause."  (Jacobs' Mot. at 4-5, 30-33).  Jacobs' argument would deprive Coors of its bargained-for benefit because JEG cannot cure its defective cost estimate after the Project is complete.  The remedy, therefore, fails of its essential purpose and should not be enforced because the Alliance Agreement is governed by Colorado's UCC.

A remedy fails of its essential purpose if it deprives a party of the substantial value of its bargain. *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 744-45 (Colo. 1991); *Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 646 (10th Cir. 1991) (applying Colorado law, court refused to limit plaintiff's recovery because the contractual limitation of remedies failed of its essential purpose). Under the Colorado Uniform Commercial Code, an exclusive remedy clause will not be enforced if the remedy "fails of its essential purpose." C.R.S. § 4-2-719(2), Official Comment 1.

Coors bargained for JEG to provide performance of "the highest professional quality." Compl. Ex. A, Alliance Agreement § 3.1. Under the Alliance Agreement's Planning & Analysis Phase, JEG performed a detailed cost estimate of the Project and represented to Coors with 100% confidence that the total Project cost would not exceed $222.932 million. Stonebraker Aff. ¶ 6 and Tab C to Ex. 2 (Project Risk Analysis). Coors relied on JEG's estimate in deciding to build the Project. Puffer Aff. ¶ 14. The Project's cost exceeded $330 million. Stonebraker Aff. ¶ 7.

Coors contends that JEG's performance was not of the highest professional quality and that it did not get what it bargained for. Sarsten Aff. ¶ 14; *see* Compl. ¶ 15. Jacobs argues that Coors' only remedy under the Alliance Agreement is for JEG to reperform. (Jacobs' Mot. at 30-33). Reperformance of the cost estimate after the decision to build has been made and the Project is finished cannot cure JEG's defective performance and is of no value to Coors. The reperformance remedy is no remedy at all, fails of its essential purpose, and should not be enforced. *See Curragh Queensland Mining Ltd. v. Dresser Indus.*, 55 P.3d 235, 241 (Colo. App. 2002) (holding that when a seller cannot cure defects by repair, a remedy limited to repair fails of its essential purpose).

A.     **Coors' negligent misrepresentation claim is not covered by the Construction Services Agreement.**

Jacobs argues that all of Coors' claims against JEG are subject to the limitation-of-liability provision in the Construction Services Agreement between Coors and JCS.  (Jacobs' Mot. at 17-18).  Jacobs contends that the Construction Services Agreement's merger clause, § 26.13, controls this issue because it applies to Work performed prior to the execution of the Construction Services Agreement.  This argument fails because § 1.16 of the Construction Services Agreement defines Work to be all tasks required as described in Article 2 and Exhibit B, and, while a copy of the estimate is included in Exhibit B, JEG's performance of the estimate and Project Risk Analysis are not part of Article 2 or Exhibit B's scope of work.  JEG performed the estimate and Project Risk Analysis under the Alliance Agreement.  Stonebraker Aff. ¶¶ 4-6.  These tasks are not covered under the Construction Services Agreement's definition of Work, and that agreement's merger clause and limitation provision are inapplicable to Coors' claims against JEG.

B.     **The Alliance Agreement involves transactions in goods and services.**

The Alliance Agreement was a mixed contract under which JEG provided services and procured goods for the Project.  Stonebraker Aff. ¶ 16; Compl. Ex. A, Alliance Agreement (Amendment Number One to the Alliance Agreement, which added procurement of goods to JEG's scope of work).  JEG was responsible for transactions for sale of goods.  Stonebraker Aff. ¶ 16 and Tab G (Alliance Service Requisitions ASR Rev. 1, ASR Rev. 2, ASR Rev. 4).  JEG earned a fee of 1% of the value of procured goods.  Tab G to Ex. 2 (Amendment Number Five to the Alliance Agreement).

**C.      The Alliance Agreement qualifies as a contract for the sale of goods.**

Colorado's UCC defines "goods" to mean "all things (including specially manufactured

goods) which are movable at the time of identification to the contract for sale…." C.R.S. § 4-2-

105(1).  "A 'sale,' by statutory definition, 'consists in the passing of title from the seller to the

buyer for a price,' and a 'contract for sale' includes a present sale of goods as well as a contract

to sell goods at a future time." *Colorado Carpet Installation, Inc. v. Palmero*, 668 P.2d 1384,

1388 (Colo. 1983), *quoting* C.R.S. § 4-2-106(1).

The Colorado Supreme Court held that carpeting and other materials were "goods"

because they were movable at the time of procurement, and the parties' agreement was held to be

a "contract for sale" because title to the carpeting would pass from the contractor to the

homeowner. *Colorado Carpet*, 668 P.2d at 1388; *see also, B.A. Smith v. Union Supply Co.*, 675

P.2d 333, 334 (Colo. App. 1983) (holding that a contract to provide materials and labor for

installation of a new roof was a contract for the sale of goods and governed by the UCC because

the materials to be installed were movable at the time of identification to the contract).

Here, all the items procured by JEG were movable at the time of identification to the

Alliance Agreement; JEG bought them and had them shipped to the Project site.  Stonebraker

Aff. ¶ 17.  Title to the goods passed from JEG to Coors for a price.  Tab G to Ex. 2; Compl. Ex.

B (Article 18).  The Alliance Agreement, therefore, is a contract for the sale of goods under

Colorado law.

**D.     The UCC applies to the Alliance Agreement.**

Colorado courts use a "primary purpose" test to determine whether the UCC applies to a mixed contract that involves both services and transactions in goods.  *Colorado Carpet*, 668 P.2d at 1388.  "Useful factors" to consider in deciding whether the UCC should apply include:

      (1)      the contractual language used by the parties;

      (2)      whether the agreement involves one overall price that includes both goods and labor or, instead, calls for separate and discrete billings for goods on the one hand and labor on the other;

      (3)      the ratio that the cost of goods bears to the overall contract price; and

      (4)      the nature and reasonableness of the purchaser's contractual expectations of acquiring a property interest in goods….

*Id.* at 1388-89 (citations omitted).  Determination of these factors in this case requires a close look at the facts.

The title of the Alliance Agreement is "Engineering Services Agreement."  Compl. Ex. A, Alliance Agreement.  Under the Alliance Agreement's original contractual language, JEG was to provide "engineering and related administrative services."  Alliance Agreement § 2.  JEG's Scope of Work under the Alliance Agreement was changed by subsequent Amendments and Alliance Services Requisitions (ASRs) to include the procurement of goods.  Stonebraker Aff. ¶ 16 and Tab G.  Amendment Number One to the Alliance Agreement states that JEG's scope of work "shall consist of engineering and procurement."  Alliance Agreement, Amendment Number One § 1.0.  Section 4.0 of Amendment Number One is titled "Procured Materials and Subcontracts."  Amendment Number Five adds "Miscellaneous Jacobs procurement activities" with JEG earning a fee of 1% of the value of procured goods.  Tab G to Ex. 2.  Coors relied upon Jacobs for procurement.  Puffer Aff. ¶¶ 6, 8-10, 12.

Applying *Colorado Carpet's* factors to the present case shows the following:

1. The original purpose of the Alliance Agreement, purchase of Jacobs' engineering services, was changed to include Jacobs' procurement of goods. Tab G to Ex. 2. Jacobs' purchase order language for procurement of goods expressly applies the UCC. Gaudion Aff. ¶ 7 and Tab A (Jacobs' purchase orders for goods on the Project, "Instructions, Agreements and Conditions" ¶ 9 states: "In addition to any express warranties contained herein or other warranties made by the Seller, all warranties set forth in the Uniform Commercial Code shall apply.").

2. The Alliance Agreement, as amended, has an overall contract price that includes both goods and services. Stonebraker Aff. ¶ 18 and Tab G. Amendment Five to the Alliance Agreement adds a 1% fee to the value of procured goods to "be invoiced concurrent with labor billing." Tab G to Ex. 2.

3. The cost of the goods exceeded the cost of services, the cost of goods being more than 50% of the amended contract price. Stonebraker Aff. ¶ 19. In a mixed contract, when the cost for goods exceeds that for services, the contract is more likely to be for goods for purposes of determining whether the contract is governed by the UCC. *BMC Indus., Inc. v. Barth Indus. Inc.*, 160 F.3d 1322, 1330 (11th Cir. 1998).

4. Coors reasonably expected to acquire a property interest in the goods, once incorporated into the Project; when JEG bought them for the purpose of selling them to Coors, the goods were movable. Stonebraker Aff. ¶ 17.

Under Colorado's "primary purpose" test, the facts weigh heavily in favor of applying the UCC to the Alliance Agreement.

In the UCC arena, decisions from other jurisdictions are particularly persuasive because of the UCC's uniform nature. *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 n.7 (10th Cir. 2008). Whether a contract is predominantly for goods or services is generally a fact question. *BMC Indus.,* 160 F.3d at 1331. Where there are no genuine issues of material fact concerning the contract's provisions on goods and services, a court may determine the UCC's applicability as a matter of law. *Id.* But where genuine issues of material fact exist, summary judgment is not appropriate. *Fiberglass Component Production, Inc. v. Reichhold Chemicals, Inc.*, 983 F. Supp. 948, 953-54 (D. Colo. 1997) (holding that general issues of material fact precluded summary judgment on UCC warranty issues).

Because summary judgment is a drastic remedy, the movant must make a convincing showing that there are no genuine issues as to any material fact. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n.1 (10th Cir. 1981). Jacobs can make no such showing. Jacobs' motion for partial summary judgment on the Alliance Agreement's Reperformance Clause should be denied.

## V.     Virginia and Colorado recognize inherent limitations on enforcement of limitation-of-liability provisions.

A contractual limitation-of-liability provision is not a license to cheat or steal. It is not a ticket allowing unfettered negligence. There are inherent limitations on the enforcement of limitation-of-liability provisions, recognized by a majority of jurisdictions—including Virginia and Colorado.

Taking Jacobs' argument to its logical conclusion, the limitation-of-liability provisions would insulate Jacobs from payment of damages even in instances where Jacobs' breach of contract was willful or grossly negligent. This argument, if correct, would undercut the

principles of consideration and mutual obligation on which all contracts rest.  For that reason,

Virginia and Colorado, along with a majority of United States jurisdictions, have recognized that

there are inherent limitations on the enforcement of limitation-of-liability provisions.  This

inherent limitation arises from the common law's implied covenant of good faith and fair dealing

in the performance and enforcement of contracts.

Limitation-of-liability provisions such as the one in the Construction Services Agreement

are not common in the construction industry and the number of cases construing such clauses is

very small.  No-damage-for-delay clauses, however, are common in construction contracts

throughout the United States and there are a large number of cases, as well as legislation in

various states, addressing the enforceability of such clauses.  A no-damage-for-delay clause

limits a contractor's delay damages to a time extension, regardless of the delay's cause.  Because

it is well recognized in the construction industry that time is money, enforcement of a no-

damage-for-delay clause can result in substantial financial losses to contractors.

The harsh result that can occur from strict enforcement of a no-damage-for-delay clause

has caused many states to impose limitations on the enforcement of such clauses.  This includes

strong freedom-of-contract states such as Virginia and Colorado.  Because a no-damage-for-

delay clause is a limitation-of-liability provision, the rationale underlying the legislative

enactments and judicial decisions limiting enforcement of no-damage-for-delay clauses are

equally applicable to a broader limitation-of-liability provision such as the one on which Jacobs

bases its pending motion.

Virginia has addressed no-damage-for-delay clauses by legislation. Virginia Code § 2.2-

4335 provides in pertinent part:

> Any provision contained in any public construction contract that purports to waive, release, or extinguish the rights of a contractor to recover costs or damages for unreasonable delay in performing such contract, either on his behalf or on behalf of his subcontractor if and to the extent the delay is caused by acts or omissions of the public body, its agents or employees and due to causes within their control shall be void and unenforceable as against public policy.

Va. Code Ann. § 2.2-4335(A).

Virginia's "unreasonable delay" limitation is much broader than the cases that limit enforcement of no-damage-for-delay clauses based on the implied obligation of good faith and fair dealing. This public policy, however, applies only to public contracts. Would the Virginia Supreme Court apply this public policy to private construction contracts? Coors contends that the Virginia Supreme Court would, at a minimum, recognize as persuasive the decision of the South Carolina Supreme Court in *United States ex rel. Williams Electric Company, Inc. v. Metric Constructors, Inc.*, 480 S.E.2d 447 (S.C. 1997). *See Blake Constr. Co./Poole & Kent v. Upper Occoquan Sewage Auth.*, 587 S.E.2d 711, 718 (Va. 2003) (*Williams Electric* discussed as weighing on proper interpretation of Va. Code Ann. § 2.2-4335 (A)).

The South Carolina Supreme Court's decision in *Williams Electric* was issued in response to the South Carolina federal district court's certified question—"what exceptions, if any, to an unambiguous no-damages-for-delay clause in a construction contract would the South Carolina Supreme Court recognize?" *Williams Electric*, 480 S.E.2d at 448.

The court began its discussion of this question by noting that, generally, no-damage-for-delay provisions are valid and enforceable so long as they meet ordinary rules governing the validity of contracts. *Id.* The court then noted that a majority of jurisdictions, however, recognize certain exceptions to such clauses. Among the recognized exceptions are delay caused by fraud, misrepresentation, or other bad faith; delay caused by active interference; and delay

caused by gross negligence. *Id.* The court analyzed these exceptions in light of South Carolina's rule that all contracts include an implied obligation of good faith and fair dealing. *Id.* To the extent that an exception amounted to a violation of the obligation of good faith and fair dealing, the court found that it was a logical extension of South Carolina law. *Id.* at 449.

Coors contends that Jacobs' over billings are a violation of the obligation of good faith and fair dealing. Allowing Coors a full refund under the facts and circumstances is a logical extension of the reasoning in *Williams Electric*. It is probable that the Virginia Supreme Court would follow *Williams Electric* because every Virginia contract contains an implied covenant of good faith and fair dealing. *Frank Brunckhorst Co., L.L.C. v. Coastal Atlantic, Inc.*, 542 F. Supp. 2d 452, 462 (E.D. Va. 2008) (applying Virginia law). And "it is a basic principle of contract law in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." *Virginia Vermiculite, Ltd. V. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998) (applying Virginia law).

If the Construction Services Agreement had expressly allowed Jacobs to bill for rework, then the covenant of good faith and fair dealing would not prevent it from doing so. *See Ward's Equipment, Inc. v. New Holland North America, Inc.*, 493 S.E.2d 516, 520 (Va. 1997). The contract, however, did not allow this. Jacobs had complete, unilateral control over its billings. Jacobs was obligated to act in good faith in exercising the unilateral discretion allowed by the contract.

The situation in Colorado is straight forward.  "Every contract in Colorado contains an implied duty of good faith and fair dealing."  *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003).  Whether a party acted in good faith is a fact issue that must be determined on a case-by-case basis.  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 499 (Colo. 1995).

In *Tricon Kent Co. v. Lafarge North America, Inc.*, the Colorado Court of Appeals ruled that a no-damage-for-delay clause is unenforceable if the claimant can "show that the defendant committed an affirmative, willful act that unreasonably interfered with the [claimant's] performance of the contract, regardless whether it was undertaken in bad faith."  186 P.3d 155, 161 (Colo. App. 2008) (expressly adopting *Williams Electric*).  Thus Colorado, like Virginia and South Carolina, recognizes inherent limitations on the enforcement of limitation-of-liability clauses.

The facts of this case, construed in the light most favorable to Coors, show that Jacobs agreed not to bill for engineering and subcontractor rework and then did so.  Stonebraker Aff. ¶¶ 9-15; Gaudion Aff. ¶¶ 8-11; Sarsten Aff. ¶¶ 10-12.  This could not be the result of mere oversight or simple negligence.  Either Jacobs willfully failed to set up timekeeping procedures to capture the cost of engineering rework, or it set up such procedures and failed to enforce them.  Either way, performance of this obligation was solely under Jacobs' control.  Its failure to perform allowed it to obtain a benefit that it expressly gave up when it made the contract.

It is undisputed that Coors approved and paid Jacobs' invoices.  But it did so trusting that Jacobs, its Alliance Partner, submitted bills that were in compliance with the Construction Services Agreement.  If Coors can show that Jacobs over billed and was overpaid by $50 million or more, should the amount Jacobs refunds to Coors be limited as a matter of law to Jacobs'

fee—approximately $4.3 million?  Coors contends that there are inherent constraints on limitation-of-liability provisions precluding summary judgment on this issue.

**VI.    Coors' tort claims are not barred by the economic loss rule because JEG and JCS had an independent duty of care.**

JEG and JCS, as engineering design professionals, owed Coors an independent duty of care in both Colorado and Virginia.  For that reason, the economic loss rule, as asserted by Jacobs in Part I of its motion, has no application to either contract.  The economic loss rule does not apply "where a plaintiff's tort claim is based on an independent duty of care."  *A.C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d 862, 867 (Colo. 2005).  *See also, Filak v. George*, 594 S.E.2d 610, 613 (Va. 2004) (Virginia economic loss rule bars claims if duty arises solely by contract rather than imposed by law.).

**A.    Colorado's economic loss rule does not bar claims based on an independent duty.**

The economic loss rule was adopted by the Colorado Supreme Court in *Town of Alma v. AZCO Construction, Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).  In that construction defects case the owner sued its contractor for negligence and breach of contract.  The court barred the owner's negligence claim under the economic loss rule, which it summarized as follows: "[A] party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach *absent an independent duty of care under tort law.*"  *Id.* (emphasis added).  The court further explained that "where we have recognized the existence of a duty *independent* of any contractual obligations, the economic loss rule has no application and does not bar a plaintiff's tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule."  *Id.* at 1263 (emphasis in original);

*see also A.C. Excavating*, 114 P.3d at 867-68; *Level 3 Communications, LLC v. Liebert Corp.*, 535 F.3d 1146, 1162 (10th Cir. 2008) (Colorado's economic loss rules does not bar a claim for negligent misrepresentation where independent duty exists.).

> **1.      JEG owed Coors a statutory duty of care under Colorado law independent of the Alliance Agreement.**

Colorado regulates the practice of engineering "to safeguard life, health, and property and to promote the public welfare."  C.R.S. § 12-25-101.  Engineers have a duty to exercise "independent professional judgment in rendering professional services for the client."  Dep't of Regulatory Agencies Rule 3.6.1, 4 Colo Code. Regs. 730-1.  Under Colorado statutory law, engineers are required to comply with "generally accepted standards of engineering practice." C.R.S. § 12-25-108(1)(b).

JEG, as a regulated professional engineering corporation working in Colorado, owed Coors a statutory duty independent and separate from the Alliance Agreement.

> **2.      JEG owed Coors a common-law duty of care under Colorado law independent of the Alliance Agreement.**

Colorado courts have repeatedly found that construction professionals have an independent duty of care to their employer to "exercise the ordinary skill and competence of members of their profession, and a failure to discharge that duty will subject them to liability for negligence." *Metropolitan Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 318 (Colo. 1981).

In a case remarkably similar to the present case, the Colorado Supreme Court recognized an independent duty of care owed by a design professional to a property owner. *Kellogg v. Pizza Oven, Inc.*, 402 P.2d 633, 635 (Colo. 1965).  In *Kellogg*, the owner sued its architect for

negligence, alleging that the architect failed to properly estimate the cost of a project and failed to adequately supervise the project's construction.  The Colorado Supreme Court held that the architect was required by common law to furnish reliable information in estimating project cost:

> An architect who substantially underestimates, through lack of skill and care, the cost of a proposed structure, which representation is relied upon by the employer in entering in the contract and proceeding with construction, may not only forfeit his right to compensation, but may become liable to his employer for damages.

*Id.*

Numerous Colorado decisions have followed *Kellogg* in recognizing the independent duty of care imposed on design professionals.  *See, e.g., Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1271 n.4 (Colo. 2000) ("In [Kellogg] we recognized that an undisputed independent duty of care supported the negligence action."); *see also Morrison v. City of Aurora*, 745 P.2d 1042, 1045-46 (Colo. App. 1987) (providing specifications and design for pipe gives rise to tort duty despite existence of contract); *Jim Arnott, Inc. v. L & E, Inc.*, 539 P.2d 1333, 1339 (Colo. App. 1975) (architect may be liable for underestimated total cost of project if architect's estimating error was substantial); *Perlmutter v. Flickinger*, 520 P.2d 596, 597 (Colo. App. 1974) (architect has duty to use degree of knowledge, skill, and judgment ordinarily possessed by architects, and to perform faithfully and diligently any service undertaken as an architect in the manner a reasonable and prudent architect would under the same or similar circumstances).

JEG, as a design professional, owed Coors the duty of care recognized by *Kellogg*— independent of any duties assumed by JEG under the terms of the Alliance Agreement.  *See Town of Alma*, 10 P.3d at 1262 (Colorado law recognizes that tort obligations arise from independent duties of care that are imposed by law without regard to any agreement or contractual relationship.).

**3.**      **Jacobs' reliance on *BRW, Inc. v. Dufficy & Sons, Inc.* is misplaced.**

Jacobs fails to address either Colorado's statutory duty of care or *Kellogg's* common-law

duty of care—even though *Kellogg* is an acknowledged exception to the economic loss rule.

*Grynberg,* 10 P.3d at 1271; *Jardel Enterprises, Inc. v. Triconsultants, Inc.*, 770 P.2d 1301, 1304

(Colo. App. 1988) (*Kellogg* "is distinguishable from this case because it falls within an exception

to the general economic loss rule.").

Relying on *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004), Jacobs argues

that the economic loss rule bars a tort claim, despite an independent duty, whenever a contract

sets forth the duty of care to be exercised by the parties.  (Jacobs' Mot. at 9).  But *BRW* is an

outlier.  It is both inconsistent with and distinguishable from the Colorado Supreme Court

decisions of *A.C. Excavating; Town of Alma; Metropolitan Gas; Cosmopolitan Homes v. Weller*,

663 P.2d 1041, 1042 (Colo. 1983); and *Lembke Plumbing and Heating v. Hayutin*, 366 P.2d 673,

675 (Colo. 1961).

The *BRW* court concluded that a duty of care memorialized in a contract "preempts" the

court's need to inquire into whether an independent duty of care exists at common law.  *BRW*, 99

P.3d at 74.  But *A.C. Excavating*, decided after *BRW*, and *Town of Alma*, where the economic

loss rule was adopted, focused on whether an independent duty of care existed outside of a

contract, not on what duty of care was memorialized within the contract.

The Alliance Agreement did not expressly memorialize Jacobs' duty not to

underestimate, "through lack of skill and care, the cost of a proposed structure, which

representation is relied upon by the employer in entering in the contract and proceeding with

construction." *Kellogg*, 402 P.2d at 635.  Even if it had, the mere existence of a contractual duty

of care does not bar a tort claim under *A.C. Excavating* and *Town of Alma*.  The Colorado

Supreme Court did not apply *BRW's* "preemption" approach to the economic loss rule when it

decided *A.C. Excavating*, a year after *BRW* was issued.  The Tenth Circuit has recognized that

*BRW* does not bar tort claims based on an independent duty.  *Level 3 Communications, supra;*

*Colorado Visionary Acad. v. Medtronic, Inc.*, 397 F.3d 867, 869-74 (10th Cir. 2005).

>    **4.      Coors' negligent misrepresentation claim against JEG is not barred by
>              Colorado's economic loss rule.**

JEG represented to Coors that the Project's total installed cost would be approximately

$210.5 million.  Stonebraker Aff. ¶¶ 4-5 and Tab B.  JEG also represented to Coors that there

was a 100% probability that the Project's cost would not exceed $222.932 million.  Stonebraker

Aff. ¶ 6 and Tab C.  JEG provided this information knowing it would be used by Coors to decide

whether to go forward with the Project.  Puffer Aff. ¶¶ 4-13.  Coors, relying upon JEG's

representations, entered into the Construction Services Agreement with JCS.  Puffer Aff. ¶ 14.

The Project's cost exceeded $330 million.  Stonebraker Aff. ¶ 7.

In *Colorado Visionary Academy*, the Tenth Circuit, applying Colorado law, held that "the

tort of negligent misrepresentation can arise from ordinary, arm's length bargaining that was

expected to lead to a contractual relationship."  397 F.3d at 874.  The Tenth Circuit reversed the

district court's holding that Colorado Visionary Academy's negligent misrepresentation claim

was barred by Colorado's economic loss rule.

In *Level 3 Communications,* the Tenth Circuit expressly stated that *BRW* does not bar a

negligent misrepresentation claim where the duty of care exists independent of the parties'

contract obligations.  535 F.3d at 1162-63.

**B.**    **Coors' breach of fiduciary duty claim against JEG is not barred by Colorado's economic loss rule.**

Coors' breach of fiduciary duty claim is not barred by Colorado's economic loss rule, because JEG owed Coors a fiduciary duty that was separate and independent of its duties under the Alliance Agreement.

**1.**    **The Coors-Jacobs relationship was fiduciary in nature.**

Coors and Jacobs have a long-standing business relationship of trust, confidence, and reliance, arising from a long-standing professional relationship under which Jacobs performs engineering services for Coors. Puffer Aff. ¶¶ 4-6. Jacobs was in control of engineering, project management, estimating, procurement, construction management, and administrative services on particular Coors' capital projects. Puffer Aff. ¶ 6. Jacobs was responsible for advising on the cost of certain Coors' projects, including the Project that is the subject matter of this suit. Puffer Aff. ¶¶ 7, 11, 13. Jacobs assumed these responsibilities and represented Coors' interests in these projects. Puffer Aff. ¶¶ 6-11, 13. Coors trusted Jacobs to perform its responsibilities and had confidence in Jacobs based upon Jacobs' proven track record on Coors' projects. Puffer Aff. ¶ 8. Coors, in reliance upon Jacobs' expertise, reduced the size of Coors' engineering staff. Puffer Aff. ¶ 12. Coors approved the implementation of the design and construction of the Project based upon Jacobs' representations concerning the Project's total cost. Puffer Aff. ¶ 14.

In Colorado, a "fiduciary" is "a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with the undertaking." *Destefano v. Grabrian*, 763 P.2d 275, 284 (Colo. 1988). A fiduciary relationship exists when one party is under a duty to act for or give advice for the benefit of another upon matters within the scope of

their relationship. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1163 (10th Cir. 2000) (applying Colorado law). "A fiduciary relationship can arise when one party occupies a superior position relative to another. It may be based upon a professional, business, or personal relationship." *Id.* A party in a fiduciary relationship is "subject to liability to the other for harm resulting from a breach of duty imposed by the relationship." *Destefano*, 763 P.2d at 284.

In Colorado, "the economic loss rule applies only to tort claims based on negligence, and only to *some* negligence claims." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226 (10th Cir. 2000) (emphasis in original) (applying Colorado law). In *United*, the defendant assumed that Colorado's economic loss rule barred all claims related to a contractual transaction except breach of contract claims. *Id.* The Tenth Circuit found that assumption to be "erroneous," and held that a claim for breach of fiduciary duty was not barred by the economic loss rule because the "claim arose not from the contract but from the parties' status as joint venturers." *Id.* at 1226-27. Here, Jacobs makes the same erroneous assumption.

> **2.    The specific facts of Jacobs' dealings with Coors show a fiduciary relationship.**

In *Vikell Investors Pacific, Inc. v. Kip Hampden, Ltd.*, the Colorado Court of Appeals upheld a trial court's finding that a geotechnical engineer did not owe a fiduciary duty to its client. 946 P.2d 589 (Colo. App. 1997). The reasoning of the case, however, shows that Jacobs did owe a fiduciary duty to Coors under the facts and circumstances here.

In *Vikell*, a property owner sued its geotechnical consultant, Morris, for breaching his fiduciary duty owed to the owner by failing to disclose that he was aware of the conditions

causing damage to the owner's property.  The court found that no fiduciary relationship existed between the owner and Morris because Morris was just one of many members of a team of engineers that worked for the owner, Morris rarely spoke to the owner, and Morris had very little control over the owner's project.  *Id.* at 597.  Morris did not have a relationship of trust and confidence with the owner, nor did the owner relax its control over the project in reliance on Morris.

In stark contrast to the relationship in *Vikell*, Coors placed a high degree of trust in JEG to perform estimating, engineering, and other services.  Puffer Aff. ¶¶ 10, 11.  Coors relied on JEG's higher degree of skill and expertise and believed, based on the nature of their relationship, that JEG would look out for Coors' best interest.  Puffer Aff. ¶¶ 8-11.  JEG, unlike Morris, was responsible for all of the engineering and construction on the Project.  Puffer Aff. ¶ 15.  Moreover, the trust established between Coors and JEG induced Coors to relax the care and vigilance it would otherwise have exercised.  Puffer Aff. ¶ 12.

### 3.    Finding a fiduciary relationship is fact dependent.

In Colorado, the existence of a fiduciary relationship is generally a question of fact.  *Atlantic Richfield*, 226 F.3d at 1162-63.  Many different relationships can create fiduciary responsibilities under particular facts and circumstances.  *Id.  See, e.g., Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 517-18 (Colo. 1986) (declining to "adopt a rule that a stockbroker/customer relationship is, per se, fiduciary in nature," and holding that the existence of any fiduciary obligations turns on "proof of circumstances"); *Bohrer v. DeHart*, 943 P.2d 1220, 1225 (Colo. App. 1996) (remarking that a clergy-parishioner relationship "may be fiduciary in nature," depending on the facts of the case); *Dolton v. Capitol Fed. Sav. and Loan*

*Ass'n*, 642 P.2d 21, 23 (Colo. App. 1981) ("While there is no per se fiduciary relationship between a borrower and lender, a fiduciary duty may arise from a business or confidential relationship…."). These cases show that "the existence of a fiduciary or confidential relationship is generally a question of fact for the jury." *Elk River Assocs. v. Huskin*, 691 P.2d 1148, 1152 (Colo. App. 1984); *see also Winkler v. Rocky Mountain Conference of the United Methodist Church*, 923 P.2d 152, 157 (Colo. App. 1995) ("Whether a fiduciary relationship exists is a question of fact to be resolved by the jury.").

In *Atlantic Richfield*, the Tenth Circuit ruled that the district court "erred when it entered summary judgment as a matter of law on the defendants' fiduciary duty claims," because there were material facts at issue on whether a fiduciary relationship existed. *Atlantic Richfield*, 226 F.3d at 1163.

Jacobs' argument that Coors' breach of fiduciary duty claim should be dismissed is based solely on *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004). Jacobs' reliance on *BRW* is misplaced because there was no breach of fiduciary duty claim in that case. The defendant in *BRW* brought claims for negligence and negligent misrepresentation. *Id.* at 67. The court, therefore, had no reason to look at the facts and circumstances to determine whether a fiduciary relationship existed independent of the contract.

The facts presented by Coors, taken as true for purposes of summary judgment, support a finding of an independent fiduciary duty arising from the relationship between the parties. A claim for breach of that duty is not subject to the economic loss rule. *See United Int'l Holdings,* 210 F.3d at 1226 (fiduciary duty arose from parties' relationship not their contract).

**C.      Virginia law recognizes an independent duty of care for engineering design professionals.**

Virginia statutory law, like that of Colorado, imposes an independent duty of care on an engineer to adhere to the minimum standards of its profession when providing services.  A claim for breach of this duty is not barred by the Virginia economic loss rule.

For Coors to pursue a tort claim under Virginia law, it need only show that the "duty tortiously or negligently breached [is] a common law duty, not one existing between the parties solely by virtue of the contract." *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d. 344, 347 (Va. 1998).  Virginia law recognizes that an independent duty of care "may arise from statute, from a municipal ordinance, or from the relation of the parties." *Rice v. Turner*, 62 S.E.2d. 24, 26 (Va. 1950).

Virginia regulates the practice of engineering.  Va. Code Ann. §§ 54.1-100 *et seq.*, 54.1-400 *et seq.*; 18 Va. Admin. Code 10-20 *et seq.*  Professional engineers have a duty to protect the health, safety, and welfare of the general public.  18 Va. Admin. Code 10-20-690.  An engineer must "adhere to the minimum standards and requirements pertaining to the practice of his own profession." 18 Va. Admin. Code 10-20-730(C).  These duties are separate and independent of any contractual duties.

JCS, as a provider of engineering services operating in the state of Virginia, was subject to the standards established for design professionals under Virginia law.  Virginia statutory law imposed an affirmative duty on JCS, separate and apart from the Construction Services Agreement, to exercise a minimum degree of skill and competence in designing and constructing the Project.  Because that duty arose independently from any duty imposed by the Construction

Services Agreement, Coors' claim for breach of that duty is not barred by the economic loss rule. *Richmond Metro*, 507 S.E.2d at 347.

## VII.   Coors' unjust enrichment claims should not be dismissed.

Jacobs did not have a "blank check" to spend Coors' money for work that was not an allowable cost under the contract.   Jacobs billed Coors approximately $50 million for design omission, schedule recovery, field conditions, and rework, some or all of which were not permissible costs under the terms of the Construction Services Agreement.   Stonebraker Aff. ¶¶ 11-14 and Tab D; Gaudion Aff. ¶¶ 8-11; Sarsten Aff. ¶¶ 10-12.   Coors' unjust enrichment claims against Jacobs are not barred because (a) Jacobs was unjustly enriched by its material and opportunistic breach, and (b) Jacobs billed for work that was outside the contract.

## A.   Jacobs was unjustly enriched by its material and opportunistic breach.

Colorado courts have repeatedly relied on the Restatement of Restitution (1937).   *See, e.g., Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008); *DCB Constr. Co., Inc. v. Cent. City Dev. Co.*, 965 P.2d 115, 121-22 (Colo. 1998); *In re Marriage of Allen*, 724 P.2d 651, 656-60 (Colo. 1986).   Virginia courts also recognize as authoritative the Restatement of Restitution.   *Faulknier v. Shafer*, 563 S.E.2d 755, 759-60 (Va. 2002); *Miller v. Quarles*, 410 S.E.2d 639, 642 (Va. 1991); *Sachs v. Tavss*, 375 S.E.2d 719, 720-22 (Va. 1989).

The American Law Institute has tentatively approved the Restatement (Third) of Restitution and Unjust Enrichment (Tentative Draft No. 4, 2005).   The Tenth Circuit, applying Colorado law, recently cited with approval the Restatement (Third) of Restitution in an unjust enrichment case.   *Van Zanen v. Qwest Wireless, L.L.C.*, 522 F.3d 1127, 1131 (10th Cir. 2008).

The Colorado Court of Appeals recognized the Restatement (Third) in *Skyland Metropolitan District v. Mountain West Enterprise, LLC*, 184 P.3d 106, 130 (Colo. App. 2007).  It is reasonable to conclude that Virginia would do so as well.

Section 39 of the Restatement (Third) is "Profit Derived From Opportunistic Breach." This section recognizes that an injured promisee is entitled to disgorgement of profits as an alternative remedy if a breach is deliberate and profitable and if contract damages are an inadequate remedy.  Restatement (Third) of Restitution and Unjust Enrichment § 39 (Tentative Draft No. 4, 2005).  A breach is "profitable" when it results in gains to the defaulting promisor (net of liability in damages) greater than the promisor would have realized from performance of the contract.  *Id.*

In *EarthInfo, Inc. v. Hydrosphere Resource Consultants, Inc.*, the Colorado Supreme Court held that there is no rule that disgorgement is unavailable as a remedy for breach of contract.  900 P.2d 113, 120 (Colo. 1995).  The court stated that because "[n]o easy formulas exist for determining when restitution of profits … is permissible … the court must resort to general considerations of fairness." *Id.* at 119.

Here, the facts show that Jacobs failed to put in place the cost controls necessary to comply with its contract obligation not to bill Coors for its or its subcontractors' rework.  As a direct result, Jacobs billed Coors approximately $50 million for design omission, schedule recovery, field conditions, and rework, some or all of which were not permissible costs under the contract.  Coors seeks to have the improperly billed monies returned, and Jacobs argues that Coors is limited to contract damages, that is, repayment of Jacobs' contract fee.  Jacobs was or should have been aware that its failure to put adequate cost controls in place would inure to its

benefit and Coors' detriment.  This is the essence of a deliberate breach.  To have committed a

deliberate breach under the impression that its liability was limited to its fee was also to commit

a patently opportunistic breach.  Jacobs' actions were unjust, and Coors is entitled to

disgorgement of Jacobs' profits from its opportunistic breach as an alternative remedy to contract

damages.

**B.      Jacobs billed for work that was outside the contract.**

Jacobs argues that courts generally refuse to entertain unjust enrichment claims when

there is an express agreement between the parties.  (Jacobs' Mot. at 13).  Jacobs admits that the

common law recognizes two exceptions to this general rule, and allows recovery if (1) the party

will have no right under an enforceable contract, for instance, because an express contract failed

or was rescinded, or (2) the unjust enrichment claim covers conduct outside the express contract

or matters arising subsequent to the express contract.  (Jacobs' Mot. at 13-14).  Coors' unjust

enrichment claims arise under both exceptions because (1) the Reperformance Clause fails of its

essential purpose, and (2) Jacobs billed Coors for work outside the express contract.  Stonebraker

Aff. ¶¶ 11-14 and Tabs D-E; Gaudion Aff. ¶¶ 8-11; Sarsten Aff. ¶¶ 10-12.

Unjust enrichment is an equitable remedy and does not depend on any contract, oral or

written.  *Lewis,* 189 P.3d at 1141.  Unjust enrichment involves a mixed question of fact and law.

*Id.* at 1140.  "Unjust enrichment claims require that courts make extensive factual findings to

determine whether a party has been unjustly enriched."  *Id.*  Summary judgment is not

appropriate on Coors' unjust enrichment claims.

## Conclusion

Jacobs' motion should be denied because:

(1)    The parties did not intend to limit Jacobs' liability for improper billings.

(2)    Virginia law prohibits the contractual limitation of an engineer's liability.

(3)    The Construction Services Agreement's limitation-of-liability provision is unenforceable under the *Kocinec* test.

(4)    The Alliance Agreement's exclusive remedy provision fails of its essential purpose and is unenforceable.

(5)    Jacobs' actions violated inherent limitations on contractual limitation-of-liability provisions.

(6)    The economic loss rule does not apply because Jacobs owed Coors an independent duty of care.

(7)    Jacobs was unjustly enriched by its material and opportunistic breach, it billed Coors for work outside the contracts, and it is unjust for Jacobs to keep Coors' money.

There are genuine issues of material fact, and on the undisputed facts Jacobs is not entitled to judgment as a matter of law.  Coors urges the Court to deny Jacobs' motion and send this case to trial on the merits.

Respectfully submitted this 16th day of January, 2009.

s/ Charles W. Surasky
Charles W. Surasky
cwsurasky@smithcurrie.com
Robert C. Chambers
rcchambers@smithcurrie.com
John M. Mastin, Jr.
jmmastin@smithcurrie.com
SMITH, CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Avenue NE
Atlanta, Georgia 30303-1227
Telephone: 404-521-3800

Facsimile: 404-688-0671

Randall H. Miller
Randall.Miller@hro.com
James N. Phillips
James.Phillips@hro.com
**HOLME ROBERTS & OWEN LLP**
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203-4541
Telephone: 303-861-7000
Facsimile: 303-866-0200

ATTORNEYS FOR PLAINTIFF
COORS BREWING COMPANY

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 16th day of January, 2009, I electronically filed the foregoing **COORS' RESPONSE IN OPPOSITION TO JACOBS' MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which sent notification via email upon:

David G. Palmer
Email:  PalmerDG@gtlaw.com
Michael R. Davis
Email:  DavisM@gtlaw.com
**GREENBERG TRAURIG LLP**
1200 17th Street, Suite 2400
Denver, CO 80202
Tel:  303-572-6500
Fax:  303-572-6540

Neal S. Manne
Email:  NManne@susmangodfrey.com
Geoffrey L. Harrison
Email:  GHarrison@susmangodfrey.com
Shawn L. Raymond
Email:  SRaymond@susmangodfrey.com
**SUSMAN GODFREY LLP**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Tel:  713-651-9366
Fax:  713-654-6666

Stephen Shackelford, Jr.
SShackelford@susmangodfrey.com
Manuel G. Berrelez
MBerrelez@ susmangodfrey.com
**SUSMAN GODFREY LLP**
901 Main Street, Suite 5100
Dallas, TX 75202-3775
Tel:  214-754-1900
Fax:  214-754-1993

**s/ John M. Mastin, Jr.**
John M. Mastin, Jr.
jmmastin@smithcurrie.com

**SMITH, CURRIE & HANCOCK LLP**
2700 Marquis One Tower
245 Peachtree Center Avenue NE
Atlanta, Georgia 30303-1227
Telephone: 404-521-3800
Facsimile: 404-688-0671