IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-00985-RPM

Coors Brewing Company,

        Plaintiff,

v.

Jacobs Engineering Group Inc.,
Jacobs Construction Services, Inc.,

        Defendants.

---

### Jacobs' Reply
### In Support of Its Motion for Partial Summary Judgment
### (1) Against Coors' Tort Claims and
### (2) Enforcing the Contracts' Limitation of Liability Clauses

---

<u>Table of Contents</u>

Table of Contents ................................................................................................................. ii

Table of Authorities ............................................................................................................ iv

I.    Coors' Atmospherics .................................................................................................2

    A.    Coors' Response Focuses on Alleged "Facts" that are Irrelevant to the Determination of this Motion for Partial Summary Judgment .............................. 2

    B.    Coors' Response Does Not Accurately Present the (Irrelevant) Alleged "Facts" on which Coors Relies .................................................................... 3

        1.    Coors' Allegation about "$50-85 Million in Overbilling" is Demonstrably Incorrect and Unsupported by Proper Evidence ............... 4

        2.    Coors' Allegation about Jacobs' Project Cost Estimate is Misleading at Best ........................................................................................ 10

II.    Coors' Tort and Unjust Enrichment Claims Fail as a Matter of Law ...................... 13

    A.    Coors' Tort Claims Fail under Colorado Law ...................................................... 13

    B.    Coors' Tort Claims Fail under Virginia Law ....................................................... 19

    C.    Coors' Unjust Enrichment Claims Fail ................................................................ 20

III.    The Limitation of Liability Clauses are Valid and Enforceable ............................. 23

    A.    Coors Does Not Plausibly Challenge Jacobs' Interpretation of the Project Agreement ...................................................................................... 23

        1.    Applying § 23.2's Limitation of Liability Clause as Written Does Not Render the Project Agreement "Absurd" or "Meaningless" .................................................................................... 24

        2.    Section 23.2's Limitation of Liability Clause Expressly Covers Coors' Claims Against JEG ......................................................... 26

    B.    Section 23.2's Limitation of Liability Clause is Enforceable .............................. 27

        1.    Coors Ignores the Actual Language and Relevant Legislative History of Virginia Code § 54.1-411 ...................................................... 27

2.      Section 23.2's Limitation of Liability Clause Easily
        Satisfies *Kocinec* .................................................................................31

3.      Coors Offers No Other Legal Authority against Enforcing
        the Project Agreement's Limitation of Liability Clause............................35

C.      The Reperformance Clause in the Alliance Agreement is Enforceable ............... 36

D.      The Alliance Agreement's Clause Barring Contingent, Consequential
        or Other Indirect Damages Applies .................................................................... 41

IV. Conclusion ...............................................................................................................41

Certificate Of Service .......................................................................................................43

Table of Authorities

<u>Federal Cases</u>

*Alpine Bank v. Hubbell,*
   506 F. Supp. 2d 388 (D. Colo. 2007)................................................................. 18

*Aluminum Co. of Am. v. Electro Flo Corp.,*
   451 F.2d 1115 (10th Cir. 1971) ....................................................................... 37

*Colorado Visionary Acad. v. Medtronic, Inc.,*
   397 F.3d 867 (10th Cir. 2005) ......................................................................... 17

*Frank Brunckhorst Co., L.L.C. v. Coastal Atlantic, Inc.,*
   542 F. Supp. 2d 452 (E.D. Va. 2008) ............................................................... 21

*Kocinec v. Public Storage, Inc.,*
   489 F. Supp. 2d 555 (E.D. Va. 2007) ......................................................... passim

*Level 3 Communications, LLC v. Liebert Corp.,*
   535 F.3d 1146 (10th Cir. 2008) ....................................................................... 17

*Lutz Farms v. Asgrow Seed Co.,*
   948 F.2d 638 (10th Cir. 1991) ......................................................................... 39

*Matthiesen v. Banc One Mortgage Corp.,*
   173 F.3d 1242 (10th Cir. 1999) ......................................................................... 9

*Micale v. Bank One N.A. (Chicago),*
   382 F. Supp. 2d 1207 (D. Colo. 2005).............................................................. 19

*Otis Elevator Co. v. Midland Red Oak Realty, Inc.,*
   483 F.3d 1095 (10th Cir. 2007) ....................................................................... 21

*U.S. v. Simpson,*
   7 F.3d 186 (10th Cir. 1993) ............................................................................. 10

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.,*
   210 F.3d 1207 (10th Cir. 2000) ....................................................................... 18

*Wenzel v. Boyles Galvanizing Co.,*
   920 F.2d 778 (11th Cir. 1991) ......................................................................... 34

<u>State Cases</u>

*A.C. Excavating v. Yacht Club II Homeowners Ass'n,*
   114 P.3d 862 (Colo. 2005) ................................................................... 15

*Ash v. All Star Lawn and Pest Control, Inc.,*
   506 S.E.2d 540 (Va. 1998) .................................................................. 34

*Augusta Mutual Ins. Co. v. Mason,*
   645 S.E.2d 290 (Va. 2007) .................................................................. 20

*Blake Construction Co. v. Alley,*
   353 S.E.2d 724 (Va. 1987) .................................................................. 19

*BRW Inc. v. Dufficy & Sons, Inc.,*
   99 P.3d 66 (Colo. 2004) ................................................. 15, 16, 17, 19

*C&O Railway Co. v. Clifton Forge-Waynesboro Tel. Co.,*
   224 S.E.2d 317 (Va. 1976) .................................................................. 31

*Cary v. United of Omaha Life Ins. Co.,*
   68 P.3d 462 (Colo. 2003) .................................................................... 41

*Charles E. Brauer Co., Inc. v. NationsBank of Virginia, N.A.,*
   466 S.E.2d 382 (Va. 1996) .................................................................. 36

*Colorado Carpet Installation, Inc. v. Palermo,*
   668 P.2d 1384 (Colo. 1983) ................................................................ 37

*Cooley v. Big Horn Harvestore Sys., Inc.,*
   813 P.2d 736 (Colo. 1991) .................................................................. 39

*Cosmopolitan Homes, Inc. v. Weller,*
   663 P.2d 1041 (Colo. 1983) ................................................................ 16

*Curragh Queensland Mining Ltd. v. Dresser Indus.,*
   55 P.3d 235 (Colo. App. 2002) ........................................................... 39

*Davis v. Norfolk S. Ry. Co.,*
   2003 WL 21536815 (Va. Cir. Ct. June 6, 2003) ................................. 32

*Dufficy & Sons, Inc. v. BRW, Inc.,*
   74 P.3d 380 (Colo. App. 2002) ........................................................... 17

*Dworak v. Olson Construction Co.,*
   551 P.2d 198 (Colo. 1976) ..................................................................... 21

*Filak v. George,*
   594 S.E.2d 610 (Va. 2004) ..................................................................... 20

*Interbank Invs., LLC v. Eagle River Water and Sanitation Dist.,*
   77 P.3d 814 (Colo. App. 2003) ............................................................... 22

*Kellogg v. Pizza Oven, Inc.,*
   402 P.2d 633 (Colo. 1965) ................................................................ 15, 16

*Metropolitan Gas Repair Serv., Inc. v. Kulik,*
   621 P.2d 313 (Colo. 1981) ..................................................................... 14

*Myers v. Mid-West National Life Ins. Co.,*
   2008 WL 4002429 (D. Colo. Aug. 25, 2008) ........................................ 10

*School Bd. of Chesterfield County v. School Bd. of City of Richmond,*
   247 S.E.2d 380 (Va. 1978) ..................................................................... 30

*Sensenbrenner v. Rust, Orling & Neale,*
   374 S.E.2d 55 (Va. 1988) ....................................................................... 19

*Smith v. Union Supply Co.,*
   675 P.2d 333 (Colo. App. 1983) ............................................................. 39

*Southern Biscuit Co. v. Lloyd,*
   6 S.E.2d 601(Va. 1940) .......................................................................... 21

*Town of Alma v. Azco Construction, Inc.,*
   10 P.3d 1256 (Colo. 2000) ....................................................... 14, 16, 18, 19

*Trumball Invs., Ltd. v. Wachovia Bank, N.A.,*
   2005 U.S. Dist. LEXIS 7195 (E.D. Va. Apr. 15, 2005) ...................... 34, 35

*Virginia Dep't of Labor and Industry v. Westmoreland Coal Co.,*
   353 S.E.2d 758 (Va. 1987) ..................................................................... 30

Statutes

C.R.S. § 12-25-108(1)(b) ............................................................................ 14

Virginia Code § 2.2-4335(A) ...................................................................... 32

Virginia Code § 54.1-411 ............................................................... 25, 27, 28

Defendants Jacobs Engineering Group Inc. ("JEG") and Jacobs Construction Services, Inc. ("JCS," and collectively with JEG, "Jacobs") respectfully submit this Reply in support of Jacobs' Motion for Partial Summary Judgment.

In its Response, Coors does not dispute that it is a sophisticated party, actively negotiated the limitation of liability provisions at issue while represented by counsel, and agreed to those provisions in a written, signed contract. Instead, Coors complains that it would be unfair to limit Jacobs' potential liability to its approximately $4.3 million fee in accordance with the parties' contractual agreement, when Coors hopes to seek as much as $85 million in damages. *See, e.g.,* Response at 2, 12-13, 21, 29-30, 33-34. Of course, that is precisely the point of this (and nearly every) limitation of liability provision – to limit a party's potential recovery to an amount lower than what it otherwise could seek.

Coors does not cite any case, statute, or contract provision that makes the amount of its hoped-for damages relevant to whether the contractual limitations of liability should be enforced. Instead, Coors ignores or misconstrues the controlling contract language, statutory language and case law, and in several instances simply ignores Jacobs' key legal arguments, effectively conceding their validity.

Coors also makes irrelevant (and inaccurate) allegations of fact, hoping to create "genuine issues of material fact" where none exist. Even if Coors' irrelevant allegations were accepted as true – they are not – Jacobs still would be entitled to partial summary judgment as a matter of law. The controlling law does not countenance Coors' fundamentally unfair and unreasonable attempt to avoid the bargain to which these large, sophisticated parties represented by legal counsel agreed.

Part I of this Reply addresses certain of Coors' irrelevant allegations. What Coors calls "facts" really are irrelevant atmospherics that Coors hopes will distract from the controlling legal issues at hand. Part II addresses Coors' attempts to save its legally defective tort and unjust enrichment claims, and explains why these claims fail as a matter of law. Part III addresses the legal deficiencies in Coors' arguments against enforcing the parties' limitation of liability agreements, and confirms that the parties' agreements should be enforced as a matter of law.

I.

Coors' Atmospherics

Coors' Response focuses on two main allegations that Coors calls "factual": that enforcing the limitation of liability clause would allow Jacobs "to walk away with $50-85 million that Coors paid on improper bills," Response at 2, and that Jacobs "represented to Coors with 100% confidence that the total Project cost would not exceed $222.932 million," Response at 24. Neither allegation is at all relevant to the purely legal matters raised in Jacobs' Motion. But, given the importance Coors nevertheless attempts to attribute to these two allegations, Jacobs is also compelled to address their inaccuracy.

A.  Coors' Response Focuses on Alleged "Facts" that are Irrelevant to the Determination of this Motion for Partial Summary Judgment

Coors devotes much of its Response to complaining about the "$50-85 million" that Coors says Jacobs will "walk away with" if the parties' limitation of liability agreements are enforced. See, e.g., Response at 2, 12-13, 21, 29-30, 33-34. Indeed, the dominant theme of Coors' Response is that it would be "unfair" to limit Coors' potential damages to the agreed amount of Jacobs' fee when Coors wants to seek a much higher amount. Even if Coors could prove that Jacobs had improperly overcharged it in breach of the Project Agreement by $50-85

million – Coors can prove no such thing – such proof would have *no legal effect* on the enforceability of the Limitation of Liability Clause in § 23.2 of the Project Agreement.

The Limitation of Liability Clause limits Coors' potential recovery to the amount of Jacobs' profit or "fee" without regard to the amount of damages Coors hopes to seek or could prove. Coors has pointed to no contract language to the contrary, and Coors was unable to cite a single case in which a court disregarded a contractual limitation of liability because a plaintiff hoped to seek damages in excess of the agreed limit. Coors has likewise not cited any contract language that exempts claims for alleged "overbilling" from the Limitation of Liability Clause, and Coors has not cited any case in which a court declined to enforce a contractual limitation of liability because a plaintiff claimed it was "overbilled."

With respect to the Alliance Agreement, Coors says that Jacobs "represented to Coors with 100% confidence that the total Project cost would not exceed $222.932 million." Response at 5, 24. This allegation is legally irrelevant to the disposition of Jacobs' Motion for Partial Summary Judgment. Again, Coors has not cited any contract language that exempts Jacobs' work on the cost estimate – which Coors alleges Jacobs performed under the Alliance Agreement – from the Alliance Agreement's Reperformance Clause, and Coors has not cited any case in which a court declined to enforce a contractual limitation of liability clause because a plaintiff claimed that estimation work performed pursuant to the contract was inaccurate.

B.    Coors' Response Does Not Accurately Present the (Irrelevant) Alleged "Facts" on which Coors Relies

Coors' allegations of "fact" are not relevant to the proper disposition of Jacobs' motion for partial summary judgment. Even so, Coors' attempt to distract from the controlling contract language and controlling law creates misimpressions that should be cleared up.

928058v1/010479                                      3

1.    Coors' Allegation about "$50-85 Million in Overbilling" is Demonstrably
      Incorrect and Unsupported by Proper Evidence

Coors alleges that Jacobs will "walk away with $50-85 million that Coors paid on improper bills" if the Limitation of Liability Clause is enforced.  Even if Coors were correct – it is not – that Jacobs had improperly billed it for $50-85 million, the only money that Jacobs "walk[ed] away with" *on the entire $333 million project*, after paying the project expenses at cost, is Jacobs' $4.3 million fee (of which Coors still owes approximately $1.6 million).

Under the Project Agreement, Coors paid Jacobs on a "Cost Plus Fee (Fixed And Incentive) Basis" in which Jacobs was to receive a "maximum Fee of 1.3% of Total Installed Cost." *See* Project Agreement, Ex. A.  Thus, while Coors alleges in ¶ 40 of its Complaint that the Total Installed Cost of the project was over $333 million, Coors was to pay only 1.3% (or $4.3 million out of this $333 million) as Jacobs' fee, and the remaining 98.7% ($328.7 million) as reimbursement for actual costs that Jacobs paid for labor, subcontractors, equipment, engineering and design work, and other items on which Jacobs did not make any fee or profit.[1] *See id.*  That, of course, is how a "cost-plus-fee" construction contract works.  Coors' allegation that enforcement of the Limitation of Liability Clause would permit Jacobs to "walk away with $50-85 million that Coors paid on improper bills" cannot be true given the contract's cost-plus-fee structure, even if Coors were correct about the alleged improper billing.

Yet Coors' allegation of "improper billing," while irrelevant to this Motion, is itself

---

[1] Coors takes considerable liberties with the "facts," for example, when it sums up as "fact" that "Jacobs' overhead recovery from its mark-up on its engineering rework and additional construction administration to deal with the field impact of engineering errors *may well have* exceeded the amount of JCS's fee." *See* Response at 8 ¶ 40 (all emphasis in this Reply is added).  This, in turn, is based on the affidavit of Coors' expert Gunnar E. Sarsten who, at ¶ 12, offers his "opinion that Jacobs *almost certainly* billed Coors for Jacobs' engineering rework" and who, at ¶ 13, offers his "*may well have*" opinion.

demonstrably *incorrect*.  Coors bases its "improper billing" allegation entirely on a pie chart (and supporting documents) that a Jacobs employee sent to Coors in February 2007.  *See* Response at 7-8, ¶¶ 32-39.  Coors opines that Jacobs "should not have billed Coors for all the costs associated with 'Design Omission, Revision, and Additions,' 'Schedule Recovery,' 'Field Conditions,' and 'Rework,'" which are four categories of project costs addressed in the pie chart.  Response at 8, ¶ 38.  But the Project Agreement, relevant subcontracts, and Coors' own documents say otherwise.

The category "Schedule Recovery" is defined in documents supporting the pie chart as "efforts to accelerate work activities to meet schedule milestones," while the category "Field Conditions" is defined as "[w]ork activities required as the result of a field condition (not design or fabricator)."  *See* Response, Ex. 2, Tab E.  The Project Agreement does *not* exempt Coors from having to pay such costs, and Coors does *not* explain why it should not have to do so.

As for the "Design Omissions, Revisions, and Additions" category, which is defined as "[w]ork activities required as a result of an omission in design" or "a change in the design," *see id.,* the Project Agreement provides in § 6.2(g) that with respect to Jacobs' own design errors, Jacobs' only responsibility to Coors is to, "without additional compensation, correct or revise any errors or deficiencies in the designs, drawings, or specifications provided pursuant to this Agreement."  The Project Agreement ***does not impose*** on Jacobs the obligation to pay for any "[w]ork activities" required to implement a corrected design.

Coors' own contemporaneous documents confirm that it knew that Jacobs would *not* be responsible for such charges.  On April 4 and 5, 2005 – just one week before the parties signed the April 11, 2005 Project Agreement – Coors' Vice President Flo Mostaccero and Coors' inside counsel Cynthia Goldman had an email exchange that discredits Coors' *post-litigation* position

(and discredits much of Goldman's affidavit filed in support of Coors' Response):

> From:  Mostaccero, Flo
> Sent:  Tuesday, April 5, 2005 5:51PM
> To:  Goldman, Cindy
> Subject:  Re:  Proposed modifications to Coors / Jacobs Jefferson Contract
>
> Cindy,
> . . . . Again, *the intent is forfeiture of fee* and re-do of *engineering* for free.  *Repair and replace costs will be by us.*  Please call me on my cell . . . .
>
> - - - - Original Message - - - - -
> From:  Goldman, Cindy Cindy.Goldman@coors.com
> To:  Mostaccero, Flo <Flo. Mostaccero@COORS.COM>
> Sent:  Mon Apr 04 20:32:18 2005
> Subject:  RE:  Proposed modifications to Coors / Jacobs Jefferson Contract
>
> Flo – I have reviewed the language proposed by [Jacobs' senior counsel Peter Loftspring] and I believe he is pushing for more than clarification in items numbered 3 and 4 [concerning "Section 17 (Warranty)" and "Section 23.2 (Limitation of Liability)"]. . . .

*See* Affidavit of Stephen Shackelford, Jr. ("Shackelford Aff."), Exhibit A-4, at Tab 1 (all emphasis in this Reply is added).

With respect to the pie chart's "Rework" category, which is defined as "[w]ork required to fix a problem that was the result of a subcontractor, fabricator or equipment supplier error," *see* Response, Ex. 2, Tab E, Coors failed to mention that *Coors expressly approved releasing two of the key subcontractors from liability for such "rework."*

- Section 7.4 of the subcontract for EnteGreat, Inc. ("EnteGreat") states: "Provided SUBCONTRACTOR is fulfilling its obligation to reperform the Work in an acceptable manner, SUBCONTRACTOR will have *no liability to JACOBS or OWNER for the repair and/or replacement costs associated with the Work.*" *See* Supplemental Affidavit of Steven R. Dickinson ("Supp. Dickinson Aff."), Exhibit A-5, at Tab 1.

- Section 7.3 of the subcontract for Briggs of Burton PLC ("Briggs") states: "Provided SUBCONTRACTOR is fulfilling its obligation to reperform the Work, SUBCONTRACTOR will have *no liability to JACOBS or OWNER for the repair and/or replacement costs associated with any item of supply, field installation, software, testing, commissioning or any other activity or cost other*

> *than such re-performance of the Work at no cost to JACOBS or OWNER."* *See* Supp. Dickinson Aff., Tab 2.

Coors' inside counsel Goldman signed a letter expressly authorizing Jacobs to include these specific contract provisions in the subcontracts, and expressly confirming that:

> *Coors has agreed* to modify the terms of Article 17 of the [Project] Agreement so that Briggs of Burton PLC ("Briggs") and EnteGreat Inc ("EnteGreat") including its subcontractor Emerson ("Engineers") retained by Contractor *shall not be required to warrant that they will remedy any defects and pay for any damage to the Project* resulting from faulty materials or workmanship other than engineering. The Engineers shall only be required to warrant re-performance of their defective Work during the warranty period and *will not be liable to Contractor or Coors for the repair and/or replacement costs associated with the Work,* other than such re-performance of engineering at no cost to Coors.

*See* Supp. Dickinson Aff., Tab 3.

Another inconvenient document that Coors omitted from its Response is the January 2007 Internal Project Audit by Coors and its parent MolsonCoors. On pages 2-3 of its Audit, Coors made several findings that flatly discredit its post-litigation "overbilling" allegations and reveal that, *before Coors chose to litigate,* it already had determined that:

- "The project required additional funds of approximately $72 million in July 2006. Approximately $56 million of the over spend is related to *industry driven inflation on labor and materials.* The remaining $16 million is the result of scope refinements, estimate overages and schedule extensions."

- *"The overall controls supporting the accuracy and validity of expenditures, accounting controls and controls over contract management were adequate.* Therefore, it is our opinion that the controls over the build-out of the Shenandoah Brewery are *satisfactory.* The following controls were reviewed and are working *effectively*:

    o   Jacobs controls surrounding contract management to ensure process for selection of sub-contractors and procurement are *adequate.*

    o   Jacobs controls over verification of sub-contractor invoices to ensure accuracy and validity of charges. Controls over the nature, type, and

frequency of audits performed over sub-contractors to ensure *adequate* coverage and independence. . . .

o   CBC [Coors Brewing Company] controls over capital approval of project and approval of change orders to ensure proper approval.

o   Controls surrounding sub-contractor expenditures to ensure what CBC pays for labor, equipment, materials, rental equipment, per diems, travel, and entertainment are *accurate and valid*.

o   Accuracy and validity of Jacobs expenditures including wages, salaries, overhead rates, purchasing, travel, and entertainment."

*See* Supp. Dickinson Aff., Tab 4.  Coors' *pre-litigation* conclusions about Jacobs – "working effectively," "satisfactory," "adequate," "accurate," "valid" – discredit Coors' *post-litigation* portrayal of Jacobs with such histrionic terms as "cheat," "steal," and "hide."  *See* Response at 13, 29.

The fact – while irrelevant – is that Jacobs kept Coors well informed about the escalating costs of the project every step of the way, and *Coors expressly and in writing knowingly approved every single penny spent on the project*:

- On August 13, 2006, Coors approved "Additional Funding" of $68,167,051.11, increasing total project funding from $210.6 million to $278.7 million.

  o   Coors signed a funding request that expressly stated the following: "The Shenandoah Brewery Project was originally estimated in October, 2004. Construction costs, primarily labor and materials, have seen double digit inflationary growth since that time.  Major materials, such as concrete, steel, stainless steel, copper and pipe have increased in price from 15% to 250%.  Labor demand has also significantly risen . . . .  This has impacted the quantity and quality of labor impacting productivity, costs, and schedules.  With the boom in construction, the project has also suffered from a non-competitive bidding environment.  All of this has resulted in an increase in forecast.  The increased cost can be summarized as follows: . . . Labor Total: $39.4M . . . Materials and Indirect Total $32.7M."  *See* Supp. Dickinson Aff., Tab 5.

- On February 26, 2007, Coors approved "Additional Funding" of $34,714,023, increasing the total project funding from $278.7 million to $313.5 million.

      o      Coors signed a funding request that stated the funding was "for the additional subcontractor staffing requirements due to productivity issues, additional scope, indirect costs, additional materials, and additional rental equipment." *See* Supp. Dickinson Aff., Tab 6.

- On April 6, 2007, Coors approved "Additional Funding" of $14.4 million, increasing the total project funding from $313.5 million to $327.9 million.

      o      Coors signed a funding request that noted the funding was "for the additional subcontractor staffing, material, and rental equipment requirements associated with design modifications, additional scope, productivity issues, and additional craft and engineering support of commissioning." *See* Supp. Dickinson Aff., Tab 7.

Now that Coors has sued Jacobs over these same bills it knowingly and willingly paid during the project, Coors cannot even muster proper summary judgment evidence in support of its overbilling allegations. In fact, the *only* evidence on this point that Coors offers are conclusory statements from two affiants that Coors hired as experts – an assertion by purported expert Neil A. Gaudion that "[u]nder the terms of the Construction Services Agreement and Jacobs' subcontracts, Jacobs ***should not have*** billed Coors for all the costs listed in ¶ 9 above" (which lists the four cost categories Coors challenges at page 8, ¶ 38 of its Response), and an assertion by purported expert Gunnar E. Sarsten that "Jacobs ***should not have*** billed Coors for all the costs associated with 'Design Omission, Revision, and Additions' and 'Rework.'" *See* Response at 8, ¶ 38 (citing only these two statements for support).

Conclusory statements in expert affidavits are not valid summary judgment evidence. *See, e.g., Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999); *Myers v. Mid-West National Life Ins. Co.*, Civ. No. 04-cv-00396, 2008 WL 4002429, at *2 (D. Colo. Aug. 25, 2008). Although the Gaudion and Sarsten affidavits briefly mention the Project Agreement and Gaudion's affidavit mentions the subcontracts, *neither* Gaudion *nor* Sarsten

offers *any* analysis explaining *why* the cited contracts support his opinion that Jacobs "should not have billed Coors" for certain costs.   Expert testimony carries no evidentiary weight "when an expert merely states an opinion on an ultimate issue without adequately exploring the criteria upon which the opinion is based." *U.S. v. Simpson*, 7 F.3d 186, 188-89 (10th Cir. 1993).

In sum, despite Coors' repeated claim of "$50-85 million" in alleged overcharges, Coors has not demonstrated that there was even a single dollar of "overcharge" of any kind under the contract, and the record evidence is to the contrary.   Coors' "overcharge" claim is nothing more than an after-the-fact attempt to reclassify as "overcharges" perfectly appropriate costs that Coors knew about years ago, audited, approved, and paid.   Coors' newfound (or hoped-to-be-found) litigation-driven interpretation of the Project Agreement is precisely the type of claim against which § 23.2's Limitation of Liability is designed to protect.

2.   Coors' Allegation about Jacobs' Project Cost Estimate is Misleading at Best

Coors' "factual" claim at pages 5 and 24 of its Response that Jacobs "represented to Coors with 100% confidence that the total Project cost would not exceed $222.932 million" is not just legally irrelevant, it also is seriously misleading.   In the very same estimate cited by Coors, Jacobs expressly told Coors that the "*[p]ricing shown reflects fair market value* for construction costs obtainable in the Elkton, Virginia area *on the date of this estimate issue.*" *See* Coors' Response, Ex. 2, Tab A.   In the estimate – on two pages that Coors did *not* attach to its Response – Jacobs also told Coors the exact cost inflation assumptions it used, which ran from 1% to 5%. *See* Supp. Dickinson Aff., Tab 8, at CBC00498093-94.

But Hurricane Katrina struck on August 29, 2005, just a few months after the Project Agreement was signed, followed less than a month later by Hurricane Rita.   In their wake, these

hurricanes left much devastation and a stratospheric increase in labor and material prices. Coors knew this then, and knows it now.

On November 4, 2005, Andrew E. Powers, Jacobs' Director for the Coors-Jacobs Alliance, sent a letter to Coors Director of Project Management Nick Riggio, copying Coors Vice President Flo Mostaccero, in which Powers explained in detail that:

- "Katrina and Rita impose an incremental burden on all capital investment elements, threatening to create unpredictable levels of cost escalation and exacerbating already extended deliveries." *See* Supp. Dickinson Aff., Tab 9, JACE00429715, at 1.

- "The situation puts most projects that owners and contractors estimated and funded prior to the hurricanes at financial and schedule risk." *Id.* at 2.

- "Unfortunately, we won't know the full commercial impact of Katrina and Rita on our clients, our suppliers, our subcontractors, and ourselves for some time; all attempts to estimate the impact in the near term are suspect." *Id.*

- "We urge you to consider the uncertainties associated with this Force-Majeure event in your business plans and prepare for some escalation and delays in the work that all contractors have with you." *Id.*

Jacobs' project manager for the brewery, Steve Dickinson, forwarded this same letter to Coors' project manager John Stonebraker two days later on November 6, 2005. *See id.*, JACE00429714. But Stonebraker already was, as he put it in an email to a fellow Coors employee, *"Painfully aware!"* of the increases Hurricane Katrina had caused in the prices of construction materials. *See* Shackelford Aff., Tab 2, at 1.

In a May 2006 internal presentation to several Coors senior executives, Coors' Vice President Flo Mostaccero noted that the "construction boom" following the two hurricanes dramatically had increased labor and material prices, with cost inflation running as high as *257%* for some materials. *See* Supp. Dickinson Aff., Tab 10 (page 6 of the attached slide presentation). Coors' Mostaccero would later explain in a March 2007 article she wrote for *Regional Brewing*

*News* just how significant the hurricanes' impact was on the brewery project:

> The devastation of hurricanes Katrina and Rita . . . had a significant impact on the brewery build-out. As the rebuild began in Louisiana and other impacted areas, the demand for experienced construction trades people and building materials *exploded*. In some cases people were offered $25 more per hour than area construction jobs. *We saw inflation on some of our materials (copper, fuel, etc.) increase by 100% in one year.*

*See* Shackelford Aff., Tab 3, at 3; *see also id.* at 5 ("There are a couple of reasons for the increased costs of the brewery, but the most significant reason is inflation").

Coors' own employees thus knew well at the time, and have repeatedly acknowledged since, that Hurricanes Katrina and Rita had an enormous effect on the cost of the brewery project. The project estimate Jacobs prepared for Coors clearly explained that it was based on "fair market value for construction costs obtainable in the Elkton, Virginia area on the date of this estimate issue," and the potential cost inflation measures built into the estimate (ranging from 1-5%) were plainly *not* calculated to account for a catastrophic *force majeure* event like the two hurricanes. *See* Coors' Response, Ex. 2, Tab A; Supp. Dickinson Aff., Tab 8, at CBC00498093-94. Jacobs' project cost estimate cannot be understood or fairly evaluated without considering the impact of those two hurricanes on the U.S. construction industry, as well as Jacobs' candid explanation in the project estimate of the inputs used in the estimate – an explanation that Coors partially buries under a different tab in its appendix, and partially fails to include at all.

* * *

Coors apparently hopes to gain some strategic or atmospheric benefit from its presentation of these and other misleading and often demonstrably inaccurate "facts." But these "facts" do *not* give rise to genuine issues of material fact. They are irrelevant to the resolution of

the purely legal matters at issue in this motion.  Even if Coors were free to disregard the inconvenient truth contained in its own contemporaneous documents, Coors still could not avoid the legal effect of the limitation of liability clauses in the contracts it signed.

II.

### Coors' Tort and Unjust Enrichment Claims Fail as a Matter of Law

In its Response, Coors does not dispute that (1) every "duty" it alleges that Jacobs breached in its tort and unjust enrichment claims is a duty contained in one of the two contracts at issue, *see* Jacobs' Motion at 6-7, 9, 11-12, 14 & n.2, and (2) Coors has not alleged or sought damages for the violation of any duties involving the safety of persons or property, *see id.* at 6. Whether under Virginia or Colorado law, this alone warrants dismissal of Coors' tort and unjust enrichment claims.

A.      Coors' Tort Claims Fail under Colorado Law

Coors attempts to save its tort claims from the Colorado Supreme Court's controlling and fatal precedent by trying to distract the Court with statutes and cases that impose some duty or other on construction professionals or engineers.  But under Colorado's economic loss rule, the issue is *not* – as Coors incorrectly suggests – whether plaintiffs can cite some statutory or common-law duties that apply to defendants.  The issue is whether plaintiffs have alleged a *breach* of such a duty *and, if so,* whether the duty allegedly breached is *not* a duty already imposed by the contract.  *See Town of Alma v. Azco Construction, Inc.*, 10 P.3d 1256, 1264 (Colo. 2000); *see also* Jacobs' Motion at 5-15 (discussing *Town of Alma* and other cases).

Each of the various duties Coors cites in its Response fails at least one part of *Town of Alma*'s economic loss rule test:

- While engineers in Colorado generally may "have a duty to exercise 'independent professional judgment in rendering professional services for the client,'" Response at 35, Coors has *not* based any of its claims against Jacobs on a failure to comply with this alleged duty, has *not* alleged that Jacobs failed to comply with such a duty, and has *not* shown that such a duty is different from, rather than merely duplicative of, a duty already contained in the parties' contracts.

- Although a Colorado statute may require engineers "to comply with 'generally accepted standards of engineering practice,'" Response at 35 (quoting C.R.S. § 12-25-108(1)(b)), Coors' Complaint alleges that the Alliance Agreement itself required Jacobs' services "to be of the 'highest professional quality,'" Complaint ¶ 13 (quoting Alliance Agreement § 3.1), and that the Project Agreement required Jacobs to "'perform and complete the Work in a good and workmanlike manner satisfactory and acceptable to Coors,'" Complaint ¶ 52 (quoting Project Agreement, Ex. B, § 3.5). Coors even reiterates in its Response that it "bargained for JEG to provide performance of 'the highest professional quality,'" and complains that it "did not get what it bargained for." Response at 24. The alleged Colorado statutory requirement merely duplicates these contractual duties.

- Likewise, any Colorado common-law duty construction professionals might have to "'exercise the ordinary skill and competence of members of their profession,'" Response at 35 (quoting *Metropolitan Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 318 (Colo. 1981)), merely duplicates the contractual duties cited above.

- Even if Jacobs did owe Coors a common-law duty not to "'substantially underestimat[e], through lack of skill and care, the cost'" of the project, Response at 36, 37 (quoting *Kellogg v. Pizza Oven, Inc.*, 402 P.2d 633, 63 (Colo. 1965)), Coors acknowledges in its Complaint that Jacobs performed its estimate of costs for the project pursuant to the Alliance Agreement, *see* Complaint ¶¶ 37, 41. Any alleged common-law duty "to furnish reliable information" as part of that estimate merely duplicates Jacobs' contractual duties under the Alliance Agreement, including Jacobs' duty to provide services "of the 'highest professional quality,'" Complaint ¶ 13 (quoting Alliance Agreement § 3.1).

Coors apparently recognized this fundamental problem with its argument, because it tried to criticize the Colorado Supreme Court's controlling decision in *BRW Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004), by calling it an "outlier." *BRW* isn't an outlier. It's the law.

The Colorado Supreme Court held in *BRW* that ***where the duty of care alleged to have been breached "was memorialized in the contracts, . . . the economic loss rule bars the tort***

*claim.*" *Id.* at 74. Coors cannot escape the controlling authority of *BRW* by citing cases decided before *BRW* – none of which, in any event, is inconsistent with *BRW*'s holding. The one post-*BRW* case that Coors cites, *A.C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d 862 (Colo. 2005), likewise does not undercut *BRW*'s holding, or even call it into question. The *A.C. Excavating* case involved a limited public policy-based exception to the economic loss rule that the Colorado Supreme Court created for tort claims involving the construction of personal residences. *See id.* at 866, 870; *see also Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041, 1043-46 (Colo. 1983). But Colorado courts have never created an independent duty of care for *commercial* construction contracts like the contracts at issue here. In fact, the Colorado Supreme Court expressly has declined to do so. *See, e.g., Town of Alma*, 10 P.3d at 1264-66.

Coors' reliance on the 48-year-old decision in *Kellogg v. Pizza Oven, Inc.*, 402 P.2d 633 (Colo. 1965), is unavailing. *Kellogg* was decided 35 years before Colorado adopted the economic loss rule in *Town of Alma*; it cannot support an exception to a rule that would not come into being in Colorado until 35 years later. In any event, the two architect defendants in *Kellogg* did not contend that a negligence action could not lie against them, whether because of the (then-unadopted) economic loss rule or otherwise. Rather, the architects argued that the evidence was insufficient to support the negligence judgment against them. *See id.* at 634.

When the Colorado Court of Appeals in 2002, like Coors in its Response, cited *Kellogg* as support for imposing an independent duty of care on an engineer in a commercial construction project, *that decision was reversed by the Colorado Supreme Court in BRW*, which puts to rest Coors' false suggestion that commercial construction projects constitute an exception to Colorado's economic loss rule. *See Duffy & Sons, Inc. v. BRW, Inc.*, 74 P.3d 380, 384 (Colo.

App. 2002), *rev'd, BRW*, 99 P.3d 66.  The Colorado Supreme Court held in *BRW* that the appeals court should have first "examine[d] whether the contracts [between the parties to the suit] created and contained the duties that [defendants] allegedly breached."  99 P.3d at 73-74.  Because the contracts at issue in *BRW* did contain the duties allegedly breached, the Colorado Supreme Court held that the economic loss rule barred the claims.  *Id.*

In an attempt to save at least its negligent misrepresentation tort claim, Coors cites two Tenth Circuit cases denying dismissal of negligent misrepresentation claims on economic loss rule grounds.   But these two cases firmly support dismissal here.   The negligent misrepresentation claims in those cases survived because the alleged misrepresentations were made in the course of negotiations *outside of a contractual relationship* and, hence, were *not* made pursuant to a duty imposed by contract.  *See Level 3 Communications, LLC v. Liebert Corp.*, 535 F.3d 1146, 1163 (10th Cir. 2008); *Colorado Visionary Acad. v. Medtronic, Inc.*, 397 F.3d 867, 870 (10th Cir. 2005).  In fact, the *Level 3* court expressly distinguished *BRW* as involving a situation in which – as Coors claims here – the alleged misrepresentation *was* made pursuant to a contractual duty.  535 F.3d at 1163.

In this case, Coors has alleged in its Complaint that the claimed negligent misrepresentation, the project cost estimate, was prepared pursuant to the written Alliance Agreement.  *See, e.g.,* Complaint ¶ 37 ("Coors paid JEG under the Alliance Agreement for performing the estimate."), Complaint ¶ 41 ("JEG, under the Alliance Agreement, supplied false information to Coors concerning the Project's estimated total installed cost.").  Coors' negligent misrepresentation claim must therefore be dismissed under *BRW* (and *Level 3*).

In an attempt to spare its breach of fiduciary duty tort claim, Coors contends that

Colorado's economic loss rule does not apply to such claims. But, again, the case on which Coors relies, *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226 (10th Cir. 2000), was decided *before* the Colorado Supreme Court adopted the economic loss rule in *Town of Alma*, and the rule the Colorado Supreme Court adopted in *Town of Alma* turned out to be broader than what the Tenth Circuit had guessed it might be months earlier in *United Int'l Holdings*: "We hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a *tort claim* for such a breach absent an independent duty of care under tort law." *Town of Alma*, 10 P.3d at 1264.

In *Town of Alma*, the Colorado Supreme Court did *not* carve out a general "breach of fiduciary duty" exception to the economic loss rule, and after *Town of Alma* no Colorado state or federal court has done so either. Indeed, citing *Town of Alma*, this Court repeatedly has held that Colorado's economic loss rule *could* bar a breach of fiduciary duty claim. *See, e.g., Alpine Bank v. Hubbell*, 506 F. Supp. 2d 388, 408-09 (D. Colo. 2007); *Micale v. Bank One N.A. (Chicago)*, 382 F. Supp. 2d 1207, 1220-23 (D. Colo. 2005).

In sum, all of Coors' tort claims, including Coors' negligent misrepresentation and breach of fiduciary duty claims, are based on Coors' allegations that Jacobs breached duties imposed on Jacobs under the Alliance Agreement or Project Agreement. Under *Town of Alma* and *BRW,* all these tort claims thus fail as a matter of law.

B.    Coors' Tort Claims Fail under Virginia Law

Coors devotes just over a page of its Response to defending its tort claims if they are decided under Virginia law. *See* Response at 43-44. In this cursory treatment, Coors simply ignores the directly controlling Virginia cases that Jacobs cited at pages 5-15 of its Motion. The

Virginia Supreme Court's decisions in *Sensenbrenner v. Rust, Orling & Neale*, 374 S.E.2d 55, 58 (Va. 1988), and *Blake Construction Co. v. Alley*, 353 S.E.2d 724, 727 (Va. 1987), confirm that (except in inapplicable cases involving the safety of persons or property) allegations of negligence against architects and builders sound in contract, not in tort. The Virginia Supreme Court's decision in *Augusta Mutual Ins. Co. v. Mason*, 645 S.E.2d 290, 295 (Va. 2007), confirms that a plaintiff cannot bring an independent tort claim under Virginia law for breach of fiduciary duty where, as here, the fiduciary duties allegedly breached had been imposed because of a contract between the parties. And the Virginia Supreme Court's decision in *Filak v. George*, 594 S.E.2d 610, 613-14 (Va. 2004), confirms that under Virginia law, as under Colorado law, the economic loss rule bars negligent misrepresentation claims where the challenged representations were made pursuant to contractual duties.

Coors ignores all this (and other) controlling Virginia case law and asserts that Virginia imposes certain statutory duties on engineers. Even putting aside the controlling Virginia case law that specifically rejects Coors' efforts to bring tort claims in this case, Coors' suggestion fails because the duties Coors cites either are duties that Coors has *not* alleged Jacobs breached, or are duties already imposed under the parties' written contracts.

C.    Coors' Unjust Enrichment Claims Fail

At pages 13-14 of its Motion, Jacobs cited several cases confirming that express contracts bar unjust enrichment claims. In its Response, Coors did not (and cannot) dispute that those cases are controlling.

Coors' defense of its unjust enrichment claims in its Response is not clear. If Coors is arguing for a "disgorgement of profits" calculation of its alleged breach of contract damages, any

such remedy would be subject to the limitation of liability provisions of the two contracts.   If Coors is attempting to assert an independent "unjust enrichment" claim, then such a claim is barred by the existence of the parties' written contracts.   Coors seems to suggest that its "improper billing" claims might fit into an exception to this rule.   Coors is wrong.

The law in Virginia[2] is clear and unequivocal that plaintiffs cannot recover on an unjust enrichment or "quasi-contract" claim when a contract governs the relationship between the parties.   Just last year, the Eastern District of Virginia held that, under Virginia law, "*A party may not recover for claims sounding in quasi-contract or unjust enrichment when an express or implied contract already governs its relationship with a defendant.*'"  *Frank Brunckhorst Co., L.L.C. v. Coastal Atlantic, Inc.*, 542 F. Supp. 2d 452, 465 (E.D. Va. 2008) (quoting *Fed. Dep. Ins. Corp. v. S.A.S. Assocs.*, 44 F. Supp. 2d 781, 788 (E.D. Va. 1999)).   In *Southern Biscuit Co. v. Lloyd*, 6 S.E.2d 601, 606 (Va. 1940), the Virginia Supreme Court confirmed that this long has been the rule in Virginia:

> It has been well settled by repeated decisions of this court that an express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter.   The rights of the parties are to be determined by the provisions of the express contract, and the law will not imply an agreement in contravention thereof.

While Virginia law controls this point – and it brooks no exceptions – Coors chose to argue based on inapplicable Colorado law.   But even under Colorado law, Coors' unjust

---

[2] Virginia law governs Coors' claims based on alleged "improper billing," given that the claims involve conduct taking place almost entirely in Virginia.  *See Dworak v. Olson Construction Co.*, 551 P.2d 198, 200 (Colo. 1976) (Colorado employs "most significant relationship" test to decide choice of law issues, focusing on, *inter alia*, "the place where the injury occurred," "the place where the conduct causing the injury occurred," and "the place where the relationship, if any, between the parties is centered"); *see also Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095, 1101 (10th Cir. 2007) (federal courts sitting in diversity apply forum state's choice-of-law rules).  Coors does not suggest otherwise in its Response.

enrichment claims fail.

In *Interbank Invs., LLC v. Eagle River Water and Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003), the Colorado court of appeals recognized two exceptions to the rule that a contract bars unjust enrichment claims. Neither exception applies here. The first *Interbank* exception applies when the contract "failed or was rescinded." *Id.* at 816. Coors alleges that Jacobs billed it for the disputed charges under the Project Agreement, *see* Complaint ¶ 61(g)-(i), and Coors has *not* alleged that the Project Agreement failed or was rescinded. It was not.

The second *Interbank* exception applies to "conduct outside the express contract." *Interbank*, 77 P.3d at 816. Coors alleges that Jacobs billed, and Coors paid, pursuant to – not outside of – the parties' contract. *See* Complaint ¶ 61(g)-(i). Indeed, Coors alleges Jacobs "breached" the contract, not that Jacobs acted "outside the express contract." *Id.* If an alleged breach of contract could simply be recharacterized as acting "outside the express contract" to qualify for the second *Interbank* exception, then the unjust enrichment cause of action would be available in virtually all contract disputes rather than, as is the case, available in virtually none.

Whether decided under Virginia law (as they should be) or Colorado law, Coors' unjust enrichment claims fail as a matter of law.

III.

## The Limitation of Liability Clauses are Valid and Enforceable

Coors does not deny that the limitation of liability clauses at issue in this case are contained in written and signed agreements, and are the product of arms-length negotiation between sophisticated parties represented by counsel. Coors instead attempts to circumvent the plain language of these limitation of liability clauses by offering up arguments that ignore or

misconstrue contract language, statutory language, and case law.

A.   Coors Does Not Plausibly Challenge Jacobs' Interpretation of the Project Agreement

The plain language of § 23.2 of the Project Agreement limits Jacobs' liability for all claims that "aris[e] out of the Project," unless the claims are "associated with" the Project Agreement's indemnification provisions or "covered by" its insurance provisions. Jacobs explained in detail in its Motion why all Coors' claims against both JCS and JEG in this action, including Coors' breach of contract claims for "improper billing" and all its tort and unjust enrichment claims, "aris[e] out of the Project," are not "associated with" the Project Agreement's indemnification provisions or "covered by" its insurance provisions, and accordingly are covered by the plain language of the Limitation of Liability Clause that limits Coors' recovery to the amount of Jacobs "Fee." *See* Motion at 16-22.

In its Response, Coors does *not* dispute Jacobs' factual statement that none of Coors' claims are covered by the indemnification or insurance provisions of the Project Agreement, and it does *not* dispute Jacobs' analysis of Coors' various contract and tort claims in light of the Limitation of Liability Clause's "arising out of the Project" language. Coors *does not even quote* the Limitation of Liability Clause.

Instead, Coors offers two reasons why it thinks the Court should ignore the plain language of the Limitation of Liability Clause. First, Coors says that it would be "absurd" to interpret the Limitation of Liability Clause in the Project Agreement as limiting Coors' recovery for JCS's alleged "improper billing." Second, Coors says that JEG's estimation work is not covered by the Limitation of Liability Clause because it is not encompassed by the defined term "Work" in the Project Agreement. Coors is wrong on both counts.

1.    Applying § 23.2's Limitation of Liability Clause as Written Does Not Render the
      Project Agreement "Absurd" or "Meaningless"

Limiting a party's potential recovery for even bona fide claims – which Coors' are not –
is the very reason parties utilize limitation of liability clauses in contracts.  It would be "absurd"
to read such clauses out of contracts because they actually have their intended effect.

Coors cited *no* Colorado cases, *no* Virginia cases, and *no* other authority for its false
suggestion that a contractual provision limiting a party's potential monetary recovery on a breach
of contract claim somehow renders any other portion of the contract "meaningless."  The text
and structure of the Project Agreement further confirm that the "conflict" Coors tries to establish
between the Limitation of Liability Clause and other provisions of the Project Agreement is
illusory.

Section 6.2(g) of the Project Agreement expressly provides that Jacobs "shall be and
remain liable to COORS for the negligent performance of any of the services furnished as set
forth in Exhibit B, *as provided for under this Agreement*."  The Project Agreement's plain
language in § 6.2(g) and § 23.2 is clear and in harmony – Jacobs *is liable* under the Project
Agreement for the "negligent performance" of its services under the contract, *but only to the
extent "provided for under this Agreement."*  Contrary to what Coors suggests in its Response,
Jacobs has never argued that it does not "retain liability for its own negligence," Response at 7, ¶
28; rather, the extent of its monetary liability for any such negligence is limited by § 23.2.

Section 23.2's Limitation of Liability Clause likewise is not in conflict with either of the
two provisions Coors cites from Exhibits A and B to the Project Agreement.  In each case, the
Limitation of Liability Clause does not render the other contractual provision "meaningless" – it
only limits the amount of money Coors can recover as part of a legal claim based on a breach of

that provision.  Yet even if parts of Exhibits A and B conflicted with § 23.2 – they don't – § 23.2

would control.   Section 1.2 of the Project Agreement provides that the Agreement (and § 23.2 is

part of the Agreement) governs over the Exhibits (such as Exhibits A and B):

> 1.2    Agreement Documents, Priority means the event of a conflict or
> inconsistency among the Agreement Documents, COORS and CONTRACTOR
> agree that the Agreement Documents shall be reviewed in the following order of
> precedence and the first such Agreement Document which resolves the conflict or
> inconsistency shall govern the interpretation of such documents:
>
> (i)     First: Modification to this Agreement (without giving any
>         consideration to and excluding the Exhibits and Construction
>         Documents);
>
> (ii)    Second: This Agreement (without giving any consideration to and
>         excluding the Exhibits and Construction Documents);
>
> (iii)   Third:  The Exhibits; and
>
> (iv)    Fourth: The Construction Documents (as defined in Article 6).

The Court should reject Coors' attempt to manufacture a conflict between § 23.2's Limitation of

Liability Clause and portions of Exhibits A and B.   Section 1.2 of the Project Agreement

instructs that the Agreement itself must be interpreted *"without giving any consideration to and

excluding the Exhibits."*

Moreover, while § 23.2 of the Project Agreement expressly limits the amount of Coors'

recovery *against Jacobs* for its claims, including "improper billing" claims, it does *not* limit

Coors' ability to recover *against subcontractors* whose bills Coors alleges it "improperly" paid.

The Project Agreement provides in § 17 that "all warranties and guaranties" of subcontractors

(and sub-subcontractors) "shall clearly state that they run to the benefit of COORS," shall "be

separately issued to COORS and *enforceable by COORS,*" and "COORS shall be a third

beneficiary of all obligations, responsibilities, liabilities, warranties and guaranties of

Subcontractors." Section 17 confirms that Jacobs' "responsibility to COORS for . . . [the] equipment, machinery, materials and workmanship [provided by vendors or Subcontractors] *shall be limited to procuring warranties* from such vendors and Subcontractors and rendering all reasonable assistance to COORS for the enforcement thereof." If Coors has a claim against a subcontractor, it is obligated by the Project Agreement to proceed directly against that subcontractor, not against Jacobs.

2.   Section 23.2's Limitation of Liability Clause Expressly Covers Coors' Claims Against JEG

Coors incorrectly suggests that its claims with respect to JEG's project estimate are not subject to § 23.2's Limitation of Liability Clause, and it bases this flawed argument solely on the definition of "Work" in § 1.16 of the Project Agreement. As discussed at pages 16-20 of Jacobs' Motion, § 23.2 covers any claims that "aris[e] out of the Project." Coors has not denied that its claims against JEG for alleged improper project estimation services "aris[e] out of the Project." Coors itself alleges in ¶ 4 of its Complaint that "JEG provided planning, estimating, engineering, technical support, and related administrative services for Coors *on Coors' new 7,000,000-barrel-per-year brewing facility in Elkton, Virginia (the 'Project')*." Coors admits that JEG's estimation and other services were performed for Coors "on" the project and, thus, Coors' claims against JEG "aris[e] out of the Project" and are covered by § 23.2's Limitation of Liability Clause.

Other parts of the contract confirm this. By its terms, § 23.2's limitation of liability "*shall include in the aggregate the parent . . . companies*" of the parties to the Project Agreement, which, of course, include JEG. Section 26.13 ("Work Prior to Agreement Execution"), on which Coors focuses its entire contract interpretation argument, merely further

reinforces what is already apparent under the plain language of § 23.2, that JEG's estimation work is covered by § 23.2's limitation of liability.

B.    Section 23.2's Limitation of Liability Clause is Enforceable

The Limitation of Liability Clause in § 23.2 of the Project Agreement is valid and enforceable under Virginia Code § 54.1-411, and is valid and enforceable under the three-part test in *Kocinec v. Public Storage, Inc.*, 489 F. Supp. 2d 555 (E.D. Va. 2007).

1.    Coors Ignores the Actual Language and Relevant Legislative History of Virginia Code § 54.1-411

At pages 25-27 of its Motion, Jacobs carefully considered § 54.1-411 of the Virginia Code and contrasted the language used to begin the second sentence of the statute with the language used to begin its third sentence. Coors chose not to address this critical characteristic of § 54.1-411's language and, instead, asked this Court to give § 54.1-411 a superficial and illogical reading.

Coors ignores § 54.1-411 except for the second sentence, which provides that "No such *organization* shall limit the liability of any licensee or certificate holder for damages arising from his acts or limit such corporation, partnership, sole proprietorship, limited liability company, or other entity from liability for acts of its employees or agents." But the third sentence of § 54.1-411 provides "No such *corporation, partnership, sole proprietorship, limited liability company, or other entity, or any affiliate thereof*, shall, on its behalf or on behalf of any such licensee or certificate holder, be prohibited from (i) purchasing or maintaining insurance against any such liability; (ii) entering into any indemnification agreement with respect to any such liability; or (iii) receiving indemnification as a result of any such liability."

Despite the obvious difference in the language, Coors hopes this Court will read the

second sentence's phrase "No such organization" as equivalent to the third sentence's phrase "No such corporation, partnership, sole proprietorship, limited liability company, or other entity, or any affiliate thereof." Read in context, however, the second sentence uses the word "organization" to describe the conduct discussed and authorized in the first sentence of § 54.1-411, which grants permission for architects, engineers and land surveyors *to organize* and practice their profession as a "corporation, partnership, sole proprietorship, limited liability company, or other entity." Simply put, § 54.1-411 provides that the act of organizing a corporation, partnership, sole proprietorship, limited liability company or other entity shall not, in and of itself, limit the liability of the entity or its employees or agents.

Coors' interpretation would require the Court to believe that Virginia's legislature intended to use the word "organization" to begin the second sentence as shorthand for the phrase "corporation, partnership, sole proprietorship, limited liability company, or other entity," even though the legislature used that exact full phrase to begin the very next (third) sentence. Coors' interpretation is not logical, is not true to the language of the statute, and is not a reasonable reading. The Virginia legislature used different words and phrases in the second and third sentences precisely because – as an in-context reading makes clear – they have *different* meanings.

Rather than directly address Jacobs' in-depth, contextual analysis of the actual statutory language and structure, Coors says at pages 14-17 of its Response that the language is "clear and unambiguous" and "could not be more plain." But, oddly enough, when Coors actually quotes § 54.1-411's language to show just how "plain" and "unambiguous" it is, ***Coors uses brackets to change the statute's language***. At pages 15 and 17 of its Response, Coors wrote:

> Here, the statutory language could not be more plain: "No such *[engineering corporation]* shall limit the liability of any licensee or certificate holder for damages arising from his acts or limit such corporation . . . from liability for acts of its employees or agents."

> . . .

> Here, Virginia public policy is clearly and certainly expressed: "No *[engineering corporation]* shall limit the liability of any licensee or certificate holder for damages arising from his acts or limit such corporation . . . from liability for acts of its employees or agents. . . ."

The *[bracketed]* words come from Coors, not from the statute.   Obviously, and improperly, Coors is attempting to "add language to the statute."

Coors also has no substantive answer to the two sworn affidavits attesting to the legislative history of § 54.1-411.   To the extent that § 54.1-411 is ambiguous, or "susceptible to more than one meaning" – although Jacobs believes the language clearly does *not* prohibit agreements to limit liability – courts "*must* resort to *extrinsic evidence* and the rules of construction to determine legislative intent, 'the paramount object of statutory construction.'" *Virginia Dep't of Labor and Industry v. Westmoreland Coal Co.*, 353 S.E.2d 758, 762 (Va. 1987).

In Virginia, where legislative history is sparse, courts may properly consult affidavits of legislators or others involved in the passage of a statute to resolve an ambiguity in the statute's language. *See, e.g., School Bd. of Chesterfield County v. School Bd. of City of Richmond*, 247 S.E.2d 380, 383 (Va. 1978) (suggesting by implication that the "testimony of a member of the General Assembly who was also a member of the task force" that had recommended adoption of the legislation at issue was the kind of "extrinsic evidence of legislative intent" that *could* be "admitted to construe a legislative act" *if* the act were ambiguous "on its face").   Coors did not

offer any controlling counter-authority, only a couple U.S. Supreme Court decisions addressing legislative history for *federal* statutes. Those decisions are irrelevant because they address a context – interpretation of *federal* statutes – where there exists an extensive, formalized system of capturing legislative history. Virginia lacks this kind of formalized system, which is likely why Virginia courts construing Virginia statutes willingly resort to extrinsic evidence of legislative intent that would not be considered by courts construing federal statutes.

Finally, Coors seems to misunderstand the point of Jacobs' references in its Motion to § 54.1-411 permitting indemnification and insurance agreements. Section 54.1-411 draws a clean (and logical) line between *voluntary contractual arrangements* that limit liability, such as indemnity, insurance, and contractual limitations of liability on the one hand, and *involuntary means of limiting liability*, such as professionals unilaterally avoiding liability merely by use of a particular corporate form. It is only the latter that the statute forbids.

2.    Section 23.2's Limitation of Liability Clause Easily Satisfies *Kocinec*

Jacobs demonstrated at pages 27-30 of its Motion that § 23.2 satisfies the three-part test set out by the Eastern District of Virginia in *Kocinec v. Public Storage, Inc.*, 489 F. Supp. 2d 555 (E.D. Va. 2007). As to *Kocinec*'s first inquiry, Jacobs cited several Virginia cases at pages 22-24 and 28-29 of its Motion confirming that § 23.2's Limitation of Liability Clause "does not contravene public policy." 489 F. Supp. 2d at 559. Coors responded at pages 20-21 by arguing that the facts of this case do not exactly match the facts of those cases. Coors misses the point. Virginia has a public policy of prohibiting (or limiting) the enforcement of exculpatory clauses *only* when such clauses purport to limit a "quasi-public" entity's responsibilities *towards the general public* – such as, for example, a common carrier's duties towards members of the

traveling public. *See, e.g., C&O Railway Co. v. Clifton Forge-Waynesboro Tel. Co.*, 224 S.E.2d 317, 322 (Va. 1976).

In *C&O Railway Co.*, the Virginia Supreme Court effectively rejected Coors' argument based on Jacobs' purported status as a "publicly regulated professional engineer," Response at 20, by holding that, although the C&O Railway was a "publicly regulated" common carrier, the *publicly regulated aspects of the railway company were not implicated in the railway company's private contract with another commercial entity.* The court explained that "neither public welfare nor public policy was involved" in that contract, and thus the court held that the parties' agreement to limit the railway company's liability for its own negligence was enforceable. *Id.*

The *C&O Railway* Court's analysis and enforcement of the parties' limitation of liability agreement applies equally with respect to the private contract between Jacobs and Coors here. The purported "publicly regulated" aspects of Jacobs' engineering practice – which Coors admits at page 20 of its Response is regulated to "protec[t] the public health, safety, and welfare of Virginians" – are not implicated by Coors' and Jacobs' private agreement to limit Jacobs' liability *to Coors* (as opposed to the general public) in their private commercial contract.

As to *Kocinec*'s second inquiry, Coors seems to dispute that § 23.2 "could be readily understood by a reasonable person in the plaintiff's position," 489 F. Supp. 2d at 559, because, Coors says, it did not understand it. Coors' inside counsel's self-serving and conclusory portrayal of her subjective understanding is irrelevant as a matter of law, *see, e.g., Davis v. Norfolk S. Ry. Co.*, 18 V.L.W. 65, 2003 WL 21536815, at *1 (Va. Cir. Ct. June 6, 2003) (where contract is unambiguous, meaning is determined as a matter of law), and in any event does not show what a "reasonable person in the plaintiff's position" could understand. A "reasonable

person in [Coors'] position" is a large, commercially sophisticated corporation, represented by counsel, and actively involved in negotiating a multi-hundred-million-dollar contract. And while Jacobs explained in detail how § 23.2's contract language works, Coors has not bothered to quote the language it now says a "reasonable person" could not have "readily understood." Coors also has not explained what (if anything) is confusing or ambiguous about § 23.2. Section 23.2 is written in easy to understand language, and any reasonable "person" in Coors' position – with its sophistication, legal representation, active negotiating involvement, and multi-million-dollar interest – certainly could, and should, "readily underst[and]" it.

The third prong of the *Kocinec* test requires a showing that the exculpatory clause "clearly and unequivocally releases the defendant from precisely the type of liability alleged by the plaintiff." 489 F. Supp. 2d at 559. The language of § 23.2 is unambiguous: "For claims *other than* those associated with CONTRACTOR's indemnification obligations hereunder, *arising out of* the Project and are *not covered* by Exhibit J and Sections 13.2 and 13.3, *CONTRACTOR's liability shall not exceed the Fee as specified in Exhibit A*." As explained in detail in Jacobs' Motion at pages 16-20, and as Coors has not denied (at least with respect to the claims it brought against JCS), *all* of Coors' claims in this lawsuit "aris[e] out of the Project," and *none* of them are "associated with" Jacobs' contractual indemnification obligations or "covered by" the contract's insurance provisions (Exhibit J and Sections 13.2 and 13.3).

Coors cites four cases, including *Kocinec* itself, for the proposition that "broad and generalized" disclaimers of liability do not satisfy the third prong of *Kocinec*, but none of these cases help Coors here. The "broad and generalized disclaimer" in *Ash v. All Star Lawn and Pest Control, Inc.*, 506 S.E.2d 540 (Va. 1998), was a written statement in a termite inspection report

saying that the "inspection did not include areas which were obstructed or inaccessible at the time of inspection." *Id.* at 541. The court held only that this disclosure should have specifically identified the areas that were inaccessible; it did *not* hold that the disclaimer failed to adequately specify what "type of liability" was being disclaimed. *Id.* at 542. The *Ash* holding has nothing to do with *Kocinec*'s requirement that an exculpatory clause "clearly and unequivocally" state the "type of liability" from which the defendant is released, and Coors' attempt to extract some "specificity" requirement from *Ash* and graft it onto the *Kocinec* test accordingly fails.

Although Coors also cites *Wenzel v. Boyles Galvanizing Co.*, 920 F.2d 778, 781 (11th Cir. 1991), that case was decided under Florida law and is inapposite here. Coors' curious reliance on Florida law highlights Coors' inability to find support in Virginia's case law. As for the exculpatory clauses that passed the third prong of the test in *Kocinec* and in *Trumball Invs., Ltd. v. Wachovia Bank, N.A.*, No. 1:05cv15, 2005 U.S. Dist. LEXIS 7195 (E.D. Va. Apr. 15, 2005), those clauses passed because their language was *clear*. *See Kocinec*, 489 F. Supp. 2d at 561; *Trumball Invs.*, 2005 U.S. Dist. LEXIS 7195, at *12. Clarity, not specificity, is the touchstone of the test's third prong; neither *Kocinec* nor *Trumball Invs.* mentions anything about the breadth or specificity of the clauses in question.

3.   Coors Offers No Other Legal Authority against Enforcing the Project Agreement's Limitation of Liability Clause

At pages 29-34 of its Response, Coors suggests that there may be other (largely unidentified) "inherent constraints" on limitation of liability provisions "precluding summary judgment on this issue." The only support Coors offers for this proposition under Virginia law (which the parties agree governs the Project Agreement, *see* Jacobs' Motion at 4) is § 2.2-4335(A) of the Virginia Code regarding "no-damage-for-delay" clauses in construction

contracts.

Neither § 23.2's Limitation of Liability Clause nor any other clause in the Project Agreement is a "no-damage-for-delay" clause, and thus § 2.2-4335(A) does not apply. "No-damage-for-delay" clauses are unique provisions that purport to prohibit *all* claims brought by a contractor against an owner (or by a subcontractor against a contractor) seeking money damages for delayed progress of a construction project. The law that has developed around these unique provisions does not in any way undercut the authoritative Virginia law that supports enforcing as written more traditional exculpatory clauses like § 23.2's Limitation of Liability Clause. Moreover, § 2.2-4335(A) applies only to *public* construction contracts, making it a particularly inapposite reference in this case. Indeed, Coors implicitly concedes at page 31 of its Response that it could not find even one Virginia case that has limited the enforcement of "no-damage-for-delay" clauses in *private* contracts like the Project Agreement.

Coors also may have been trying to suggest that some implied "obligation of good faith and fair dealing" should apply here. Under Virginia law, a claim for breach of such a duty (if it exists) is still a *breach of contract* claim, not an independent tort claim. *See, e.g., Charles E. Brauer Co., Inc. v. NationsBank of Virginia, N.A.*, 466 S.E.2d 382, 385 (Va. 1996); *see also Frank Brunckhorst Co.*, 542 F. Supp. 2d at 465. Hence, any such claim by Coors remains subject to the provisions of the Project Agreement, including § 23.2's Limitation of Liability Clause. Coors did not cite any Virginia cases to the contrary.

C.   The Reperformance Clause in the Alliance Agreement is Enforceable

In its Response, Coors did *not* dispute Jacobs' interpretation of the Alliance Agreement's § 3.2 Reperformance Clause, and did *not* dispute that the Reperformance Clause applies to all of

Coors' claims against JEG. Coors simply argued that the Alliance Agreement's Reperformance Clause is not enforceable.

Coors' only argument against the enforceability of the Alliance Agreement's Reperformance Clause is that, Coors says, it "fails of its essential purpose." Coors' argument is incorrect as a matter of law. Coors admits at pages 23-24 of its Response that the source of its "failure of essential purpose" argument is the Colorado Uniform Commercial Code ("UCC"). But the UCC *does not apply* to contracts for the sale of services. And that's exactly what the Alliance Agreement is.

In *Colorado Carpet Installation, Inc. v. Palermo*, 668 P.2d 1384, 1387-88 (Colo. 1983), the Colorado Supreme Court explained that the "controlling criterion" for determining whether a contract is for the sale of goods (to which the UCC applies) or for the sale of services (to which the UCC does *not* apply) is "whether the circumstances underlying the formation of the agreement and the performance reasonably expected of the parties demonstrates the primary purpose of the contract as the sale of goods or, in contrast, the sale of labor or service." In determining under *Colorado Carpet* what the "primary purpose" of an agreement is, a court should examine factors such as the "contractual language" and whether there were "separate and discrete billings" for labor versus other expenditures. *Id.* at 1388; *see also, e.g., Aluminum Co. of Am. v. Electro Flo Corp.*, 451 F.2d 1115, 1118 (10th Cir. 1971) (where contract involved the sale of products and the seller did *not* separately bill for engineering services provided in connection with the sale of the products, then the contract was for "sale of goods" and was covered by the UCC).

The primary purpose of the Alliance Agreement – initially, and as confirmed through

multiple amendments – was the sale of JEG's labor and services to Coors.  It is undisputed that:

- The Alliance Agreement is titled "Engineering *Services* Agreement."

- The original Alliance Agreement and the first amendment to that agreement (on which Coors focuses its Response) state in numerous places that JEG was providing "services" to Coors under the agreement. *See, e.g.*, Alliance Agreement §§ 2, 3.1, 3.2, and 3.3, and First Amendment §§ 1.0, 2.0, and 6.0(c).  Even the section of the amendment that expands JEG's responsibilities to include "procurement" services, § 1.0, is entitled "Scope of *Services*," and procurement is but one of a long list of other *services* JEG was to provide Coors under the amended contract.

- JEG was reimbursed separately, at cost, for any materials it procured for Coors, and under § 4.0 of the first amendment all warranties on such materials ran from the manufacturer "directly to [Coors]."

- Jacobs issued "separate and discrete billings" for labor, which was paid at JEG's labor rates, versus expenditures for equipment, material, or subcontractors, which were reimbursed at cost. *See, e.g.*, Supp. Dickinson Aff., Tab 11, at 3, 4.

It is thus clear that the purpose of the Alliance Agreement, even as amended, was for Coors to secure JEG's *services* on various projects.

The parties' invoicing practices under the Alliance Agreement further prove the point. Coors itself says that the estimation work that is the source of its claims against JEG was "performed" "[u]nder the Alliance Agreement's Planning & Analysis Phase." Response at 24. All this estimation work was separately invoiced and paid for, and involved only JEG's provision of services, not goods, to Coors. *See, e.g.*, Supp. Dickinson Aff., Tab 11, at 4 (listing and breaking out the total labor cost charged to Coors for "Estimating" for the period from January 29, 2005 through February 25, 2005, under the Alliance Agreement's "Planning & Analysis Phase"; the project estimate Coors is challenging was dated February 18, 2005, *see* Response, Ex. 2, Tab B).

The impropriety of Coors' attempt to shoe-horn its complaints about JEG's estimation

work into Colorado's "failure of essential purpose" case law is evident upon examination of the cases Coors cites in its Response.  In each of the cases Coors cited – and quite unlike here – the plaintiff complained that some particular purchased good could not be repaired or had otherwise not performed properly.  *See, e.g., Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 639 (10th Cir. 1991) (onion seed); *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 738 (Colo. 1991) (grain storage and distribution system); *Curragh Queensland Mining Ltd. v. Dresser Indus.*, 55 P.3d 235, 238 (Colo. App. 2002) (coal mining dragline machine); *Smith v. Union Supply Co.*, 675 P.2d 333, 334 (Colo. App. 1983) (roof).  In this case, though, there is no particular "good" to be repaired.  Rather, Coors alleges that JEG did not perform certain intangible services properly. It does not make sense to debate how (or when) such services might be "repaired."

But even putting aside the inapplicability of the "failure of essential purpose" analysis to this dispute over services, the remedy contained in the Alliance Agreement's Reperformance Clause was adequate to fulfill its purpose.  Section 3.2 provided Coors with a 12-month window within which to seek reperformance at JEG's cost if JEG's services were deficient.

If Coors believed there were any deficiencies in JEG's estimate within this 12-month period, Coors could have required JEG to redo the estimate, at JEG's cost.  Alliance Agreement § 3.2.  And if the revised estimate caused Coors at that still-early point to re-think how (or whether) to complete the brewery project, including whether to continue having Jacobs serve as prime contractor, then Coors could have stopped the brewery project at any time, or turned over responsibility for it to another contractor.  *See* Project Agreement § 23.1(b).

Of course, if Coors decided to raise any perceived deficiencies with JEG's estimate outside this 12-month window, such claims would be barred by § 3.2's plain terms.  But a

contractually agreed "statute of limitations" does *not* mean that the time-limited remedy "fails of its essential purpose." Otherwise, parties could never agree to a contractually-set time limit on claims. *See, e.g., Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 50 (2d Cir. 1993) (rejecting the contention that because an alleged defect in a sprinkler system did not become apparent until after the warranty had expired, the warranty had "failed of its essential purpose"). Given the short window the parties agreed on for the availability of the reperformance remedy, and Coors' rights under the Project Agreement to stop the project or to replace Jacobs at any time and for any reason, the remedy set out by the Reperformance Clause was adequate to fulfill its purpose.

Finally, at pages 29-34 of its Response Coors again vaguely suggests – as it did with respect to Virginia law – there may be "inherent constraints" on limitation of liability clauses under Colorado law. But all Coors can muster is again irrelevant law with respect to "no-damage-for-delay" clauses. These irrelevant cases about an inapposite clause cannot overcome the numerous applicable and controlling Colorado cases that Jacobs cited at pages 23-24 and 32-33 of its Motion confirming that limitation of liability clauses are fully enforceable in Colorado. Coors has no real answer to this directly controlling case law. To the extent Coors may have been trying to suggest that some implied "obligation of good faith and fair dealing" should apply, in Colorado (as in Virginia) a claimed breach of this obligation sounds in contract, not tort, and thus is bound by the provisions of the contract allegedly breached. *See Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003).

D.   The Alliance Agreement's Clause Barring Contingent, Consequential or Other Indirect Damages Applies

The Alliance Agreement still would limit JEG's liability even if, somehow, § 3.2 of the Alliance Agreement were considered void under Colorado law. Section 8.4 of the Alliance

Agreement provides that "[n]otwithstanding any other provision of this Agreement, [JEG] shall have no liability to [Coors] for contingent, consequential, or other indirect damages." To the extent that Coors seeks to recover, under the Alliance Agreement, for anything more than the money it paid Jacobs to perform the estimate (all of which was separately invoiced), such recovery is barred by § 8.4.

IV.

Conclusion

Jacobs respectfully requests that this Court grant partial summary judgment as requested in Jacobs' October 8, 2008 Motion.

Respectfully submitted this 17th day of February, 2009.

GREENBERG TRAURIG LLP

By:    s/ David G. Palmer
       DAVID G. PALMER
       MICHAEL R. DAVIS
       1200 17th Street, Suite 2400
       Denver, CO  80202
       Telephone: 303-572-6500
       Facsimile: 303-572-6540
       E-mail: PalmerDG@gtlaw.com
               DavisM@gtlaw.com

       and

       SUSMAN GODFREY LLP

       NEAL S. MANNE
       GEOFFREY L. HARRISON
       SHAWN L. RAYMOND
       1000 Louisiana Street, Suite 5100
       Houston, TX 77002-5096
       Telephone: 713-651-9366
       Facsimile: 713-654-6666
       E-mail:  NManne@susmangodfrey.com
                GHarrison@susmangodfrey.com
                SRaymond@susmangodfrey.com

       STEPHEN SHACKELFORD, JR.
       901 Main Street, Suite 5100
       Dallas, TX 75202-3775
       Telephone: 214-754-1900
       Facsimile: 214-754-1993
       E-mail: SShackelford@susmangodfrey.com

       ATTORNEYS FOR DEFENDANTS
       JACOBS ENGINEERING GROUP, INC.
       and JACOBS CONSTRUCTION
       SERVICES, INC.

<u>Certificate Of Service</u>

    I hereby certify that on this 17th day of February 2009, a true and accurate copy of the above and foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF system which sent notification via email upon:

> Martin D. Litt
> E-mail: martin.litt@hro.com
> James N. Phillips
> E-mail: james.phillips@hro.com
> HOLME ROBERTS & OWEN LLP
> 1700 Lincoln Street, Suite 4100
> Denver, CO 80203-4541
> Telephone: 303-861-7000
> Facsimile: 303-866-0200
>
> Robert C. Chambers
> E-mail: rcchambers@smithcurrie.com
> Charles W. Surasky
> E-mail: cwsurasky@smithcurrie.com
> John M. Mastin, Jr.
> E-mail: jmmastin@smithcurrie.com
> SMITH CURRIE AND HANCOCK
> 2700 Marquis One Tower
> 245 Peachtree Center Avenue, NE
> Atlanta, GA 30303-1227
> Telephone: 404-521-3800
> Facsimile: 404-688-0671

SUSMAN GODFREY LLP

*s/ Geoffrey L. Harrison*

By:    Geoffrey L. Harrison
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: 713-651-9366
Facsimile: 713-654-6666
E-mail:  GHarrison@susmangodfrey.com