# UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

### Senior District Judge Richard P. Matsch

Civil Action No. 08-cv-00985-RPM
(Consolidated with Civil Action No. 09-cv-00271-RPM

COORS BREWING COMPANY and
BRIGGS OF BURTON, PLC,

                             Plaintiffs,

      vs.

JACOBS ENGINEERING GROUP INC.,
JACOBS INDUSTRIAL SERVICES, INC., a/k/a/
JACOBS CONSTRUCTION SERVICES, INC., and
JACOBS CONSTRUCTION, INC.,

                             Defendants.

      And

_____

JACOBS ENGINEERING GROUP INC. and
JACOBS CONSTRUCTION SERVICES, INC.,

                        Third Party Plaintiffs,

      vs.

BRIGGS OF BURTON, PLC,

                       Third Party Defendant.

_____

## DEFENDANT JACOBS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

_____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................III

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS .........................................................2

III.    ARGUMENT AND LEGAL AUTHORITY .......................................................5

      A.    SUMMARY JUDGMENT MUST BE GRANTED WHERE THE
              PLAINTIFF FAILS TO OFFER EVIDENCE TO SUPPORT AN
              ESSENTIAL ELEMENT OF ITS CASE. .....................................................5

      B.    SUMMARY JUDGMENT IS PROPER BECAUSE COORS CANNOT
              PROVE ITS DAMAGES WITH REASONABLE CERTAINTY AS
              REQUIRED UNDER BOTH COLORADO AND VIRGINIA LAW. ..................6

            1.    Summary Judgment is Proper Because Coors Cannot
                 Meet Its Burden of Proving the Existence and Cause of Its
                 Alleged Damages Through Admissible Expert Testimony. .....................8

                 a)    Coors Cannot Meet Its Burden of Proving
                     Damages Because FTI Has Not Rendered
                     Admissible Opinions on the Existence and Cause
                     of Coors' Alleged Damages. ...........................................9

                 b)    Coors Cannot Meet Its Burden of Proving
                       Damages Because Gunnar Sarsten Cannot Render
                       Admissible Testimony on the Existence and Cause
                       of Coors' Alleged Damages. .........................................12

                     (1)    Mr. Sarsten is Not a Damages Expert. ............................13

                     (2)    Mr. Sarsten Cannot Identify the Cause(s)
                           of Coors' Alleged Damages. ...........................14

                         (3)    Gunnar Sarsten Failed to Trace Coors'
                             Alleged Damages to Specific Breaches by
                           Jacobs. ...............................................................23

                     (4)    Mr. Sarsten Failed to Use an Accepted
                           Method of Calculating Construction
                         Contract Damages. .............................................26

C.      COORS IS ATTEMPTING TO IMPROPERLY SHIFT THE BURDEN OF PROVING DAMAGES TO JACOBS............................................................35

IV.    CONCLUSION................................................................................................36

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Bagwell Coatings, Inc. v. Middle S. Energy, Inc.*,
   797 F.2d 1298 (5th Cir. 1986) ........................................................................27

*Boyajian v. U.S.*,
   423 F.2d 1231 (Ct. Cl. 1970) .........................................................................27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .........................................................................................5

*F. H. McGraw & Co. v. U.S.*,
   130 F. Supp. 394 (Ct. Cl. 1955) .....................................................................27

*Fattore Co. v. Metro. Sewerage Com.*,
   505 F.2d 1 (7th Cir. 1974) .............................................................................27

*Kumho Tire]*
   526 U.S. 137 at 157 (1999) ............................................................................26

*Lifewise Master Finding v. Telebank*,
   374 F.3d 917 (10th Cir. 2004) .......................................................................13

*Oliver-Finnie Co. v. U.S.*,
   279 F.2d 498 (Ct. Cl. 1960) ...........................................................................27

*Parkridge Phase Two Assoc. v. Lockheed Martin Corp.*,
   1999 U.S. App. LEXIS 1422 (4th Cir.) ............................................................7

*Rickards v. Canine Eye Registration Foundation, Inc.*,
   704 F.2d 1449 (9th Cir.), *cert. denied*, 464 U.S. 994, 104 S. Ct. 488, 78 L. Ed. 2d 683
   (1983).................................................................................................................8

*Servidone Constr. Corp. v. U.S.*,
   931 F.2d 860 (Fed. Cir. 1991).........................................................................27

*Turnbull, Inc. v. U.S.*,
   389 F.2d 1007 (Ct. Cl. 1967) .........................................................................30

### STATE CASES

*Bayly Martin & Fay, Inc. v. Pete's Satire, Inc.*,
   739 P.2d 239 (Colo. 1987)..............................................................................35

*Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*,
    624 S.E.2d 55 (Va. 2006)................................................................6

*Capital Life Ins. Co. v. Roth*,
    553 P.2d 390 (Colo. 1976)............................................................35

*Dep't of Health v. Donahue*,
    690 P.2d 243 (Colo. 1984)..............................................................6

*Doyle v. Linn*,
    547 P.2d 257 (Colo. Ct. App. 1975) ...............................................6

*Exch. Nat'l Bank v. Sparkman*,
    554 P.2d 1090 (Colo. 1976)..........................................................36

*Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating Co.*,
    233 Va. 231 (1987) .........................................................................7

*Hale v. Fawcett*,
    214 Va. 583 (1974) .........................................................................7

*Heldt v. Tunnel Dist.*,
    196 Va. 477 (1954) .........................................................................7

*Husband v. Colo. Mountain Cellars, Inc.*,
    867 P.2d 57 (Colo. Ct. App. 1993) .................................................7

*Isaac v. Am. Heritage Bank & Trust Co.*,
    675 P.2d 742 (Colo. 1984)..............................................................7

*Judkins v. Carpenter*,
    537 P.2d 737 (Colo. 1975)............................................................35

*Panther Coal Co. v. Looney*,
    185 Va. 758 (1946) .........................................................................7

*Pomeranz v. McDonald's Corp.*,
    843 P.2d 1378 (Colo. 1993)............................................................6

*Riggs v. McMurty*,
    400 P.2d 916 (Colo. 1965)..............................................................7

*Roberts v. Adams*,
    47 P.3d 690 (Colo. App. 2001) .......................................................6

*Runiks v. Peterson*,
    392 P.2d 590 (Color. 1964).............................................................7

*Smith v. The Pittson Co.,*
    203 Va. 711 (1962) ..........................................................................................................7

*Taylor v. Flair Prop. Assoc.,*
    248 Va. 410 (1994) ......................................................................................................6, 7

*Terrones v. Tapia,*
    967 P.2d 216 (Colo. Ct. App. 1998) ...........................................................................6, 8

*Tull v. Gundersons, Inc.,*
    709 P.2d 940 (Colo. 1985) ..............................................................................................6

*W. Distrib. Co. v. Diodosio,*
    841 P.2d 1053 (Colo. 1992) ..........................................................................................36

*Westminster v. Centric-Jones Constructors,*
    100 P.3d 472 (Colo. 2003) .....................................................................................passim

## STATUTES AND RULES

FED. R. CIV. PROC.
    RULE 56(c) .......................................................................................................................5

Fed. R. Evid.
    Rule 702 .........................................................................................................................13

## OTHER AUTHORITIES

Bernhard A. Aaen, *The Total Cost Method of Calculating Damages in Construction
    Cases*, 22 Pac. L.J. 1185 (1991).............................................................................27, 28

RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981)................................................7

Stephen A. Hess, *"Total Cost Method (or Approach)" and
    "Modified Total Cost Method (or Approach)" to Proving Damages
    in State Contract Cases,*
    124 A.L.R. 5th 375 (2010) ...........................................................................................27, 28

# I.

## <u>INTRODUCTION</u>

Coors alleges in its Complaint that JACOBS ENGINEERING GROUP INC. and JACOBS CONSTRUCTION SERVICES INC. (collectively, "Jacobs") are liable for damages arising from the design and construction of a new, state-of-the-art brewing facility in Elkton, Virginia. Specifically, Coors alleges that Jacobs was guilty of multiple breaches of the standard of care owed under two separate written agreements which caused Coors significant damages. In order to succeed on the merits of its claim, Coors must prove, with reasonable certainty, the cause and existence of its damages. Now, at the close of discovery, it is clear that Coors has not and cannot meet its burden of proving causation and actual damages. Instead, it is clear that Coors' intends to use the fact that the final cost of the project exceeded the original estimate as proof of both wrongdoing by Jacobs and the amount of its damages. By so doing, Coors apparently seeks to shift the burden to Jacobs to disprove Coors' claims. Such a simplistic approach to its burden of proof is not legally supportable.

Throughout the pendency of this matter, efforts to encourage Coors to specify and quantify the manner in which it calculated its alleged $85 million damages claim have been unavailing at best. Indeed, the Court suggested that Coors detail the basis for its damages claim in the Revised Scheduling Order. While Coors added a "damages chart" to the Revised Scheduling Order, this undertaking only further established that Coors has not and cannot prove the existence and cause of its alleged damages as the chart is devoid of any evidence that specific damages were caused by specific Jacobs' wrongdoing. Further, Coors cannot offer any admissible expert testimony to prove the "bricks and mortar" of its alleged damages as its expert forensic accountants were not asked to calculate or apportion Coors' alleged damages to specific breaches by Jacobs and its engineering expert Gunnar Sarsten, who is not a damages expert, did not utilize an legally accepted method of calculating damages in this case.

Coors is unable to meet its burden of proving the existence and cause of its alleged damages, which is an essential element of its claims against Jacobs.  For that reason, the Court should grant Jacobs' Motion for Summary Judgment.

## II.

## STATEMENT OF UNDISPUTED FACTS

Coors and Jacobs Engineering Group Inc. ("JEG") entered into an Engineering Services Agreement ("ESA") on May 17, 1999 under which JEG provided planning, estimating, engineering, technical support, and related administrative services for Coors' capital projects. (See Exhibit A to Plaintiff's Complaint and Docket No. 26, p. 29, Undisputed Fact No. 1.)  The ESA is a cost reimbursable contract also known as a "cost plus" contract.  (See Exhibit A to Plaintiff's Complaint, pp. 4-5, paragraph 6.)  It is not a lump sum contract.  (*Id.*)

Coors and Jacobs Construction Services Inc. ("JCS") entered into a Construction Services Agreement ("CSA") on April 11, 2005 for the construction of a brewery at Coors' facilities in Elkton, Virginia (the "Project").  (See Exhibit B to Plaintiff's Complaint and Docket No. 26, pp. 29-30, Undisputed Fact No. 7.)  The CSA is a cost plus contract with an incentive provision.  (See Exhibit B to Plaintiff's Complaint, p. 2, paragraph 1.5.)  It is not a lump sum contract.  (*Id.*)

Construction for the Coors brewery in the Shenandoah Valley near Elkton, Virginia is now complete, and the brewery is functioning well.  (Docket No. 26, p. 30, Undisputed Fact No. 8.)

On May 12, 2008, Coors filed its Complaint alleging breach of contract, breach of fiduciary duty, negligence, negligent misrepresentation and unjust enrichment.  (Docket No. 1.)

On June 13, 2008, Jacobs filed its Answer, denying Coors' claims and cross-complaining against Coors for breach of contract, and declaratory relief.  (Docket No. 15.)

On March 1, 2010, Coors designated Paul Ficca and Neil Gaudion of FTI Consulting, Inc. and retired engineering executive Gunnar Sarsten as its experts.  Coors retained Mr. Gaudion, who claims to be an expert in cost engineering, and Mr. Ficca, a CPA, to analyze cost overruns relating to the project.  (Deposition of Neil Gaudion attached to the Declaration of Albert Peacock as Exhibit "A-1," pp. 6–10; Deposition of Paul Ficca attached to the Declaration of Albert Peacock as Exhibit "A-2," pp. 7–8.)  Coors also retained Mr. Sarsten who claims to be an expert on engineering and construction to opine on whether or not Jacobs breached the standard of care owed by an engineer and construction manager and on damages.  (Expert Report of Gunnar Sarsten attached to the Declaration of Albert Peacock as Exhibit "A-3," pp. 1–9.)

On June 14 and 15, 2010, Jacobs deposed Gunnar Sarsten.

On June 22 and 23, 2010, Jacobs deposed Neil Gaudion.

On June 23, 2010, Jacobs deposed Paul Ficca.

Mr. Gaudion and Mr. Ficca both testified that they were not asked to and did not attempt to trace Coors' alleged damages to specific breaches by Jacobs.  (Exhibit A-1, pp. 255–256; Exhibit A-2, pp. 49–53, 64, 65, 114.)

Mr. Sarsten testified that he does not have a degree in accounting, finance, or economics, has no training in damage analysis, has never testified as a damages expert or prepared an expert damages report, has never taught a course or lectured on damages, and has never been published in the field.  (Deposition of Gunnar Sarsten attached to the Declaration of Albert Peacock as Exhibit A-4, pp. 4–12, 13–15, 78–79, 87–89.)

Mr. Sarsten concluded that Jacobs breached its contracts with Coors by failing to meet the applicable standard of care, and that those breaches caused Coors' damage. (Exhibit A-3, pp. 1–5, 16.)  Mr. Sarsten could not identify support from the record for his conclusions.  (Exhibit A-4, pp. 156–158, 158–159, 214–218, 235–240, 278–280, 282–284.) Mr. Sarsten could not identify any specific provisions of the ESA or CSA which were breached

other than the general breach of the standard of care owed under those contracts.  (Exhibit A-4, pp. 341–344.)

Mr. Sarsten did not quantify Coors' damages by connecting them causally to specific breaches by Jacobs.  (Exhibit A-4, pp. 156–157, 157–158, 163–164, 226, 263, 277, 279, 290–291, 316.)

Instead, Mr. Sarsten opined that Jacobs caused a total of $89.3 million in damages to Coors by its collective breaches.  He calculated this figure by taking the difference between the original estimate ($210.5 million) and the final cost of the project ($333.4 million) and subtracting an amount which he did not believe was attributable to Jacobs' fault ($33.6 million).  The amount he did not believe was attributable to Jacobs' fault was not determined in any detail, but was calculated by simply increasing the AFU (Amount For Unforeseen events) also known as the "contingency" built into the project estimate from 10% to 30%.  The remainder of $89.3 million was what Mr. Sarsten opined were Coors' damages in this case. (Exhibit A-3, pp. 8-9, 13-14, and Exhibit A-4, pp. 322-326.)  Alternatively, Mr. Sarsten calculated damages of at least $57.4 million from Jacobs' collective breaches using a similar method but applying the 30% AFU in a different way.  (Exhibit A-3, pp. 9, 14, and Exhibit A-4, pp. 322-326.)  Mr. Sarsten admitted that he made up this method of calculating damages.  (Exhibit A-4, pp. 322–329.)

Mr. Sarsten admitted that he did not research, was not aware of, and did not consider utilizing any other method of calculating damages in this case.  (Exhibit A-4, p. 330.)

Mr. Ficca admitted that some of Coors' alleged damages could be calculated using a direct damages calculation method.  (Exhibit A-2, pp. 92–93.)

Mr. Gaudion admitted that some of Coors' alleged damages could be calculated using a direct damages calculation method.  (Exhibit A-1, pp. 255–257.)

Mr. Sarsten also admitted that some of Coors' alleged damages could be calculated using a direct damages calculation method, but that he did not attempt to do so. (Exhibit A-4, pp. 432–439.)

### III.

### ARGUMENT AND LEGAL AUTHORITY

**A.     SUMMARY JUDGMENT MUST BE GRANTED WHERE THE PLAINTIFF FAILS TO OFFER EVIDENCE TO SUPPORT AN ESSENTIAL ELEMENT OF ITS CASE.**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c).  In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), the Court held that when the nonmoving party will have the burden of proof at trial, the moving party can meet its initial burden on summary judgment merely by pointing to the absence of evidence in the record to support an essential element of the nonmoving party's case.  The Court reasoned that summary judgment is proper in this circumstance because "there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–323.

In this case, causation and damages are essential elements of Coors' claims against Jacobs.  However, the record is devoid of any admissible evidence supporting Coors' claim for specific damages allegedly caused by Jacobs' specific breaches.  Therefore, summary judgment is proper.

**B.      SUMMARY JUDGMENT IS PROPER BECAUSE COORS CANNOT**
**PROVE ITS DAMAGES WITH REASONABLE CERTAINTY AS**
**REQUIRED UNDER BOTH COLORADO AND VIRGINIA LAW.**

Actual damages are an essential element in a breach of a construction contract action and the party seeking damages has the burden of proving the existence and cause of damages.[1] *Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 477 (Colo. 2003); *Terrones v. Tapia*, 967 P.2d 216, 218 (Colo. Ct. App. 1998); *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993); *see also Roberts v. Adams*, 47 P.3d 690 (Colo. App. 2001). The general measure of damages for breach of a construction contract is the amount required to place the owner "in the same position he would have occupied had the breach not occurred." *Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 477–478 (Colo. 2003), quoting *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993); *see also Taylor v. Flair Prop. Assoc.*, 248 Va. 410, 414 (1994). This rule protects defendants against speculative awards that would otherwise provide plaintiffs with an economic windfall. *See Dep't of Health v. Donahue*, 690 P.2d 243 (Colo. 1984).

Under both Colorado and Virginia law, the party seeking damages for breach of contract has the burden to establish its damages and prove them with "reasonable certainty." *Tull v. Gundersons, Inc.*, 709 P.2d 940, 944 (Colo. 1985); *Taylor v. Flair Prop. Assoc.*, 248 Va. 410, 414 (1994). Admittedly, mathematical certainty is not required, but damages that are

---

[1] Damages are also an essential element of any tort claim and the argument that Coors' has failed to meet its burden of proving its damages for its tort claims (should they survive in this case) is the same as the argument that Coors has failed to meet its burden of proving contract damages as discussed herein. *Doyle v. Linn*, 547 P.2d 257, 259 (Colo. Ct. App. 1975)("Injury or damage to the person complaining is an essential element of actionable negligence."); *Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*, 624 S.E.2d 55, 62 (Va. 2006). ("The elements of an action in negligence are a legal duty on the part of the defendant, breach of that duty, and a showing that such breach was the proximate cause of injury, resulting in damages to the plaintiff.")

merely speculative, remote, imaginary or impossible of ascertainment, cannot be recovered. *Tull*, 709 P.2d at 944; *Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 478 (Colo. App. 2003); *Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating Co.*, 233 Va. 231 (1987) (quoting *Manss-Owens Co. v. Owens & Son*, 129 Va. 183 (1921); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981) (damages are not recoverable beyond an amount that evidence permits to be established with reasonable certainty).

The party seeking damages must also prove the cause of the damages it claims. *Westminster*, 100 P.3d at 478. Thus, the party seeking damages must show that the damages are "traceable to and the direct result of the wrong sought to be redressed." *Husband v. Colo. Mountain Cellars, Inc.*, 867 P.2d 57, 59–60 (Colo. Ct. App. 1993); *Runiks v. Peterson*, 392 P.2d 590, 591 (Colo. 1964); *see also Isaac v. Am. Heritage Bank & Trust Co.*, 675 P.2d 742 (Colo. 1984); *see also Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating Co.*, 233 Va. 231 (1987) (quoting *Manss-Owens Co. v. Owens & Son*, 129 Va. 183 (1921) (". . . [i]f damages are so remote as not to be directly traceable to that breach, or are attributable to some other intervening cause, then they cannot be allowed.").

Furthermore, when there is evidence of damage from several causes, the burden is on the plaintiff to show within a reasonable degree of certainty the share of damages for which a defendant is responsible. *Hale v. Fawcett*, 214 Va. 583, 586 (1974); *Parkridge Phase Two Assoc. v. Lockheed Martin Corp.*, 1999 U.S. App. LEXIS 1422 (4th Cir.); *Smith v. The Pittson Co.*, 203 Va. 711, 715 (1962); *Heldt v. Tunnel Dist.*, 196 Va. 477, 484 (1954); *Panther Coal Co. v. Looney*, 185 Va. 758, 771–72 (1946).

In order to meet its burden, the party seeking damages must provide a reasonable basis for computation of damages. *Riggs v. McMurty*, 400 P.2d 916, 919 (Colo. 1965); *Taylor v. Flair Prop. Assoc.*, 248 Va. 410, 414 (1994) (the party seeking recovery must set forth sufficient facts to allow the trier of fact to make an intelligent and probable estimate of the damages

sustained).  This can be accomplished by presenting expert testimony on the existence and cause of the alleged damages.  *Terrones v. Tapia*, 967 P.2d 216, 218–19 (Colo. Ct. App. 1998).  For example, in *Terrones*, the court granted summary judgment after finding that the non-moving party's evidence of damages was speculative because the non-moving party failed to offer expert testimony from an accountant or economist relating to the quantity of damages, relied on hearsay statements from other restaurant owners, and failed to provide data or other support for his damages figure.  *Id.*  In support of its holding, the court cited *Rickards v. Canine Eye Registration Foundation, Inc.*, 704 F.2d 1449 (9th Cir.), *cert. denied*, 464 U.S. 994, 104 S. Ct. 488, 78 L. Ed. 2d 683 (1983), which similarly held that summary judgment was appropriate when a non-moving party has neither identified expert witnesses nor designated documents that supported a basis for computing its damages claims.  *Id.*  In such circumstances, there is no competent or relevant evidence from which a jury could fairly estimate damages.  *Id.*

In this case, Coors is required to prove damages as part of its claim against Jacobs; however, the record is devoid of any admissible evidence to support its claim for actual damages caused by Jacobs' alleged breaches.

    **1.**        **Summary Judgment is Proper Because Coors Cannot Meet Its Burden of Proving the Existence and Cause of Its Alleged Damages Through Admissible Expert Testimony.**

Coors designated three experts to prove the essential elements of its case against Jacobs including forensic accountants Neil Gaudion and Paul Ficca of FTI Consulting, Inc. and retired engineering executive Gunnar Sarsten.

After deposing Mr. Gaudion, Mr. Ficca, and Mr. Sarsten, and upon review of their expert reports, it is clear that Coors has not met and cannot meet its burden of proving the existence and cause of its damages with reasonable certainty as required by Colorado and Virginia law.  Specifically, Mr. Gaudion and Mr. Ficca testified that they were not asked to and

did not calculate or apportion damages and would not identify specific breaches of the

Engineering Services Agreement, Construction Services Agreements, or the applicable standard

of care owed by Jacobs.  (Exhibit A-2, pp. 49–53, 63–64; Exhibit A-1, pp. 70–71.)  Instead,

Mr. Gaudion and Mr. Ficca referred to Mr. Sarsten to provide damages testimony.  (Exhibit A-2,

p. 118.)  However, Mr. Sarsten is not a damages expert, his opinions as to the cause of Coors'

damages are speculative, and he did not calculate damages using a legally accepted method.

a)   **Coors Cannot Meet Its Burden of Proving Damages Because
FTI Has Not Rendered Admissible Opinions on the Existence
and Cause of Coors' Alleged Damages.**

FTI Consulting, Inc. provides forensic accounting services for litigation, and

FTI's Mr. Gaudion or Mr. Ficca were designated by Coors as expert witnesses.  Curiously,

however, Mr. Gaudion and Mr. Ficca were not asked to and did not calculate the damages

attributable to Jacobs for alleged breaches of the two contracts or for breaches of the standard or

care.  (Exhibit A-2, pp. 49–53.)  Specifically, Mr. Ficca provided the following testimony with

respect to FTI's failure to calculate damages:

> [Mr. Peacock]:  And I take it from your partner's
> [Mr. Guadion's] testimony, that you weren't able to quantify
> specific areas of damage attributable to specific breaches of either
> the standard of care or the contract on Jacobs' part?
>
> A:   Well, the... ultimately that's not what we did. You
> know, I don't, I don't know if I would go so far as to say it's
> completely impossible, but I think based on the records we saw, it
> was, it was...essentially impractical for us to do it.  I mean, it
> was -- the records just were not kept in a way that I felt
> comfortable that we could, with some level of specificity, do it
> within the -- some reasonable bounds.  So that's why we didn't do
> it.
>
> Q:   Can you tell me the difference between impossible and
> impractical in your view, as you used those terms in your last
> answer?
>
> A:   Well, impossible means it can't be done.

Q:   Okay.

A:   Impractical might mean not without some extraordinary level of time and effort.  So that would be my distinction.

Q:   Okay.  And just so that we're clear, in this case you found that it would be impractical to calculate the damages attributable to Jacobs either breach of contract or breach of the standard of care, correct?

A:   I don't know if I'd quite characterize it that way.  I mean, we didn't -- I mean, I guess I would summarize by saying, you know, we looked at a lot of data associated with the cost overruns, and ultimately that's what's reflected in our report.  But there isn't a summary of damages that is described in the report.

Q:   Okay.  The report doesn't take the cost overrun identified and determine what portion of that is attributable to Jacobs' either breach of the contract or breach of an applicable standard of care?

A:   Right.

Q:   Is that an accurate –

A:   Or any other reason, right.

Q:   And similarly, it doesn't attempt to break out any portion of and attribute any portion of the cost overrun to any of the work that Briggs did?

A:   (There was no response.)

Q:   Let me rephrase it, because that was a bad question.  Because you did do that; you did look at the difference between Briggs' original budget and Briggs' final number.  You didn't attempt in this report to attribute any portion of the cost overrun to any fault on Briggs' part in terms of its breach of its contract or its failure to meet the standard of care applicable?

A:   I think that's right.

Q:   Okay.

Q:   Right before we changed tapes, you told us that you didn't try to quantify damages in your report.  Were you asked to do so by Smith, Currie and Hancock?

A:   No.

Q:   Did Smith Currie tell you what you're assignment was?

A:   I think we had a clear understanding of that.

Q:   Which was?

A:   The scope we described in our report.

Q:   Did you have an understanding from counsel that another expert would be the one... like Mr. Sarsten, who would be the one attempting to quantify the damages?

A:   I think that was the outcome.  So I would say yeah, that was, that was, that was generally my understanding, is that that would be handled by him and our scope was as defined in the report.

Q:   Did you ever find it a little bit odd that the consulting firm that includes a CPA would not be calculating damages, but that the guy with the construction background would be the one trying to quantify the damages?

A:   Not particularly.

(Exhibit A-2, pp. 49–53.)

Throughout Mr. Ficca's testimony, he also confirmed that FTI did not quantify or apportion Coors' alleged damages to any specific breach of contract or breach of the applicable standard of care by Jacobs.

Q:   And I think we've established, but correct me if I'm wrong, you didn't allocate certainly any specific damages caused by any specific failure to follow the requirements of either the alliance agreement[2] or the construction services agreement in your report?

A:   I didn't quantify a specific number associated with that, right.

(Exhibit A-2, p. 64.)

Q:   And just to confirm, you didn't attempt to quantify the specific damages that were caused by any breach of any applicable standard of care when it came to Jacobs in your report?

---

[2] Alliance agreement = Engineering Services Agreement.

A:   Did not quantify a number associated with that, right.

(Exhibit A-2, p. 65.)

It is evident from Mr. Gaudion and Mr. Ficca's testimony that Coors has not met and cannot meet its burden of proving the existence and cause of its damages with reasonable certainty through its experts at FTI because Mr. Gaudion and Mr. Ficca were not asked to do so and did not attempt to trace or quantify Coors' alleged damages to specific breaches by Jacobs.

Admittedly, Mr. Ficca and Mr. Gaudion have identified specific cost increases, but they have not attempted to identify or trace the cause(s) of those increases to a specific breach of the standard of care owed by Jacobs, to a specific breach of the ESA or CSA, or to any other actor or source (e.g. Briggs, inflation, etc.).  In order to recover damages from Jacobs, Coors must produce evidence that specifically ties each cost increase it claims as damage to a specific breach by Jacobs.  Without such evidence, any damages award based on FTI's work would be purely speculative and would provide Coors with an economic windfall which the law does not allow, particularly given that the ESA and CSA are cost plus contracts, not lump sump contracts, under which Coors assumed the risk of costs increases.

**b)**     **Coors Cannot Meet Its Burden of Proving Damages Because Gunnar Sarsten Cannot Render Admissible Testimony on the Existence and Cause of Coors' Alleged Damages.**

As noted above, Coors and its forensic accountants FTI relied on Gunnar Sarsten, Coors' engineering/construction expert, to quantify damages in this case.[3]  However, Coors cannot meet its burden of proving the existence and cause of its alleged damages with reasonable certainty through the testimony of Mr. Sarsten because:  (1) Mr. Sarsten is not a damages expert, (2) his opinions as to the cause of Coors' damages are speculative and, (3) he failed to trace or quantify Coors' damages using a legally acceptable method.  In fact, without knowing it, he used

[3] Mr. Sarsten's qualifications and opinions will be the subject of a subsequent *Daubert* motion.

a disfavored method of calculating damages called the "Modified Total Cost" method which is not legally or factually appropriate or acceptable under the facts of this case.

### (1)   Mr. Sarsten is Not a Damages Expert.

Jacobs is aware that this Court does not wish to hear *Daubert* motions at this time.  For that reason, Jacobs will not belabor this point in this motion.  However, for purposes of understanding the fundamental flaw in the way Mr. Sarsten has calculated Coors' damages, it is important to know that he is not a damages expert and does not have the specialized knowledge, skill, experience, training, or education in calculating damages in a complex engineering/construction case to offer opinions.  See FED. R. EVID. 702.

Mr. Sarsten does not have a degree in accounting, finance, or economics, has no training in damage analysis, has never testified as a damages expert or prepared an expert damages report, has never taught a course or lectured on damages, and has never been published in the field.[4]  *See Lifewise Master Finding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004); Exhibit A-4, pp. 4–12, (previous expert experience), pp. 13–15 (education), pp. 78–79 (lectures/publications), and pp. 87–89 (courses).  Indeed, Mr. Sarsten admitted that he was not a "financial guy" and relied on others to handle accounting and financial issues for him. (Exhibit A-4, p. 47.)  Mr. Sarsten's only proffered qualification for rendering expert opinions on damages was his review in the 1970s and 1980s of numerous reports from the Construction Industry Institute that analyzed why some construction projects were successful and why others were not.  (Exhibit A-4, p. 88.)  Simply put, Mr. Sarsten's methodology and damages calculation are legally and factually flawed because Mr. Sarsten is not qualified to render opinions on damages.

---

[4] In fairness to Mr. Sarsten, prior to his retirement in 1994, he served as CEO of United Engineers and Constructors International and Morrison Knudsen, two construction/engineering firms.  However, in that role, he was not responsible for calculating damages.

### (2)    Mr. Sarsten Cannot Identify the Cause(s) of Coors' Alleged Damages.

In order to prove damages, Coors must offer evidence of Jacobs' specific breaches and casually connect those to its damages.  In thirty overly broad and conclusory opinions, Mr. Sarsten claims that Jacobs breached its contracts with Coors and the applicable standard of care, and that those breaches caused Coors' damage.  (Exhibit A-3, pp. 1–5, 16.)  Yet, when asked in his deposition to identify support from the record for his conclusions, or to quantify the damages caused by Jacobs' specific breaches, Mr. Sarsten could not do so.  Indeed, Mr. Sarsten repeatedly admitted that he did not review all of the relevant records, could not identify specific examples of deficiencies, and could not quantify the impact of the alleged deficiencies.  For example, Mr. Sarsten was asked to state support for his opinion that "Jacobs should not have billed Coors for all the costs associated with design omission, revision, and additions and rework."  (*See* Exhibit A-3, p. 2, paragraph 11.)

> Q.   Okay.  Let's go to item No. 11.  "Jacobs should not have billed Coors for all the costs associated with 'Design Omission, Revision, and Additions' and 'Rework.'"
>
> A.   Yes, sir.
>
> Q.   And did you find any evidence that Jacobs did bill Coors for rework -- engineering rework?
>
> A.   I saw in the contract that they were not to bill for engineering rework, and that they were supposed to provide notification to Coors of any such error, correction that they did.  So of all the documents that I reviewed, I never saw evidence that Jacobs did any of their engineering work for free, and I never saw any documents that showed that they acknowledged that they made some mistake and asked for Coors' approval like the contract required.  So I drew the conclusion that they did not do the engineering rework for free.

Q.   Did you see any evidence that they actually billed Coors for any engineering rework?

A.   I can only refer to my last answer.

Q.   Can you quantify the amount of engineering rework that contractually should not have been billed to Coors that was actually billed to Coors and Coors paid for?

A.   I cannot.

Q.   It says, "Jacobs should not have billed Coors for all the costs associated with 'Design Omission, Revision, and Additions.'"  And I want to focus on design revisions and additions.

If Coors changed something that required Jacobs to revise its designs or do additional design, were they entitled to bill for that?

A.   Yes, they were.  Only if the revision was due to an error, is my understanding, that they couldn't bill for.

Q.   An error by Jacobs?

A.   An error by Jacobs.

Q.   Okay.  And, again –

A.   If they did an error by Jacobs and had to make a revision as a consequence, then my understanding of the contract is that they were not to bill for that.

Q.   Okay.  And can you cite to me a specific example where Jacobs billed for a design omission, revision, or addition that it should not have?

A.   I have not attempted to.

Q.   And I take it from your answer you can't quantify how much, if any, Jacobs billed for design omissions, revisions and additions that it shouldn't have, and that Coors ultimately paid for?

A.   Yeah.  I would agree with what you said, with the exception of the "if any," because I think there is some.

(Exhibit A-4, pp. 156–158.)

Similarly, Mr. Sarsten could not identify support for paragraph 12 of an affidavit dealing with the same subject – engineering rework – which  he submitted to this Court in opposition to Jacobs' original motion for partial summary judgment.  (Docket No. 33-13.)

> Q.    And in paragraph 12 you say, "It is my opinion that Jacobs almost certainly billed Coors for Jacobs' engineering rework that Jacobs agreed under the contract not to bill."
>
> A.    That's my opinion.
>
> Q.    And where does the "almost certainly" come from?
>
> A.    Well, the sentence would be good without those words.
>
> Q.    And that's based on the fact that you didn't see anything in the records showing hours that Jacobs spent doing rework and specifically identified as rework and then specifically did not bill to Coors?
>
> A.    That's correct.  And just coincidentally, I did see evidence that Briggs did engineering rework for free because they acknowledged it and said so and produced some evidence saying so.  Whether Briggs always did it for free or not, I can -- I can't testify to, but I can testify that I saw evidence in the files that at least on some occasions, and notable occasions, Briggs acknowledged that -- and stated that they had done that work -- that correction work for free.  But I didn't see anything like that related to Jacobs.
>
> Q.    Did you go through the Jacobs billing records in detail to determine whether any of the billings were for work that could have been –
>
> A.    I did not.
>
> Q.    -- that could have been designated as rework, you did not?
>
> A.    I did not.

(Exhibit A-4, pp. 158–159.)

On another subject, Mr. Sarsten opined that Jacobs did not provide the adequate number of personnel needed for the project, but could not identify how many more personnel were needed:

Q.  Item 3, "Jacobs did not provide the adequate number of personnel needed to address the project's needs, e.g., timely engineering completion and timely resolution of engineering and construction issues." How many more personnel would have been needed, in your opinion, to adequately staff this project?

A.  I'm not prepared to answer that question precisely. You maybe want me to say when nine more people would have done it. However many people were necessary to get the work done on time, the engineering time, that's how many they needed.

Q.  Do you have any evidence that you've seen in the record that indicates that Jacobs knew when it originally created the team that it didn't have an adequate number of personnel for the project?

A.  No.

Q.  At what point in the project do you think Jacobs should have realized that the team it had assembled did not consist of an adequate number of people?

A.  May, June, July 2005.

Q.  And how many more people should they have added at that time, if you can say?

A.  Enough to get the work done on time.

Q.  Looking with the benefit of 20/20 hindsight, can you give me an estimate of how many additional people that would have been?

A.  I think that would be very subjective to argument.

(Exhibit A-4, pp. 214–218.)

Similarly, Mr. Sarsten opined that Jacobs should have added more people to its

project control staff when the decision was made to use time and material subcontracts instead of

lump sum subcontracts.

Q.  Continuing on in paragraph 17 you say, "Jacobs either lacked, or simply failed to supply, the resources to supplement its already weak project control staff as required to reasonably monitor and control time and material subcontracts."

I take it that to monitor and control time-and-material subcontracts takes more manpower than doing so for a lump-sum subcontract?

A.   Yes, sir.

Q.   Can you tell me how many more people Jacobs should have put on this project once the decision was made to convert the subcontracts to time and material?

A.   No, sir, I cannot.

Q.   Can you tell me the type of people, what level of folks would be required?

A.   Well, certainly a lot of schedule monitoring, cost control, people managing the subcontractors to ensure that they weren't doing rework at Coors' expense that they were supposed to be doing at their own expense, that sort of thing.

Q.   Do you know how many -- do you know how many people Jacobs already had assigned initially when the decision was made to go with time-and-material subcontracts?

A.   No, I do not know the number.

Q.   Do you know if Jacobs ever supplemented that staff at some point?

A.   I believe they did.

Q.   And do you know how many more people they added?

A.   I cannot -- I do not know the number.

(Exhibit A-4, pp. 278–280, 282–284.)

Mr. Sarsten made no effort to quantify damages caused by his opinions that a sufficient number of personnel were not assigned to the project or that more should have been added later in the project.  In addition, Mr. Sarsten did not take into consideration that Coors would have had to pay for any additional Jacobs personnel added under the CSA given that it was a cost plus contract.  In order to quantify damages, let alone provide an admissible opinion on breach, Mr. Sarsten would have to:  (1) identify the number of additional personnel which were needed; (2) explain how the failure to so caused a specific amount of delay or damage; and, (3)  deduct from the damages the additional costs to Coors for those additional personnel.  Since

Mr. Sarsten was unwilling or unable to quantify the number of additional personnel needed it was not possible for him to quantify damages from this alleged breach.

What is even more absurd is Mr. Sarsten's conclusion that Jacobs' drawings contained numerous errors, inconsistencies, and clashes, which caused Coors' damages. (Exhibit A-3, p. 4, paragraph 22 and p. 6, paragraph 8.)  In fact, Mr. Sarsten admitted reviewing only a small fraction of the design drawings prepared for the project and then could not quantify or identify errors in those few drawings he did review.  Coors apparently expects Jacobs to defend itself against the allegation that Coors suffered damages due to Jacobs' engineering design errors, even though Coors' expert did not and cannot identify which drawings contain errors, what those errors are or what damages those errors caused.

> Q.   I want to skip all the way ahead to No. 22.  We'll come back to No. 12 tomorrow.  "Drawings issued by Jacobs and its engineering subcontractors contained numerous errors, inconsistencies, and clashes."
>
> A.   Yes, sir.
>
> Q.   Have you reviewed the Jacobs drawings and identified specific errors, inconsistencies, and clashes within the Jacobs' engineering drawings?
>
> A.   Yes, sir.
>
> Q.   How many of Jacobs' engineering drawings have you reviewed?
>
> A.   I'm going to say 50 but, you know, I'm judging from my memory.  I didn't write a count down.
>
> Q.   Have you written down anywhere a list of the design drawings that Jacobs prepared that you looked at that had errors, inconsistencies, or clashes in them?
>
> A.   I have not made such a list.
>
> Q.   Can you quantify for me by percentage or by the number of drawings created by Jacobs that have errors, inconsistencies, or clashes in them?
>
> A.   I cannot.

Q.   Is there an acceptable level for an engineer to have errors, inconsistencies, or clashes in their design drawings?

A.   Yes, I would say there is.

Q.   And can you quantify what today the acceptable percent of errors, inconsistencies, and cashes the standard of care would allow?

A.   Not with any precision.

Q.   Have you looked at design drawings prepared by -- you list here subcontractors, such as Briggs?

A.   Correct.

Q.   And have you found errors, inconsistencies and/or clashes in Briggs' design drawings?

A.   Yes, sir.

Q.   How many Briggs design drawings have you reviewed?

A.   It's more than a hundred.

Q.   And can you identify by document number or drawing number those Briggs design drawings which contain errors, inconsistencies, or clashes?

A.   It doesn't list them as such.

Q.   Can you give me the total number of drawings prepared by Briggs which have errors, inconsistencies, or clashes?

A.   No.  The only quantification that I could provide to you to be responsive to your question is that there were 2,000 RFIs[5], and so -- that's Jacobs and Briggs together -- that were related to engineering issues.  And it's a huge number.

Q.   And that goes back to item No. 12 in part?

A.   That goes back to item No. 12.

Q.   How many total RFIs were there on this project?

---

[5] RFI = Request For Information—a tool used by subcontractors to seek information or clarification.

A.   Well, more than 2,000.

Q.   How many of those were directly attributable to design questions?  And I want to be clear –

A.   The huge majority of them.

Q.   And how many of those RFIs didn't just involve design questions, but as it turned out were the result of design errors, inconsistencies, clashes, or omissions?

A.   Oh, that was a long question, I'm sorry.

Q.   Sure.  No.  No.  It's getting late.  I'll repeat it.

Of those RFIs that you attribute to design issues, how many of those were the result of design errors, inconsistencies, clashes, or omissions?

A.   Almost all of them.

Q.   Did you attempt to -- or did you make a list of the RFIs by RFI number that you attributed to a Jacobs or a Briggs design error, inconsistency, or clash?

A.   I did not make such a list.

Q.   Do you know if anyone has made such a list?

A.   I know of no one that has made such a list.

Q.   How did you determine which of the RFIs related to design issues as opposed to some other?

A.   I looked at them.  I probably looked at all of them

Q.   And when you went through the 2,000 or so RFIs, did you keep a tally of which ones were related to engineering, design, drawings by Jacobs?

A.   No, I did not.

Q.   Did you keep a tally of how many of those RFIs were related to engineering design issues involving Briggs?

A.   No, I did not separate them.  From my standpoint, Briggs' errors were Jacobs' errors.

Q.   And did you try to determine how many of the RFIs were just the asking party, not understanding what were, in fact, acceptable design drawings?

A.   There wasn't much of that.

Q.   Can you quantify it?

A.   Not as I sit here.

(Exhibit A-4, pp. 235–240.)

Since Mr. Sarsten did not make a list of how many or which design drawings by Jacobs or by Briggs had errors, inconsistencies, clashes or omissions, he could not and did not quantify any damages caused by them.  Similarly, since Mr. Sarsten did not make a list of how many or which RFIs were caused by design errors by Jacobs or Briggs, he could not and did not quantify any damages or delays caused by RFIs.

As a final example, Mr. Sarsten could not provide specific support for his 14th, 15th, 16th or 17th opinions.  (Exhibit A-3, pp. 3–4.)

> Q.   Item No. 14, "Jacobs did not properly coordinate 'all Work for the Project' as required by Article 2 of the contract with Coors."
>
> And the evidence that they didn't properly coordinate it, I take it, is the end result of the project?
>
> A.   I was specifically thinking in this case of some of the clashes between the engineering work of Briggs and the engineering work of Jacobs.
>
> Q.   Okay.  And can you tell me how many clashes there were as a result of the failure to coordinate?
>
> A.   I cannot tell you.
>
> Q.   Item 15, "Jacobs did not adequately ensure that all fabricators or subcontractors always had the latest drawings from which to work with -- from which to work," excuse me.
>
> A.   Yes, sir.
>
> Q.   And did you read the deposition testimony from the representative from Bristol, one of the fabricators?
>
> A.   No, sir, I don't think I did.
>
> Q.   Do you know -- let's just focus on fabricators.

Do you know how many pipe spools had to be redone or reworked in the field because the fabricator did not have the latest drawings?

A.   No, I cannot tell you the number.

Q.   Can you quantify either by cost or by delay the effect on the other subcontractors that Jacobs' failure to provide the latest drawings had on the project?

A.   I cannot.

Q.   Item 16, "Jacobs did not adequately ensure that pipe spools were corrected or fabricated when revised drawings were issued after previously being released for fabrication."

Can you tell me the number of spools affected by this problem?

A.   No, I cannot.  But when you read the sentence, you said "fabricated" as opposed to "refabricated."  But my answer is the same.

Q.   Okay.  I appreciate it.  I'm sorry, I misspoke.

Can you quantify for me the cost that that particular issue added to the project?

A.   I cannot.

(Exhibit A-4, pp. 278–280.)

Mr. Sarsten's opinions are nothing more than speculation and conjecture evidenced by his repeated inability to identify specific details, documents and/or testimonial support for his conclusion that Jacobs breached its contracts and the applicable standard of care which caused specific damages or delays to Coors.  As a result, Coors is unable to meet its burden of proving the existence ***and cause*** of its alleged damages with reasonable certainty as required.

### (3)   Gunnar Sarsten Failed to Trace Coors' Alleged Damages to Specific Breaches by Jacobs.

Coors cannot meet its burden of proving the existence and cause of its alleged damages with reasonable certainty through Mr. Sarsten's testimony because Mr. Sarsten admits

that he did not quantify Coors' alleged damages by tracing its damages to Jacobs' alleged

breaches.

> Q.   Can you quantify the amount of engineering rework that contractually should not have been billed to Coors that was actually billed to Coors and Coors paid for?

> A.   I cannot.

(Exhibit A-4, pp 156–157.)

> Q.   And I take it from your answer you can't quantify how much, if any, Jacobs billed for design omissions, revisions and additions that it shouldn't have, and that Coors ultimately paid for?

> A.   Yeah.  I would agree with what you said, with the exception of the "if any," because I think there is some.

(Exhibit A-4, pp 157–158.)

> Q.   Can you quantify for me the additional construction administration cost to deal with the field impact of engineering errors referenced in paragraph 13?

> A.   I think with a reasonable certainty.  I mean, we -- all we've said is that it exceeds $3 million.  I'm really expecting a number that's hugely bigger than that.

> Q.   Can you quantify it?

> A.   Not as we sit here.

> Q.   Have you quantified it between the time of your affidavit and the time of your expert report?

> A.   No.

(Exhibit A-4, pp. 163–164.)

> Q.   Can you quantify, Mr. Sarsten, for me the dollar amount of the cost increase that can be causally connected to item No. 3 in your report, the failure to provide an adequate number of personnel needed to address the project's needs?

> A.   No, I cannot.

> Q.   Can you quantify for me any schedule delay -- the amount of schedule delay from the original first brew date to the

ultimate March 1, 2000, first brew date that was caused by Jacobs'
failure to provide the adequate number of personnel identified?

    A.  I cannot.

(Exhibit A-4, p. 226.)

    Q.  Can you quantify the amount of additional cost that
Coors incurred as a result of Mr. Corwin stamping Briggs' design
drawings that had errors or omissions in them?

    A.  No, sir, I cannot.

(Exhibit A-4, p. 263.)

    Q.  Did you attempt to quantify dollar-wise costs that you
think were attributable to delays in any specific or group of RFIs?

    A.  I did not do that.

(Exhibit A-4, p. 277.)

    Q.  Can you quantify either by cost or by delay the effect
on the other subcontractors that Jacobs' failure to provide the latest
drawings had on the project?

    A.  I cannot.

(Exhibit A-4, p. 279.)

    Q.  Can you quantify for us the cost incurred as a result of
components not fitting or not being able to be assembled as
intended?

    A.  Well, I present later in my report what I believe are the
overall cost consequences of the project of all of these things
together, but not individually.

    Q.  And I take it from your last answer that you wouldn't
be able to tell us the additional man-hours that were incurred
because of components not fitting or not being able to be
assembled as intended?

    A.  Yes, sir.  I can't take any one of these and put
quantification on them.

(Exhibit A-4, p. 316.)

As Mr. Sarsten admitted, he did not quantify Coors' alleged damages

"individually" by tracing them to a specific breach by Jacobs.  (*Id.*)  Without this evidence,

Coors is unable to meet its burden of proving the existence and cause of its alleged damages with reasonable certainty as required.

**(4)**      **Mr. Sarsten Failed to Use an Accepted Method of Calculating Construction Contract Damages.**

Coors cannot meet its burden of proving the existence and cause of its alleged damages because Mr. Sarsten failed to use an accepted method of calculating construction contract damages. An expert's application of his/her own unique methodology, rather than a proper analysis which is well-known and respected, may deem any resulting opinion testimony unreliable and inadmissible. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137 at 157 (1999). Here, Mr. Sarsten failed to follow well-known and established principles let alone legally acceptable methods of calculating damages. Instead, he admits that he made up his own method of calculating damages. (Exhibit A-4, p. 329.)

Mr. Sarsten opined that the total damages in this case are $89.3 million. (Exhibit A-4, pp. 326–329.) He calculated this "damages" figure by simplistically subtracting the original project estimate ($210.5 million) from the final project cost ($333.4 million) which yielded a difference of $122.9 million. He then subtracted from that difference an amount he did not believe was attributable to Jacobs' fault ($33.6 million). This number ($33.6 million) was not based on an analysis of specific cost increases which Mr. Sarsten opined were caused by other actors or event over which Jacobs had no control. Instead, the $33.6 million was invented by Mr. Sarsten by simply increasing the 10% AFU number in the original estimate to 30%. The remainder of $89.3 million was what Mr. Sarsten claimed were Coors' damages in this case. (Exhibit A-4, pp. 322–329.) Mr. Sarsten admitted that ***he made up this method of calculating damages***. (Exhibit A-4, p. 329) (emphasis added). Indeed, Mr. Sarsten admitted that he did no research, was not aware of, and did not consider utilizing any other method of calculating damages in this case (which further demonstrates his lack of qualifications in the field of

damages analysis).  (Exhibit A-4, p. 330.)

Although Mr. Sarsten did not know it at the time, the method he utilized is known within the construction industry as the "modified total cost" method.  *See* Stephen A. Hess, *"Total Cost Method (or Approach)" and "Modified Total Cost Method (or Approach)" to Proving Damages in State Contract Cases*, 124 A.L.R. 5th 375 (2010)(see Notice of Lodgment) Ironically, Mr. Sarsten did not know he was utilizing the modified total cost method, for, if he had, he would have also known (as a damages expert) that the "total cost" and "modified total cost" methods are highly disfavored by the courts and commentators.[6]  Indeed, the total cost and modified total cost methods are "by no means satisfactory" and are only used as "a last resort method" and then with "trepidation" because the methods do not require the plaintiff contractor to break down its costs and link each extra cost to the defendant owner's actions.  *F.H. McGraw & Co. v. U. S.*, 130 F. Supp. 394, 511 (Ct. Cl. 1955); *Oliver-Finnie Co. v. U.S.*, 279 F.2d 498, 506 (Ct. Cl. 1960); Bernhard A. Aaen, *The Total Cost Method of Calculating Damages in Construction Cases*, 22 Pac. L.J. 1185, 1193–94 (1991)(See Notice of Lodgment).

Significantly, the total cost and modified total cost methods have only been

---

[6] *Id.; See also* Bernhard A. Aaen, *The Total Cost Method of Calculating Damages in Construction Cases*, 22 Pac. L.J. 1185 (1991); *City of Westminster v. Centric Jones Constructors*, 100 P.3d 472 (Colo. Ct. App. 2003) (rejecting total cost method because owner could have used an alternative method to provide the jury with a reasonable basis for apportioning damages); *Servidone Constr. Corp. v. U.S.*, 931 F.2d 860 (Fed. Cir. 1991) ("Trial court[s] must use the total cost method with caution and as a last resort." ); *Boyajian v. U.S.*, 423 F.2d 1231, 1243 (Ct. Cl. 1970) (cautioning that total cost method "has been tolerated only when no other mode was available and when the reliability of the supporting evidence was fully substantiated" ) (quoting *W.R.B. Corp. v. U.S.*, 183 Ct. Cl. 409, 426 (Ct. Cl. 1968)); *F. H. McGraw & Co. v. U.S.*, 130 F. Supp. 394, 400 (Ct. Cl. 1955) ("[The total cost] method of proving damages is by no means satisfactory . . ." and should only be used in "an extreme case and under proper safeguards."); *Bagwell Coatings, Inc. v. Middle S. Energy, Inc.*, 797 F.2d 1298, 1307 (5th Cir. 1986) (warning that under total cost method, non-breaching party's own inefficiencies and problems are not taken into account when determining increased costs); *Fattore Co. v. Metro. Sewerage Com.*, 505 F.2d 1 (7th Cir. 1974) ("A pure total cost method, even when applied to selective items, would allow for correction of bidding errors and reward possibly inefficiency."); Exhibit A-4, pp. 329-330.

applied in contractor lawsuits against owners, or subcontractor lawsuits against contractors involving lump-sum contracts.  They have not been used or accepted for use in owner lawsuits against contractors.  Indeed, the Colorado Court of Appeals in *City of Westminster v. Centric Jones Constructors*, 100 P.3d 472, 479 (Colo. Ct. App. 2003) specifically recognized that total cost method cases involved claims made by contractors against owners, not owners against contractors.  To date, Jacobs' research has not revealed any published case in which the total cost or modified total cost methods have been approved for use by an owner such as Coors against its contractor involving a cost reimbursable or cost plus contracts, and Coors would be hard-pressed to present authority for the proposition that either method is appropriate or acceptable in a case such as this.  *See* Stephen A. Hess, *"Total Cost Method (or Approach)" and "Modified Total Cost Method (or Approach)" to Proving Damages in State Contract Cases*, 124 A.L.R. 5th 375 (2010).

In *City of Westminster v. Centric Jones Constructors*, 100 P.3d 472 (Colo. Ct. App. 2003), the Court of Appeals specifically rejected the use of the total cost method.  In that case, the City entered into a contract with prime contractor Jones to expand the City's water treatment plant.  *Id.* at 476.  Work continued beyond the scheduled date and disagreements between the City, Jones, and the engineering arose over water leakage and structural problems.  *Id.*  In 1997, with most of the work done, the City terminated the contract and hired new engineers who recommended the City demolish and rebuild the structure according to a different foundational design.  *Id.*  The City did so and the costs drastically exceeded those in the original contract.  *Id.*  The City then sued the prime contractor Jones for breach of contract and negligence, claiming as damages the entire cost of removing, redesigning and rebuilding the structure.  *Id.*  At trial, the court directed verdicts for all defendants, concluding that the City had failed to present a reasonable basis on which the jury could award or apportion damages based on either the benefit of the City's bargain with Jones, or Jones' breaches.  *Id.*

On appeal, the parties disputed only the sufficiency of the City's damages evidence. *Westminster*, 100 P.3d at 476.  The Court stated that in order to survive a directed verdict challenging proof of actual damages, the City must have presented "evidence of both the existence and cause of damages," and "provide the factfinder with a  reasonable basis for calculating actual damages in accordance with the relevant measure*." Id.*  The Court noted that it did not find any Colorado case discussing total cost theory, but that the method was "disfavored' and "generally rejected." *Id.* at 478.  Further, the court recognized that total cost method cases "typically"[7] involved claims made by contractors against owners, not the other way around as the City was advocating.  *Id.* at 479.  The court nevertheless found total cost method cases from other jurisdictions "helpful because they address the tension presented here between evidence of overall reasonableness of remedial action and multiple causes of harm alleged." *Id.* The Court found that that City was responsible for some of the damage and that it failed to apportion damages between optional redesign and necessary correction of the contractor's defective construction.  *Id.*  Accordingly, it affirmed the trial court's directed verdict, holding that the City's use of the total cost method did not present a reasonable basis on which the fact finder could apportion damages as required by Colorado law.  *Id.* at 481.

Assuming *arguendo* that the total cost or modified total cost methods of calculating damages could ever apply in owner versus contractor lawsuits involving cost plus contracts, Coors would have to first satisfy each element of the requisite four-part test:  (1) it is unreasonably difficult or impossible to calculate damages using alternative methods; (2) the contractor's original bid was reasonable; (3) the actual cost incurred in performing the work is reasonable; and (4) the contractor is not responsible for the additional costs it incurred in

---

[7] While the Court used the word "typically," it did not cite to a single case in which the total cost method was applied in any other context.

performing the work. *Westminster*, 100 P.3d at 478. Neither Mr. Sarsten nor Coors has made any effort to meet these four requirements nor could they.

For example, courts will not allow the use of the total cost method where there is an alternative method of calculating damages. *Turnbull, Inc. v. U.S.*, 389 F.2d 1007, 1015 (Ct. Cl. 1967). Here, Mr. Ficca, Mr. Gaudion, and Mr. Sarsten all admitted that at least some of Coors' alleged damages could be calculated using a direct damages calculation method.

For example, Mr. Gaudion admitted that it was possible to apportion some of Coors' alleged damages in this case, but that he did not do so.

> Q:   You, you knew when you prepared this report that this was a lawsuit?
>
> A:   Yes.
>
> Q:   And you knew that Coors was seeking damages from Jacobs?
>
> A:   Uh-huh.
>
> Q:   For some portion of the cost overrun, correct?
>
> A:   I knew that, yeah.
>
> Q:   And you understood that FTI's job, in part, was to try to quantify the amount of money that Jacobs should pay for the cost overrun, didn't you?
>
> A:   No.  I disagree with the way you worded that.
>
> Q:   Well, don't you think it would have been important that if there were a number of CCMs[8] that were devoid of detail or explanation, as listed at the bottom of page 71, that Jacobs -- excuse me, that Coors would want to know which specific CCMs and what the total dollar value of those CCMs were as part of its claim?
>
> A:   No.  And the reason I didn't say that is because I think in several locations in the report we talk about how these CCMs by the nature and the way they were administered, and because you

---

[8] CCM = Contract Correspondence Memorandum—a tool used on the project to track and control changes and costs increases.

don't have visibility into why the hours were incurred, what the scope was that generated these increases, because it's not there, it's, it's impossible to figure out and isolate how much was for, say, rework, how much was for poor productivity outside of the rework.
              It's hard to unscramble the egg.  It's impossible to unscramble the egg.

      Q:   But you could partially unscramble the egg by saying, Well, at least here's $22.563 million worth of CCMs that we believe, based on our experience, lack sufficient detail and explanation.  You could do that, couldn't you?

      A:   We could.

      Q:   And that was not done in this report?

      A:   That was not done in this report.

(Exhibit A-1, pp. 255–257.)

      Similarly, Mr. Sarsten admitted that it was possible to calculate Coors' alleged damages using a direct damages calculation method:

      Q.  I'm going to go back to the question of methodology of calculating damages.

      A.  Yes, sir.

      Q.  There were spool rework authorization forms?

      A.  There were.

      Q.  And those spool rework authorization forms listed the ISOs[9] that were involved in the rework, does that sound right?

      A.  Yeah, I believe so.  I mean, they certainly identified the spools, so that would – I think they would have identified with that the ISO, yes, sir.

      Q.  And I think we established before that on the spool rework authorizations there were also boxes that tried to identify, or at least categorize, the reasons for the spool rework authorization?

      A.  Yes, sir, we did talk about that.

---

[9] ISO = Isometric engineering drawing.

Q.   Did you make any attempts to go back through the spool rework authorizations and separate out those that were identified as being caused by engineering revisions or engineering errors?

A.   No.  But I'm going to recommend that we do so now.

Q.   Okay.  And if you did that, you could then look at those and look at the ISOs and determine as an engineer whether or not there was an error or the revision was necessitated by an error in the first instance, correct?

A.   Correct.

Q.   And then you could take those that you believed were -- that had errors that fell below the standard of care, and you could add up all of the spool rework authorization costs attributable to those, correct?

A.   I think I would have to say incorrect to that.  I mean, you could add up the -- if they have cost numbers on the SRAs[10] as to what that specific one cost, yes, you can add up all those numbers.  The problem -- the problem with the phenomenon in this project, and I introduced that term death by a thousand cuts before, is that it's a fact of life for projects like this that when you start with something that's supposed to cost $210 million and you have -- let's just say 1,000 engineering errors, just to pick a fictitious hypothetical number, and somebody adds up what the project said at the time, and they come up with $250,000, but that doesn't take into account at all what the cumulative impact of all those errors were.

Now, I gave that example before of, you know, a typical day in a pipe fabricator – pipe installer team.  You don't want me to repeat that. Nobody captures all of that.  It just doesn't get captured, and so the costs -- when you go back and add up all of those numbers that might be on SRAs, it's not going to capture the costs that were experienced on this job by the items that I have been talking about in my report.

Q.   Okay.  You could capture the number of all of the spool rework authorizations that were attributable either by the project folks or by your own analysis by looking at the design drawings attributable to design errors, correct?

A.   Correct.

---

[10] SRA = Spool Rework Authorization.

Q.   You could add all of those numbers up and you could come up with a total number that is limited to just the additional costs incurred to rework spools based on design errors, correct?

A.   You could probably capture what you paid to a fabricator to refabricate a spool.  I think you could reasonably accurately capture that.

Q.  Okay.

A.   If they were redone in the field, you're probably not going to capture it, but . . .

Q.   Now, there is another series of documents on this project, CCMs.  Are you familiar with the CCMs?

A.   I am, yes, sir.

Q.   And on this particular project, CCMs were used as a change management documentation tool?

A.   Correct.

Q.   And so you could go to the CCMs, and you could review the CCMs, and you could try to determine, based on the descriptions of the CCMs, which ones were clearly due to design errors, or those that you suspect were caused by design errors, and trace those through to the drawings if it was a design issue?

A.   Yes, sir.

Q.   And you could then quantify, not necessarily capture all of it, but at least quantify those CCMs and the additional costs incurred under those CCMs that you thought were the result of design errors?

A.   Yes, sir.

Q.   And you could add those to the spool rework number that we've already talked about doing, correct?

A.   Yes, sir.

Q.   Then you could go to the RFIs.  And on this particular project is it your understanding that RFIs were also used as a change management tool?

A.   Yes, sir.

Q.   And that included authorization to go ahead with certain types of work under an RFI, it wasn't simply an answer to a question?

A.   Maybe an SRA would result from an RFI.

Q.   Okay.  And you could go and do the same thing with the RFIs, which RFIs on their face are clearly design error RFIs, or appear to be, and need a little bit more research for me to determine whether they are design related, correct?

A.   Yes, sir.

Q.   You could add all those up?

A.   Right.

Q.   You could add those to the CCMs and to the spool reworks to the extent there wasn't any overlap?

A.   Yes, sir.

Q.   Then you could go to the trend notices and the change notices, another change management tool used on this project?

A.   Yes, sir.

Q.   And you could try to determine which of those may be related to design, or more likely, in the case of the trend notices, were related to additions in the scope?

A.   Yes, sir.

Q.   And you could add those numbers up, correct?

A.   Yes, sir.

Q.   Can you think of any other ways to try to capture, without capturing the whole number, capturing portions of the number that would have been caused by design problems, caused by other things that you attribute to Jacobs' errors, or items like membrane filtration that clearly weren't Jacobs' fault?

A.   Right.

Q.   And could you think of any other sort of chain like RFI, CCM, trend notice, spool rework authorization?

A.   AXWs.[11]

Q.   And we could do that with AXWs, correct?

A.   Correct.

Q.   Any others?

A.   It doesn't come to mind at the moment.

Q.   And yet while adding all of those together may not have captured the total damage, it would have -- it would have been a tool to use to calculate specific items of damage, correct?

A.   I'll say yes.

Q.   And that isn't what was done here by you?

A.   That is not what was done here by me. And I don't think you're going to capture the impact of the faulty engineering by that method, what my opinion is as to the damages incurred by the quality of the engineering.  I'm confident that those numbers all totaled up are not going to capture it all.

(Exhibit A-4, pp. 432–439.)  Even if the court was inclined to consider allowing Coors to meet its burden of proving damages by utilizing the total cost method, the fact that all three of Coors' experts admit that some of its damages could have been calculated using a direct method should preclude Coors' use of the total cost method.

## C.   COORS IS ATTEMPTING TO IMPROPERLY SHIFT THE BURDEN OF PROVING DAMAGES TO JACOBS.

Coors has the burden of proving its damages against Jacobs.  The burden of proving a prima facie case for recovery on a civil claim is on the plaintiff.  *See Bayly Martin & Fay, Inc. v. Pete's Satire, Inc.,* 739 P.2d 239, 243 (Colo. 1987); *Capital Life Ins. Co. v. Roth,* 553 P.2d 390, 392 (Colo. 1976).  Once a plaintiff establishes a prima facie case, the defendant may produce evidence to rebut the plaintiff's prima facie case, but the burden of proof or persuasion

---

[11] AXW = Authorization for Additional Work.

on the essential elements of the claim remains with the plaintiff.  *See generally Capital Life Ins. Co.,* 553 P.2d at 392; *Judkins v. Carpenter,* 537 P.2d 737, 738 (Colo. 1975).

Here, Coors is attempting to skirt its burden of proving causation and damages, which are essential elements of its claim, by shifting the burden of proof to Jacobs.  Indeed, Coors' position appears to be that the record-keeping for this project makes it difficult, but not impossible, for Coors' to adequately prove its damages, and for that reason, Jacobs should have to disprove causation and damages.  However, Coors has to date not offered any authority for the position that the burden of proof should shift to the defendant simply because it is difficult for the Plaintiff to prove the existence and cause of its damages.  In fact, the authority is settled that "the burden of proof resting upon the plaintiff to prove the elements of his case, as determined by the pleadings, by a preponderance of the evidence, does not shift during the course of trial, although it may be aided by a presumption or a shift of the burden of going forward with the evidence once the plaintiff has established a prima facie case." *Exch. Nat'l Bank v. Sparkman*, 554 P.2d 1090 (Colo. 1976); *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053 (Colo. 1992).  Coors has not to date identified any presumption applicable to this case or any other justification for attempting to shift its burden of proving causation and damages to Jacobs.  Absent such authority, Coors should be held to its burden of proving causation and damages in this case.  As demonstrated herein, Coors cannot meet its burden.  Therefore, Jacobs respectfully requests this court grant its motion for summary judgment.

## IV.

## <u>CONCLUSION</u>

For the foregoing reasons, Jacobs respectfully requests that this court grant Jacobs' Motion for Summary Judgment on the grounds that Coors has not met its burden of

proving the existence and cause of its damages with reasonable certainty, which is an essential element of its breach of contract and tort claims against Jacobs.

DATED:  August 2, 2010

**s/David G. Palmer**
David G. Palmer, COSB No. 2634
GREENBERG TRAURIG LLP
1200 17th Street, Suite 2400
Denver, Colorado  80202
Telephone:  (303) 572-6500
Facsimile:  (303) 572-6540
E-mail:  PalmerDG@gtlaw.com
Attorneys for Defendant/Third-Party Plaintiffs
JACOBS ENGINEERING GROUP INC., JACOBS
INDUSTRIAL SERVICES, INC., a/k/a JACOBS
CONSTRUCTION SERVICES, INC., and
JACOBS CONSTRUCTION, INC.

DATED:  August 2, 2010

**s/Albert E. Peacock III**
Samuel A. Keesal, Jr., COSB No. 21130
Scott T. Pratt, CASB No. 67192
Terry Ross, CASB No. 58171
Albert E. Peacock III, CASB No. 134094
Elizabeth P. Beazley, CASB No. 138198
KEESAL, YOUNG & LOGAN
400 Oceangate, P.O. Box 1730
Long Beach, California  90802
Telephone:  (562) 436-2000
Facsimile:  (562) 436-7416
E-mail:  al.peacock@kyl.com
Co-Counsel for Defendant/Third-Party Plaintiffs
JACOBS ENGINEERING GROUP INC., JACOBS
INDUSTRIAL SERVICES, INC., a/k/a JACOBS
CONSTRUCTION SERVICES, INC., and
JACOBS CONSTRUCTION, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd of August 2010, a true and accurate copy of the foregoing **DEFENDANT JACOBS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of Court using the CM/ECF system which sent notification via e-mail transmission at least to:

Randall H. Miller, Esq.
HOLME ROBERTS & OWEN LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203-4541
E-mail:  Randy.Miller@hro.com

Robert C. Chambers, Esq.
SMITH CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, Georgia 30303-1227
E-mail:  RCChambers@smithcurrie.com

Christian Heath Hendrickson, Esq.
SHERMAN & HOWARD LLC
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
E-mail:  chendrickson@shermanhoward.com

Paul F. Keneally, Esq.
UNDERBERG & KESSLER LLP
300 Bausch & Lomb Place
Rochester, New York 14604
Telephone:  584-238-2724
Facsimile:  584-258-2822
E-mail:  pkeneally@underbergkessler.com

GREENBERG TRAURIG LLP

_s/ Jennifer Stafford_
Jennifer Stafford
1200 17th Street, Suite 2400
Denver, Colorado 80202
Telephone:  303-572-6500
Facsimile:  303-572-6540
Email:  StaffordJL@gtlaw.com