**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Senior District Judge Richard P. Matsch

Civil Action No. 1:08-cv-00985-RPM
(Consolidated w/Civil Action No. 09-cv-00271-RPM)

COORS BREWING COMPANY AND
BRIGGS OF BURTON, PLC,

              Plaintiffs,

v.

JACOBS ENGINEERING GROUP INC.,
JACOBS INDUSTRIAL SERVICES, INC., a/k/a
JACOBS CONSTRUCTION SERVICES, INC., and
JACOBS CONSTRUCTION, INC.,

              Defendants,

and

JACOBS ENGINEERING GROUP INC. and
JACOBS CONSTRUCTION SERVICES, INC.,

              Third-Party Plaintiffs,

v.

BRIGGS OF BURTON, PLC,

              Third-Party Defendant.

---

### Coors' Response in Opposition to Jacobs' Motion for Summary Judgment

---

        Coors Brewing Company respectfully submits its Response in Opposition to Defendant

Jacobs' Motion for Summary Judgment (Doc. No. 102).

## Summary of Argument

Jacobs once again moves for summary judgment on all of Coors' claims.  This time Jacobs argues that Coors cannot prove the "existence and cause of its damages"—that is, cannot prove that Jacobs' admitted breaches made Coors worse off than it would have been but for Jacobs' breaches.  Ignoring admissions by senior Jacobs executives, Jacobs seems to assert that the only evidence available to Coors to establish damage is Jacobs' original cost estimate, and the fact that the estimate was exceeded.  While that fact is relevant—although for reasons different than Jacobs contends—there are many record facts by which a reasonable jury could conclude that Jacobs had contractual, professional, and statutory obligations that it repeatedly breached, causing damage to Coors.

Jacobs admits in its own internal documents, attached as exhibits to this response, that it:

- Failed to properly manage the Coors project.

- Failed to provide a competent site manager.

- Failed to provide engineering in accordance with its contract and Virginia law.

- Failed to properly manage and administer its subcontracts.

- Failed to properly manage and track changes, backcharges, and rework.

Jacobs' failures were contract breaches, common-law breaches, and, in some instances, statutory violations.  These breaches and violations caused Coors to suffer damage—increased project costs that would not have occurred if Jacobs had properly performed.

As to the amount of damages, an issue not appropriately before the Court at this stage, Coors simply seeks the sum that would put it in the same position it would have occupied if Jacobs had not breached.  Yet Jacobs essentially argues that because Jacobs failed to maintain

adequate records of changes, backcharges, and rework, Coors' claims must fail because Coors cannot allocate the "amount of damages" with precision, breach by breach.  This is not the law and, in any event, is academic for purposes of this motion.  Drawing reasonable inferences in Coors' favor, Jacobs admits the *fact of damage*, which is all that matters for this motion, and moreover admits an amount of damages—"$100 million PLUS."  Such admissions are enough for a reasonable jury to conclude that Jacobs breached and violated its obligations, causing damage to Coors.

The issue before the Court in this motion is not the qualifications of expert witnesses, as Jacobs argues,[1] but whether a reasonable jury could return a verdict for Coors upon the evidence presented.  Coors' supporting materials, attached hereto, set forth specific facts showing that:

(1) Jacobs was in breach of its contract obligations, professional duties, and Virginia law;

(2) Jacobs' breaches injured Coors; and

(3) Coors has sufficient evidence to permit the jury to perform an intelligent and fair estimate of Coors' damages.

Coors' supporting materials are sufficient to meet its burden of proof on the cause and existence of damage.  Jacobs' motion should therefore be denied.

### Standard of Review

Summary judgment is proper only when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In

---

[1] Jacobs argues that Gunnar Sarsten is not a "damages expert" and "has never testified as a damages expert."  Jacobs is wrong because Sarsten is qualified to render expert testimony on damages, and has done so in the past by testifying as a damages expert at trial.  *See* discussion in Part I.B. below.

ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to

the party opposing the motion and that party must be afforded the benefit of all reasonable

inferences to be drawn from the evidence.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

(1970).

      The movant bears the initial burden and must show there is "an absence of evidence to

support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 447 U.S. 317, 325 (1986);

*Manders v. Okla. ex rel. Dep't of Mental Health,* 875 F.2d 263, 264 (10th Cir. 1989).  If that

burden is met, the burden then shifts to the nonmovant to demonstrate that there is a material

issue of fact that precludes summary judgment.  *Adickes*, 398 U.S. at 158–60; *Clark v. Coats &*

*Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (Only when the moving party's initial burden

"has been met does the burden shift to the non-moving party to demonstrate that there is indeed a

material issue of fact that precludes summary judgment.").

      If the movant is successful in meeting its burden, the nonmovant is then required to "go

beyond the pleadings" and present evidence in the form of affidavits, depositions, and the like

designating "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at

324.  The nonmovant is not required to produce evidence in a form that would be admissible at

trial in order to avoid summary judgment.  *Id.*  And Rule 56 does not require the nonmovant to

depose its own witnesses.  *Id.*

      Resolving all doubts in favor of the nonmovant, the Court must determine "whether a

fair-minded jury could return a verdict for the plaintiff upon the evidence presented." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  If reasonable minds could differ as to

conclusions drawn from the evidence, the motion for summary judgment should be denied. *Id.* at

251.  Summary judgment is a drastic remedy, to be granted with caution and only upon a clear showing that no triable issue exists.  *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n.1 (10th Cir. 1981); *Conway v. Smith*, 853 F.2d 789, 792 n.4 (10th Cir. 1988).

### Scope of Review

Jacobs asks this Court to grant summary judgment dismissing in full all of Coors' contract and tort claims.  Jacobs' principal argument is the unsupported proposition that Coors must provide evidence that specific damages were caused by specific breaches.  As explained below, that is not the law on proof of damages in Virginia or Colorado, and Jacobs therefore has failed to meet its initial *Celotex*-Rule 56 burden.

Furthermore, Jacobs provides no factual or legal discussion on Coors' tort claims or tort damages.  Therefore, Jacobs has failed to meet its burden of showing the absence of evidence to support Coors' tort claims because it ignored the tort claims.  Jacobs' motion for summary judgment should be denied in full.

### Counter-Statement of Material Facts

The following facts are either undisputed, or supported in the record, and therefore must be taken as true for purposes of this opposition.

**A.      Jacobs failed to properly manage the project resulting in damage to Coors.**

***Construction Services Agreement***

1.      Jacobs shall "build and install all improvements."  Construction Services Agreement, Article 2, § 2.2. (**Ex. 1**).[2]

2.      Jacobs "is responsible for coordinating all Work for the Project."  Construction Services Agreement, Article 2, § 2.3. (**Ex. 1**).

3.      Jacobs has "sole responsibility to direct and control the method of performance and the means of accomplishing the desired result."  Construction Services Agreement, Article 3, § 3.4. (**Ex. 1**).

4.      Jacobs "shall be fully responsible to Coors for the acts and Work of any Subcontractor."  Construction Services Agreement, Article 4, § 4.5(c). (**Ex. 1**).

5.      Jacobs "shall record changes to the project costs and schedule forecast on cost trends, which shall be approved by Coors.  Cost trends shall be monitored and reported monthly and incorporated into the project forecast.  Based on cost trends developed by Jacobs, Jacobs may propose a change in the Work to Coors.  Such Proposed Change Request must document any significant changes to the Project from both a cost and schedule basis, as well as detailing the need for the proposed change."  Construction Services Agreement, Article 10. (**Ex. 1**).

*Construction Services Agreement (Exhibit B)*

Exhibit B to the Construction Services Agreement is a two-volume notebook[3] that further defines Jacobs' duties, obligations, and responsibilities, including, but not limited to:

6.      The Construction Execution Plan in Exhibit B confirms Jacobs' ultimate responsibility for the Project to Coors:

---

[2] In accordance with D.C.COLO.LCivR 56.1(C), only relevant portions of voluminous documents are attached.  Coors will provide the Court with complete copies of any exhibits upon request.

[3] Relevant portions of Construction Services Agreement Exhibit B are attached hereto as **Ex. 2**.

Jacobs Engineering [JEG] is working in collaboration with Briggs and EnteGreat on this project. Jacobs will provide overall program management including engineering, procurement, and construction management. Briggs is responsible for providing the process design associated with the actual brewing portion of the project, while EnteGreat is responsible for the manufacturing systems work, including MES and Delta V. This being said, *Jacobs has the ultimate responsibility* to coordinate all of these efforts and deliver a 6 million barrel per year brewery to Coors.

Exhibit B, Section 3.5.1 *Construction Execution Plan*, 1.0. (**Ex. 2** at p. 6) (emphasis added).

7.      "The Jacobs Construction Services team will be responsible for the overall management of the execution of the construction effort." Construction Services Agreement, Exhibit B, Section 3.5.1 *Construction Execution Plan*, 5.0. (**Ex. 2** at p. 12).

### *Jacobs-Briggs Subcontract*

8.      Jacobs subcontracted with Briggs for Briggs to provide "the process, mechanical, piping and electrical design for the Basic Process Envelope (BPE). This includes Brewhouse, Brewery Tank Farm, Fermentation, Green Beer, Maturation, Rough Beer and tie-in to the existing Blending facility." Jacobs-Briggs Professional Services Subcontract Agreement (PSSA No. 16BL9940-S-490600) Attachment "A" Scope of Work ¶ 2.1.1 (**Ex. 3** at p. 6).

9.      Jacobs was to schedule and coordinate Briggs' performance of its work with the work of others and the requirements of the project for which Briggs' work is being performed, and Briggs agreed to comply strictly with such scheduling and coordination. Jacobs-Briggs Professional Services Subcontract Agreement (PSSA No. 16BL9940-S-490600) Article 9.0, ¶ 9.1. (**Ex. 3** at p. 4).

***Jacobs' own documents and testimony show multiple breaches resulting in substantial additional costs.***

10.     Beginning in the early phases of the Project, Steve Dickinson, Jacobs' Project Manager, acknowledged Jacobs' failure to implement proper project controls in a document titled "Project Controls Woes."  Dickinson wrote:

> I have grave concerns about my project because of the following:
>
> Scheduler:   Greg Bryan was taken away from me without warning on December 8, one week ahead of a major interactive planning event.
>
> • Two months have now passed and I do not have a replacement.
>
> • We have lost two man-months of potential schedule development work that we will never be able to get back. . .
>
> • We now have a schedule and it is not a horribly incomplete schedule, but as a result of this underresourcing the schedule is inadequately developed and it is making it extremely difficult to run this project in the way that it needs to be run.  It needs a lot of care and attention that we are not giving it.
>
> • Given the state of our schedule and the unresolved resourcing issue please consider these sobering realities:
>
>> We are breaking ground in April (2 months from today)
>> We are pouring concrete in June
>> We are erecting steel in July
>> We will begin receiving and erecting 40 fermenters, each the size of a house, in September
>
> • We must have a dedicated resource to plan this project at a greater level of detail that we have been able to do….
>
> • The client is concerned. This will soon turn to alarm and anger.

(**Ex. 4**) (emphasis in original).

11. About eight months later, Dickinson admitted that the Jacobs Project team still did not have adequate project controls.

> We are however grossly understaffed in project controls on this very "project controls intensive" project and have been since day one. Despite my vociferous complaints and pleas to all levels of this company we have yet to solve this problem and I no longer hold out hope that we ever will.

(**Ex. 5** at p. 3).

12. On October 5, 2005, Dickinson sent a follow-up email further explaining Jacobs' inability to obtain adequate project controls.

> I have been asking for help since December 2004. We have been in perpetual recovery mode for most of the project. I won't bore you with a lengthy review of the saga but it has been ***our biggest failing*** to Coors on the project and my biggest personal disappointment in this company.

(**Ex. 5** at p. 2) (emphasis added).

13. Dickinson admitted in his deposition testimony that Jacobs' failure to provide proper project controls adversely impacted the Project.

> Q. Mr. Dickinson, did the lack of adequate project control support have an impact on your ability to apprise Coors of the downstream impact of the numerous design issues that you were struggling with?
>
> A. Well, the lack of project control support, which was something that was obviously an irritant to me, as you can see through this and many other documents in the record, was an impediment to effective project management. It limited my ability to understand and communicate in some respects from time to time.

Depo. Steven R. Dickinson 153:22 to 154:7 (June 11, 2010) (excerpt of deposition transcript attached as **Ex. 6**).

14. Gary Walcott, Jacobs Greenville Project Controls Manager, visited the Project in the fall of 2005. Walcott testified about his visit, including explaining the impetus for the first of

several Jacobs internal project evaluations conducted by what Jacobs called a Performance

Assessment Team ("PAT").  A "PAT" consists of a team of Jacobs executives sent to assess a

project.  As Walcott testified:

> […] I identified that the happy talk was just that.  The project team was
> sinking and sinking fast, and nobody seemed to be aware of it.  And I was
> concerned.    This  was  beyond  construction.    This  is  engineering,
> procurements.  And the reason for that is -- if you look at the data, I'm sure
> it will bear it out -- everything was slipping.  Everything.  Every metric.
> The costs were running over.  The hours were running over.  And every
> metric was in one way or another slipping.
>
> A gentleman by the name of Jim Dixon, who was a head of
> construction for the southern region, I believe, at that time, he reacted and
> came out to do his own assessment.  My understanding, through Don
> Coulson, was that Mr. Dixon shared my assessment, and he was on site for
> only four hours.
>
> I believe Mr. Dixon was -- I have cause to believe Mr. Dixon was
> the impetus behind a PAT team being sent to the site.  It may have been in
> collaboration with Pat Stoller.  I don't know.

Depo. Gary Walcott 191:9 to 192:3 (April 16, 2010) (deposition excerpt attached as **Ex. 7**).

15.     Jacobs' Performance Assessment Team visited the Project site in December 2005,

observed a lack of adequate project controls, and issued a PAT report:

> **Project Controls Staff** – The current cost engineer, Erik Carlson, is not
> effective and needs to be removed immediately.  This was confirmed by
> all interviewees.  In addition, due to the requirements of the two largest
> subcontracts (Mechanical and E/I), an additional cost person should be
> brought on staff.  These two contracts are both T&M with Target prices
> and part of the fee is on an earned basis.  The team has already determined
> that the details of the progress and productivity will be done by the
> subcontractors.  They will, however, need to be thoroughly checked by
> Jacobs, analyzed, and the forecast needs to be adjusted as necessary.
>
> **Recommendation** – Find two senior field cost persons to (a) replace Erik
> Carlson, and (b) augment the current staff count to allow detailed review,
> analysis, and forecasting of the mechanical and E/I subcontract accounts.
> Much of this function has been performed by Jay Yale, in addition to his

function as the chief field engineer.  Everyone agrees that Jay is a high performer who excels, but he has become a bottleneck for the project due to the project overloading him.

(**Ex. 8** at p. 8).

16.     In June 2006, six months after the above PAT report and *16* months after Dickinson first identified the problem, Jacobs' project controls team was still inadequate.  Steve Pfeifer of Jacobs, who had recently taken over as the site construction manager, stated, "[w]e are still in dire need of a Project Controls Manager" at the Coors' site, and he pleaded for help.  (**Ex. 9**).

17.     Jacobs' confidential, internal reports confirmed multiple problems with Project controls, including:

- The original Project Controls Engineer was too inexperienced for the job, and realizing that, it took a ridiculous amount of time to correct that problem, resulting finally in Gary Walcott having to deploy to site full time.

- We were not adequately supported by Jacobs [management] in obtaining top talent in Contracts and Project Controls.  Every call for help was either ignored or B/C players provided.  Too little too late.

- It takes contracts, construction and controls together to run a successful program, but never have these three groups effectively worked together on this project.

- The project was initiated as a lump sum environment, however, when we changed gears in May '06 to reimbursable to the tune of $75mm and did not adequately mobilize enough or the right kinds of contracts admins, construction or project controls staff to managing in that environment.

(**Ex. 10** at pp. 1–3).

18.     In spring 2006, a year into construction, Dickinson wrote to his immediate superior in the Jacobs Greenville office that the Jacobs team on the Project had become a "house divided."

> **Subject:** a house divided":
>
> One of the things you elected to take on was to get this whole team working together.  At this point I would say we are more divided than ever.  Just had a long talk with Gary [Walcott].  He is becoming increasingly frustrated with Paul [Wilcox] and thinks the whole construction team out here is not doing their jobs and is not taking any accountability….He says the productivity is not being driven by Jacobs and that our construction team is making excuses (now mostly that it's about the engineering issues and that we can't get the craft labor)….Gary believes Paul has undermined Donna [Cueroni] and that she is the one that has ownership and truly cares about what we are doing and is most concerned that we succeed.  He told me that he believes she is the one who understands this type of facility and that neither Paul nor Chris do.  He believes that Paul/Chris are going to push for a huge number in our major forecast effort in May ($300+ million) and an extended schedule (several months beyond Dec 15 for first brew).  He believes they are setting the bar very low and are not taking the challenge of making things happen.

(**Ex. 11**).

19.     Shortly thereafter, Jacobs executive, Don Engelking, acknowledged that the Project site needed a new leader.  "Here is the recommended path forward for Coors.  1. The Site needs a new leader.  Jim Dixon [of Jacobs] is working through the candidates.  2. The project controls infrastructure needs to be solidified to track and drive the project." (**Ex. 12**).

20.     On June 14, 2006, 16 months after Dickinson had expressed "grave concerns" about Jacobs' Project resources, Pat Stoller, Jacobs Vice President of Operations in Greenville, wrote that Jacobs was assigning a new DPE (Designated Project Executive) who had "recently turned around a similarly troubled project in Jacobs."  (**Ex. 13**).

21.     On January 26, 2007, Jacobs executive, Robert (Bob) Clement, wrote to Coors attempting to explain the latest of the Project's tremendous cost increases.   Clement identified seven reasons why Jacobs was unable to "call the cost growth earlier":

1.      The most fundamental issue is that there was not a full-project base-line of quantities and scope for this project that was ever accurate or real.   The project has been in continual catch up mode in the Briggs area.   This scope was / is disconnected from the estimate and over time continues to grow.   We needed a full-time resident from our team in the Briggs office to help manage Brigg [sic] manage the job.

2.      The original execution strategy was based around multiple lump sum contracts placed with local / regional subcontractors.   Key to the concept was that the local subs would be responsible for control of the scopes of work assigned to them and for reporting / forecasting their work progress and costs.

3.      Our early performance issues with Kinetics, which were exacerbated by the evolving and late release of Briggs deliverables, drove the project team to change from Lump Sum field contracts to cost reimbursable contracts in order to avoid locking this project up in "change order hell".   While the union labor situation in the area as it relates to caliber, quantity and continuity of crafts may have been the root cause of Kinetics issue, they used every engineering / material shortcoming as a change order opportunity.   The result is that we converted the piping subcontractors to cost reimbursable contract format and shifted work from Kinetics to other subs.

4.      We assigned staff, implemented systems and ran the early phases of the job with a team that was capable of managing lump sum packages, *but not equipped to lead/control/anticipate the issues of cost reimbursable subcontract management*.   In retrospect the project was probably *too complicated* and fluid for them *regardless of contract format*.

5.      When we shifted from lump sum contracts to cost reimbursable contracts we never got control of the growing / shifting scope and we did not put control systems in place soon enough to get our hands around this fluid situation.   We both share accountability here since there was constant pressure to cut corners to hold down

costs and to not invest time / money where it wasn't absolutely necessary.  We didn't have the fortitude to push back where we should have.

6.    We continued to rely on the subcontractors to report cost, progress, material purchases, rework and related items to us which in turn caused both a time lag in information flow and uncertain accuracy in real progress reporting.  Basically the subs weren't all that worried about accuracy or timeliness of this information and we didn't install robust enough systems soon enough to backstop their information or make early calls on the key control parameters.

7.    The forecasting time lag which resulted from relying on subcontractors' information flow means that there was always a 6-10 week lag between actual expenditures at the sub level and our knowing these expenditures from their invoices.  The same time lag applies to other job progress metrics (percent complete / rework / productivity / work remaining / etc.).  Given that this project was spending some $4 million per week, you can see how a $27MM "surprise" begins to unfold.

(**Ex. 14**) (emphasis added).

22.    Clement followed up later that same day in an internal email to other Jacobs executives:  "I think the challenge will be getting an objective assessment of what 'guilt' is ours, what 'guilt' is Coors driven and what can be laid off on the market, Briggs, the subs, etc." (**Ex. 15**).

23.    As part of an internal Jacobs effort, led by Paul Stoppelwerth, to understand and reconcile the unexpected multimillion dollar "cost growth" noted by Clement in ¶ 21 above, Gary Walcott weighed in.  Walcott reported in a January 6, 2007 email that Jacobs issued "'fill me up' change authorizations without scope change documentation or explanations for overruns in too many cases." (**Ex. 16**).  Walcott was asked in his deposition if issuing "fill-me-up" change authorizations without scope change documentation was proper:

Q.    Is that the right way to manage this job?

A.      It's the right way to pay – make sure you facilitate payment for the contractor's work.

Q.      Were you supposed to be documenting the reason for the changes?

A.      That would be the intended purpose.

Q.      Okay.  And that was not happening; is that correct?

A.      In some cases, that was not happening.

Depo. Gary Walcott 333:10-18 (deposition excerpt is attached as **Ex. 7**).

24.      Walcott further admitted in his January 6, 2007 email to Doug Lockard (Manager, Supply Management, Jacobs, Greenville Operations), Stoeppelwerth, and Dickinson that Jacobs Greenville was entirely responsible for the $100 million cost overrun. (**Ex. 16**).

> The issue I strongly recommend we address is as follows:  We are issuing "fill me up" change authorizations without scope change documentation or explanations for overruns in too many cases.  We need the documentation to at least substantiate our issues related to the late and hosed-up Briggs design and market conditions assessments.  We are forecasting a $100MM overrun **_PLUS_** and there is going to be great anguish and teeth-gnashing for the over 50% increase in project costs.  Right now it looks like Jacobs (specifically Greenville operations) is entirely responsible.

(**Ex. 16**) (emphasis in original).

25.      Lockard agreed with Walcott that Jacobs Greenville was entirely responsible for the $100 million cost overrun.  Lockard wrote:  "Agree on all points. thx"  (**Ex. 16**).

26.      Lockard admitted in his confidential, internal "Lessons Learned" document (**Ex. 10**) that Jacobs failed to properly manage the Project in many aspects, including:

a.      Jacobs did not have a strong candidate for subcontracts administrator and Jacobs made a "bad decision" in using Matt Pandos.  Jacobs "eventually had to push him out, but long after the damage was done."  (**Ex. 10**, Item 1.a. on p. 1).

b.      Jacobs' "Project Controls Engineer was too inexperienced" and it took Jacobs a "ridiculous amount of time" to replace him.  (**Ex. 10**, Item 1.c. on p. 1).

c.      It took Jacobs almost 9 months to put a materials coordinator on the Project.  (**Ex. 10**, Item 1.d. on p. 1).

d.      Jacobs had inadequate administrative support and no field accountants.  (**Ex. 10**, Item 1.e. on p. 1).

e.      The Jacobs site team was "not adequately supported by Jacobs in obtaining top talent in Contracts and Project Controls.  Every call for help was either ignored or B/C players provided.  Too little too late."  (**Ex. 10**, Item 1.f on p. 1).

f.      Jacobs' "[f]ield engineering staff was inadequate and became a major factor in processing timely change control documents."  (**Ex. 10**, Item 1.g on p. 1).

g.      Jacobs used change control documents after the fact to address work already performed.  This eliminated any chance "of managing the work going forward, or maintaining any kind of accurate forecast."  (**Ex. 10**, Item 5.b. on p. 4).

h.      Jacobs change control management "was broken early-on and could never be effectively corrected."  (**Ex. 10**, Item 5.e. on p. 4).

(**Ex. 10** at pp. 1, 4).

27.     In his Personal Lesson Learned on the Project, Dickinson wrote:

> A project can get worse, much worse than you can imagine.  Do not underestimate how bad this can be.  Avoid rationalization and denial…. Do not hesitate to call time out.  Engineering deficiencies compound multi fold in the field.  To the power of 2 when contractor resources are sub par.

(**Ex. 17**).

28.     Dickinson admitted "that there was a continuing difficulty with many elements of the Briggs design that ultimately translated into higher costs for Coors."  Depo. Dickinson 148:7-10. (excerpt of deposition transcript attached as **Ex. 6**).

29.     On May 17, 2007, Lockard sent out a confidential email with attachments to Jacobs executives.  (**Ex. 18**).  The attachment included confidential internal lessons learned and a

recap of Contractor/Subcontractor Lessons Learned (*see* **Ex. 18** pp. 9–10 for confidential recap). In the body of the email, Lockard wrote that some of the statements in the recap "could be perceived as exposing some vulnerability on Jacobs part that could be damaging in a litigation proceeding." (**Ex. 18** at p. 1). For that reason, he wrote that he didn't use the names Jacobs and Kinetics[4] on the recap, but used Contractor and Subcontractor instead. *Id.* In the confidential recap of lessons learned, Lockard admitted that:

- Jacobs failed to validate Kinetics database for value earned in late spring 2006

- Jacobs never should have assigned small bore detailing to Kinetics

- Jacobs was late with material laydown areas

- Jacobs field engineering backlogged RFIs

- Jacobs failed to "manage rework caused by Engineering lateness and redesign"

- Engineering was "late, late, late"

- Engineering was of poor quality

- Engineering failed to cross check interferences

(**Ex**. **18** at p. 9) (Contract/Subcontractor Lessons Learned – RECAP).

30.     A subsequent Jacobs Lessons Learned document dated October 7, 2007 admitted that Jacobs "did not have enough qualified Project Controls personnel on the project, specifically in the field, and those we did have were not adequately experienced." (**Ex. 19** at p. 6, Issue No. 12).

---

[4] Kinetics was Jacobs' mechanical piping subcontractor on the Project.

B.      **Jacobs failed to provide a competent site manager resulting in damage to Coors.**

31.     Jacobs agreed to "provide a competent project manager on the Project during its entire progress until Final Completion." Construction Services Agreement, Article 4, § 4.4. (**Ex. 1**).

32.     Jacobs agreed to "not employ any unfit person or anyone not skilled in the portion of Work to be assigned to such person." Construction Services Agreement, Article 4, § 4.5(a). (**Ex. 1**).

33.     Jacobs agreed to "maintain a competent staff at the project site to coordinate and provide general direction of the work progress of the subcontractors and vendors on the project." Construction Services Agreement, Exhibit B, Section 3.5.1 *Construction Execution Plan,* 2.0 Scope of Work (Construction Management Services) ¶ 2.1.1. (**Ex. 2** at p. 8).

34.     Jacobs' first site manager, Donna Cueroni, reported to the Project site fulltime in April 2005. Depo. Donna Cueroni 42:14–15 (April 14, 2010) (excerpt of deposition transcript attached as **Ex. 20**).

35.     Starting in January 2006, based on the first PAT evaluation, Cueroni was supplemented and supervised by a "more senior CM Site Manager," Paul Wilcox. (**Ex. 8** at p. 6); *see also* Depo. Cueroni 23:22 to 25:22 (**Ex. 20**). At that point in time, the PAT did not recommend removing Cueroni, "but placing her in a subordinate role." (**Ex. 8** at p. 6).

36.     Cueroni was ultimately replaced in June 2006 by the new site leader, Steve Pfeifer. (**Ex. 12**); *see also* Depo. Cueroni 23:22 to 25:22 (**Ex. 20**).

37.     Jacobs admits that Cueroni did not have the requisite experience to manage the

Project.  Cueroni "was placed on this project without large project experience, and is therefore at

a disadvantage in experience."  (**Ex. 8** at pp. 5–6).

38.     Dickinson admits that Jacobs abandoned Donna Cueroni on the Project—a project

she was not qualified to lead—and that this was not fair to the Coors Project.  He testified:

> Q.     In your evaluation, you say, "She," Donna Cueroni, "was
> brought onto the project with the fully stated commitment from Jacobs'
> senior management that she would be supported and surrounded by highly
> experienced and qualified people with very strong CM capabilities and
> skills to complement and mentor her and make her a success.  This
> commitment was not provided, and Donna was left in a very vulnerable
> position.  She was in many respects abandoned by JCSI and left to fend
> for herself on a huge and difficult project that was well beyond anything
> she had ever been called on to lead."
>
> Was that an accurate statement?
>
> A.     In general, this was an accurate statement.  Quite honestly,
> a little bit of this was emphasized, I believe, in my thinking at the time
> because I felt that Donna needed some support, and it was not fair to her
> that she had been taken from the project in the way that she was; and I just
> wanted to point out to her that quite a lot of that was not her doing.
>
> Q.     Was it fair to Coors?
>
> MR. ROSS:  Object to the form.  You can answer.
>
> A.     To take her off the project?
>
> Q.     (BY MR. SURASKY) No.  To abandon her and leave her
> in a vulnerable position.
>
> A.     I would have to say that was not fair to the project.

Depo. Steven R. Dickinson 255:10 to 256:13 (June 12, 2010) (excerpt of deposition transcript
attached as **Ex. 6**).

**C.**    **Jacobs failed to provide engineering in accordance with the contract and Virginia law, which led to work and rework for which Jacobs billed Coors.**

As demonstrated in the facts below, Jacobs breached its contract obligations and professional duties by billing Coors for work and rework that was required only because Jacobs failed to comply with Virginia professional engineering design regulations.

The facts set out below support a reasonable conclusion that Jacobs and Briggs schemed together to circumvent the law resulting in damage to Coors.  By the time Jacobs and Briggs found an engineer to stamp Briggs' drawings, the design was essentially complete and had already gone to the field.  *See* ¶¶ 63, 64.  Consequently, the design deficiencies that were eventually noted by the licensed Virginia engineer (Bill Corwin) were not corrected by Jacobs at its own expense as required by contract.  *See* ¶ 43.  Instead, the deficiencies were corrected at Coors' expense by Jacobs' construction subcontractors performing work and rework in the field. *See* ¶¶ 53–57.

39.    Virginia law requires that any engineer who stamps design drawings for Virginia construction must have exercised "direct control and personal supervision over the work."  18 VAC 10-20-760 (**Ex. 21**).

40.    Jacobs agreed "that the design shall comply with the applicable statutes, laws, rules and regulations."  Engineering Services Agreement § 15.1 (**Ex. 22**).

41.    Jacobs agreed that all designs "shall be reviewed, approved and stamped by architects or engineers registered to practice in [Virginia]."  Engineering Services Agreement § 15.2 (**Ex. 22**).

42.     Jacobs "shall comply with all Laws applicable to the Work."  Construction Services Agreement, Article 3, § 3.1.  (**Ex. 1**).

43.     Jacobs "shall, without additional compensation, correct or revise any errors or deficiencies in the designs, drawings, or specifications provided pursuant to this Agreement." Construction Services Agreement, Article 6, § 6.2(g).  (**Ex. 1**).

44.     Jacobs was "fully responsible to Coors for the acts and Work" of its subcontractors.  Construction Services Agreement, Article 4, § 4.5(c).  (**Ex. 1**).

45.     Jacobs subcontracted the process, mechanical, piping, and electrical design for the Basic Process Envelope to Briggs.  Jacobs-Briggs PSSA No. 16BL9940-S-490600, Attachment "A" Scope of Work § 2.1.1 (**Ex. 3** at p. 6).

46.     Briggs agreed that "its design Work shall comply with applicable statutes, laws, rules, and regulations."  Jacobs-Briggs PSSA No. 16BL9940-S-490600 § 7.1 (**Ex. 3** at p. 2).

47.     Briggs agreed that its design "shall be reviewed, approved and stamped by architects or engineers registered to practice in [Virginia]."  Jacobs-Briggs PSSA No. 16BL9940-S-490600 § 7.7 (**Ex. 3** at p. 3).

48.     On September 3, 2004, eight months before construction started, Steve Dickinson confirmed by email to Rob Buxton of Briggs that the engineer who puts his seal on the design drawings and specifications must be in "responsible charge" of the work.  (**Ex. 23**).

49.     Late in 2005, eights months after construction had started, Dickinson and Bill Reese of Jacobs secured the services of engineer Bill Corwin and instructed Corwin to review and stamp Briggs' detailed isometric mechanical design drawings—months ***after*** the drawings

had been prepared by Briggs, and months after work based on Briggs' drawings had commenced at pipe fabrication shops and in the field.  *See* **Exs. 24, 25**.

50.     Dickinson stated to Reese that Corwin's stamping of the design drawings would be "mostly a formality" and "[v]ery easy money" for Corwin.  (**Ex. 24**).

51.     Dickinson apparently drafted Corwin's scope of work, sent it to Reese, and instructed him to forward it to Corwin.  (**Ex. 25**).

52.     Corwin stamped Briggs' mechanical piping design, but the design was not done under his direct control and personal supervision as required by law.  18 VAC 10-20-760 (**Ex. 21**).

53.     Corwin immediately found errors when he finally reviewed Briggs' design. Corwin reported these errors to Jacobs in a letter dated January 24, 2006.  (**Ex. 26**).

54.     Instead of correcting or revising the mechanical piping design drawings and specifications to correct what Corwin "found wrong," as noted in his January 24, 2006 letter (**Ex. 26**), Jacobs responded to almost every problem Corwin noted with the written comment, "Field will take care of."  *See* **Ex. 27**.  "Field will take care of" meant that Jacobs billed Coors for this work and rework rather than Jacobs even attempting to correct the design deficiencies at its own expense as required by contract.  *See* **Exs. 28, 29**; ¶¶ 55–57 below.

55.     Jacobs' documents show that it billed Coors at least $6,065,867 for design omissions, revisions, and additions.  (**Ex. 28**).

56.     Jacobs' documents show that it billed Coors at least $29,277,290 for "Rework." (**Ex. 28**).

57.     Jacobs defined "Rework" as "Work required to fix a problem that was the result of a subcontractor, fabricator or equipment supplier error." (**Ex. 29**).

58.     In addition to circumventing the law on Briggs' mechanical design, Jacobs and Briggs did the same thing on Briggs' electrical design.  In February 2006, Dickinson approached Mike Webb of Jacobs asking for help in finding someone to stamp Briggs' electrical design drawings after they were complete. (**Ex. 30**).

59.     In May 2006, Dickinson contacted Behrent Engineering Company asking Behrent if it would be willing to stamp Briggs' electrical design drawings. (**Ex. 31**).

60.     In July 2006, Behrent gave Jacobs a proposal for "reviewing and sealing" Briggs' electrical drawings.  Dickinson asked Behrent to resubmit its proposal replacing "Jacobs Engineering" with "Briggs." (**Ex. 32**).

61.     Behrent hired a part-time employee to review Briggs' electrical design drawings. (**Ex. 33**).

62.     Behrent stamped Briggs' electrical design drawings, but the design was not done under Behrent's direct control and personal supervision as required by law.  18 VAC 10-20-760 (**Ex. 21**).

63.     Keith Poynton, Briggs Director of Engineering, testified that Briggs' design was not done under the supervision or control of a registered Virginia professional engineer.  Depo. Keith Poynton 198:18 to 199:16 (July 27, 2010) (excerpt of deposition transcript attached as **Ex. 34**).

64.   Poynton also testified that a large portion of Briggs' design was complete, and field work based on the design was ongoing, before the design was reviewed by a registered Virginia professional engineer.  Depo. Poynton 203:1 to 205:1; 211:3 to 224:16. (**Ex. 34**).

**D.   Jacobs failed to properly manage and administer its subcontracts by abandoning its lump-sum contracting strategy and by assigning subcontract administrators who were not qualified.**

65.   A Virginia engineer is required to "adhere to the minimum standards and requirements pertaining to the practice of [the engineering] profession." 18 Va. Admin. Code 10-20-730-(C). (**Ex. 21**).

66.   Under Virginia law, the practice of engineering includes by statutory definition "responsible administration of construction contracts."  Va. Code Ann. § 54.1-400.

*Lump-sum subcontracting strategy abandoned*

67.   Jacobs committed to bid the subcontract packages "on a lump sum basis to the maximum degree possible."  Construction Services Agreement, Exhibit B, Section 3.3.1 *Contracting Strategy and Breakdown Structure.* (**Ex. 2**).

68.   Jacobs shall "[c]ommercially and administratively, as far as practical, use a lump sum approach to all subcontracts."  Construction Services Agreement, Exhibit B, Section 3.5.1 *Construction Execution Plan*, ¶ 4.0.  (**Ex. 2**).

69.   On July 26, 2006, Gary Walcott, Jacobs Greenville Project Controls Manager, expressed grave concerns in a confidential email to his supervisor in Greenville, Ralph Dove, about abandoning the lump sum approach for subcontracts and changing to time & materials (T&M).  (**Ex. 35**).  Walcott advised that there were too many hidden costs associated with T&M, and that based on his 20+ years of experience on lump-sum/T&M pitfalls he knew that Jacobs

Greenville was not adequately prepared or sufficiently experienced to properly manage and administer T&M subcontracts on the Coors Project. *Id.*

70.     Walcott admitted that: "The reason for considering T&M is due to late design issuance." *Id.* As detailed above, Jacobs was contractually responsible for all design.

71.     In his confidential email on the T&M issue, Walcott wrote, "this is the BIG issue and we will sink or swim on this one." *Id.*

72.     Dove responded to Walcott: "I fully agree that [Jacobs] Greenville doesn't have the experience to pull this off alone and that other strategies need to be considered." *Id.*

73.     Jacobs, however, abandoned the contractually required lump sum approach and went with a T&M approach because Briggs' design was late. *See* Depo. Steve Dickinson 130:1–9. (**Ex. 6**).

74.     As discussed above, Jacobs did not provide adequate project controls to manage the T&M subcontracts, and, as evidenced by Jacobs' documents cited herein and attached hereto, Jacobs Greenville was not able to "pull it off alone," and Jacobs did "sink" as warned by Walcott. (**Ex. 35**).

75.     Late in the project, Jacobs executive, Bob Clement, admitted that: "When we shifted from lump sum contracts to cost reimbursable contracts [T&M] we never got control of the growing / shifting scope and we did not put control systems in place soon enough to get our hands around this fluid situation." (**Ex. 14** at p. 2, Item 5).

***Jacobs' subcontract administrators were not qualified***

76.     Jacobs "will be responsible for construction management services as agreed in the Coors/Jacobs Alliance and will manage the subcontractors providing craft and sub-

subcontractors." Construction Services Agreement, Exhibit B, Section 3.5.1 *Construction*

*Execution Plan* ¶ 2.1.  (**Ex. 2** at p. 7).

77.     Jacobs shall "inspect the work of the subcontractors for defects and deficiencies."

Construction Services Agreement, Exhibit B, Section 3.5.1 *Construction Execution Plan* ¶ 2.1.1.

(**Ex. 2** at p. 8).

78.     Jacobs used its standard form Master Services Agreement for its subcontracts with

its construction subcontractors.  *See, e.g.,* **Ex. 36**.

79.     Under Jacobs' construction subcontracts, its subcontractors were responsible for

replacing or correcting nonconforming material or workmanship at their own expense.

> Subcontractor shall promptly correct any Work rejected by Contractor for
> failing to conform to the requirements of the Subcontract Documents,
> whether discovered before or after final completion, and whether or not
> fabricated, installed or completed.  Costs of correcting such rejected
> Work, including additional testing, inspections, and removal or
> replacement of other work, shall be at Subcontractor's expense.  […]
> Subcontractor, at its own expense, shall promptly correct or replace
> nonconforming material or workmanship with materials or work which
> does conform to the Subcontract Documents.

(**Ex. 36** § 5.G., at p. 6).

80.     Jacobs Subcontracts Manager, Richard ("Ric") Martin, admitted that the

Subcontract Administrators (SCAs) that Jacobs assigned to the Project "were not qualified."

(**Ex. 37** at p. 1).

81.     Doug Lockard, Jacobs Supply Management Manager, admitted that Jacobs had a

"general lack of cost reimbursable experience in all disciplines" on the Project and that "was a

problem."  (**Ex. 10** at p. 2, Item 1.i.).  Lockard stated that reimbursable contractors did not

consistently submit reports and the reports submitted "were rife with errors."  (**Ex. 10** at p. 3,

Item 4.a.).  Lockard stated that Jacobs "never synced the subcontract pay-applications to the forecast."  (**Ex. 10** at p. 3, Item 4.c.).  Lockard admitted that:  "From the beginning, there was no attempt to scrutinize the change control process for misuse of the funding allocations and alignment with the forecasts being provided."  *Id.*

82.     Despite Jacobs making "no attempt to scrutinize the change control process for misuse of the funding allocations," it certified the subcontractor pay-applications for payment and forwarded the applications to Coors, and Coors paid Jacobs.  *Id.*

83.     Because Jacobs, as it admits, had unqualified subcontract administrators with a lack of cost reimbursable experience, it billed Coors at least $29,277,290 for "Rework."  (**Ex. 28**).

84.     Jacobs defined this "Rework" as "Work required to fix a problem that was the result of a subcontractor, fabricator or equipment supplier error."  (**Ex. 29**).  This work was not to have been billed under the terms of the subcontracts (*see* ¶ 79 above), but the work was certified by Jacobs as proper for payment because Jacobs, as it admits, made "no attempt to scrutinize the change control process for misuse of the funding allocations." (*see* ¶ 81 above).

      **E.**    **Jacobs failed to properly track changes, backcharges, and rework resulting in significant damage to Coors.**

85.     Jacobs was obligated by contract to document any significant changes to the Project from both a cost and schedule basis, as well as detailing the need for the proposed change.  Construction Services Agreement, Article 10.  (**Ex. 1**).

86.     Jacobs admits that:  "Subcontract changes were not tracked for the cause of the change" and the impact was "[a]ctual reasons for the growth in subcontract costs was not known."  (**Ex. 38** at p. 2).

87.     Jacobs admits that: "The duties and responsibilities for a backcharge coordinator were not defined and were not assigned.  The process of backcharge administration was not implemented on the project."  (**Ex. 37** at p. 3).

88.     Jacobs admits that its field team provided verbal direction to its subcontractors and that:  "Verbal direction was out of control creating loss of control of work, cost and schedule."  (**Ex. 37** at p. 2).

89.     Jacobs admits:  "We did not adequately track the causes of subcontract changes and so cannot provide attributable metrics for analysis."  (**Ex. 19** at p. 4, Issue No. 8).  Jacobs also admits that it breached the standard or care because it "did a below average job on managing Backcharges on Coors."  *Id.* at p. 7, Issue No. 14.

90.     Steve Dickinson admitted that Jacobs had a tremendous amount of rework in the field as a result of design issues.  Dickinson testified:

> Q.     But in terms of what you experienced during 2006, you had a tremendous amount of rework in the field as a result of design issues, did you not?
>
> A.     That is true.

Depo. Dickinson 147:7–10 (excerpt of deposition transcript attached as **Ex. 6**).

91.     Jacobs admits that it did "a pretty poor job overall in recovering monies for reperformance [rework] that should have been backcharged between contractors."  (**Ex. 10** at p. 5, Item 14).

92.     Jacobs admits it failed "to manage rework caused by Engineering lateness and redesign."  (**Ex. 18** at p. 9).

93.     Jacobs' own documents show that it failed to properly manage changes:

Issue:  Did not establish a process for defining the basis for change.

Impact:   There were over 4,000 change documents issued (RFIs and CCMs) that increased subcontract costs by almost $80 MM through Prolog [Jacobs' software system] that did not capture the basis for the changes.  This provided an unknown basis for the project cost increase could not be easily identified.

(**Ex. 39** at p. 3, Item 3.1).

Despite Jacobs' admissions that it breached its contract and did not track the basis for $80 million in Project changes, it argues in its motion for summary judgment that all of Coors' claims should be dismissed because Coors failed to provide evidence that tracks each cost increase to a discrete breach.  Jacobs admits in its own confidential, internal records that this would be impracticable if not impossible.

**G.     Coors suffered $89.3 million in damage because of Jacobs' breaches.**

94.     Jacobs provided a detailed Project Risk Analysis as a part of its estimate.[5]  In this Jacobs analysis, Section 2.4 of Exhibit B to the Construction Services Agreement (the Project

---

[5] "Project Risk Analysis" is sometimes referred to in the industry as a "Monte Carlo Risk Analysis."  "The term 'Monte Carlo method' was coined in the 1940s by physicists working on nuclear weapon projects in the Los Alamos National Laboratory.  Monte Carlo methods are a class of computational algorithms that rely on repeated random sampling to compute their results."  http://en.wikipedia.org/wiki/Monte_Carlo_method.  "[T]he use of the name 'Monte Carlo' does not mean to imply that the method is either a 'gamble' or 'risky.'  It simply refers to the *manner* in which individual numbers are selected from valid 'representative collections of input data' so they can be used in an iterative calculation process.  These 'representative collections of data' are typically called 'Frequency Distribution Functions,' or just 'Distribution Functions,' for short."  James F. Wright, Ph.D Ltd. Co. http://www.drjfwright.com/d/

Risk Analysis is attached as **Ex. 40**), Jacobs represented to Coors that there was a 100%

probability that the Project would be built for no more than $222,932,000.  (**Ex. 40**).

96. Mike Watson, Jacobs Chief Estimator, testified that it was a "good estimate" and

that he had "high confidence" in the estimate.  Depo. Michael D. Watson 118:18 to 119:23

(April 15, 2010) (excerpt of deposition transcript attached as **Ex. 41**).

96. Dickinson also testified that it was a "good estimate."  Depo. Dickinson 67:8–11

(**Ex. 6**).

97. Coors paid Jacobs $4,064,070 for services performed during the Planning &

Analysis Phase, which included Jacobs performing the detailed estimate and the Project Risk

Analysis.  *See* **Ex. 40** for the Project Risk Analysis and **Ex. 42** at p. 2 for the expended amount.

98. According to Jacobs' attached cost report (attached as **Ex. 42**) Jacobs has

billed Coors and Coors has paid Jacobs $333,413,137 for Jacobs' services on the Project.

Watson testified that the final cost of the Project was approximately $334 million.  Depo.

Watson 121:11–20 (**Ex. 41**).

99. Jacobs admits that it was "entirely responsible" for additional costs of at least

$100 million.  *See* ¶¶ 24, 25; **Ex. 16**.  In addition to Jacobs' admission, Coors' damages are

further evidenced by the following:

100. Jacobs "shall, without additional compensation, correct or revise any errors or

deficiencies in the designs, drawings, or specifications provided pursuant to this Agreement."

Construction Services Agreement, Article 6, § 6.2(g).  (**Ex. 1**).

---

tramcmeth.html#mcma.  Here, Jacobs ran 40,000 iterations of its Project Risk Analysis computer
program.  *See* **Ex. 40** at p. 1 ("Iterations Run:  40,000").

101.    Jacobs' subcontractors were contractually obligated to fix their own problems at their own expense.  *See* ¶¶ 78, 79; (**Ex. 36**).

102.    Jacobs admits that it billed and was paid $6,065,867 for design omission, revision, and additions.  (**Ex. 28**).

103.    Jacobs admits that it billed and was paid $10,443,883 for schedule recovery.  (**Ex. 28**).

104.    Jacobs admits that it billed and was paid $10,221,768 for field conditions.  (**Ex. 28**).

105.    Jacobs admits that it billed and was paid $29,277,290 for "Rework."  (**Ex. 28**).

106.    Jacobs admits that the "Rework" was "Work required to fix a problem that was the result of a subcontractor, fabricator or equipment supplier error."  (**Ex. 29**).

107.    Under the terms of the contracts and subcontracts, as detailed above, Jacobs should not have billed Coors for most of the $56,008,808 reflected in ¶¶ 102–105 above.

108.    Jacobs' own documents verify the existence of damage, and Jacobs admits in its documents that it billed for costs that should not have been billed under the contracts—thus causing damage to Coors.  (**Exs. 28, 29**).

109.    Jacobs admits in numerous internal documents, detailed above, that it failed to properly track and manage cost changes, backcharges, and rework.  Coors' experts, after reviewing Jacobs' project records, agree that Jacobs failed to maintain adequate records, and testified that because of Jacobs' poor records Coors cannot calculate its damages with mathematical exactness.  *See* **Exs. 44–46**.  *See also* discussion in Part I.A. below.

110.    Coors' expert, Gunnar E. Sarsten, calculates Coors' damages at $57.4 million to

$89.3 million, with it being "more likely than not that Coors' damages caused by Jacobs'

breaches are $89.3 million."  Coors' Expert Report of Gunnar E. Sarsten at pp. 8–9.  (introduced

by Jacobs as deposition Exhibit E-3) (Sarsten's expert report is attached as **Ex. 43**).  At his

deposition, Sarsten testified:

> Q.    Are you able to quantify the cost effect to Coors of Jacobs' management not providing competent, timely, and meaningful corporate oversight as listed in item No. 4?
>
> A.    Yeah.  I think the damages part of my discussion at the end of the opinion does that.
>
> Q.    Do you believe that if Jacobs' management had provided competent, timely, and meaningful corporate oversight that the project would have come in either 80-some-odd million under the total installed cost or –
>
> A.    Within the range that I had in my report.  Somewhere between 57 million and 89 million.
>
> Q.    And was Jacobs' management's failure to provide competent, timely, and meaningful corporate oversight the cause of all of those damages, or just a contributing factor to those 50 to $80-som-odd-million figures?
>
> A.    Well, obviously everything contributed.  But if Jacobs' corporate management had done the kinds of things that I think they could have done with meaningful oversight, meaningful action, they would have delayed the start of construction, and I believe those amounts of money, the amounts of money in that range, would have been saved.

Depo. Gunnar E. Sarsten, P.E. 234:6 to 235:5 (June 14, 2010) (excerpt of deposition transcript

attached as **Ex. 44**).

111.    Sarsten further testified:

> Q.    And it is your opinion that Jacobs should have to pay for $89.3 million of Coors' $330-million-plus project?

> A.   Well, that's up to a court to decide.  My opinion is that Jacobs' failures led to $89.3 million worth of extra costs that Coors experienced.

Depo. Gunnar E. Sarsten, P.E. 326:24 to 327:4 (June 15, 2010) (excerpt of deposition transcript attached as **Ex. 44**).

Coors has sufficient evidence, in the materials detailed above and attached hereto, for a jury to make a reasonable finding that damage exists and was caused by Jacobs' breaches of its contractual, professional, and statutory duties.  And as explained below, Coors' evidence provides a reasonable basis for a jury to make an intelligent estimate of the damages, which is all that is required under the law.

## Argument and Legal Authority

The only question raised by Jacobs' present motion (its ninth) is whether a reasonable jury could find that Coors was damaged because of Jacobs' breaches of its contractual and professional obligations.  Jacobs apparently concedes, at least for this motion, that a reasonable jury could find that Jacobs breached those obligations.   To grant the motion, the Court must conclude that no reasonable jury could find that Jacobs' incompetent management and defective engineering raised the cost of this complex, multi-million dollar brewery project.  That conclusion seems unlikely as a matter of common sense.  More importantly, the record here—including Jacobs' own "confidential," pre-litigation admissions—demonstrates that Jacobs' repeated breaches did make Coors worse off, or so a reasonable jury could easily find.  No more is needed for the motion to be denied.

Jacobs seeks to confuse the issue by conflating two distinct concepts: the *fact of damage*, which is an element of a breach of contract claim, and the *amount of damages*, which is not an element.  *See Tull v. Gundersons, Inc*., 709 P.2d 940, 943 (Colo. 1985) ("[O]nce the fact of damage has been established with the requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery."); *Loughridge v. Chiles Power Supply Co*., 431 F.3d 1268, 1281 (10th Cir. 2005) (same); *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 481 (Colo. App. 2003) ("Nominal damages are recoverable for breach of contract even if no actual damages resulted or if the amount of actual damages has not been proved."); *Kiser v. Amalgamated Clothing Workers of America*, 194 S.E. 727, 732–33 (Va. 1938) (rule against recovery of uncertain damages generally has been directed against uncertainty as to cause rather than uncertainty as to amount).

The amount of damages is "the money compensation that is awarded for the damage[.]" *See* 11-55 *Corbin on Contracts* § 55.12 (Matthew Bender & Co. 2010).  "Damage" (or "loss" or "injury") means "the factual harm suffered."  *Id*.  Jacobs' repeated demands for a separate "quantification" of the cost to Coors of each of Jacobs' performance failures (billing for rework, using incompetent staff, understaffing the project, putting incompetently prepared incomplete and inaccurate drawings into the field and fabrication shops, committing a large number of design errors, and so on) show that Jacobs is actually challenging the calculation of damages, rather than the fact of damage.

Jacobs' own admissions establish the fact of damage with reasonable certainty.  Once the fact of damage is established, the amount of damages that would compensate Coors for its injury does not have to be established with "mathematical certainty."  *Tull*, 709 P.2d at 944 – 945.  In

this case, Coors has sufficient evidence to permit a reasonable jury to make a fair approximation

of an actual damages amount that would compensate Coors for its injury at Jacobs' hands.  *See*

*Denny Constr. Co. v. City and County of Denver*, 199 P.3d 742, 746 (Colo. 2009).  Both issues—

the fact of damage, and the amount of damages that should be awarded—are questions for the

jury in this case.  The motion should be denied.

  **I.**  **Summary judgment is not proper because Coors' supporting materials
establish a genuine issue of material fact for trial.**

  If the defendant meets its burden of showing an absence of evidence on an essential

element of the plaintiff's case, the plaintiff must respond by making "a sufficient showing" with

respect to that element.  *Celotex Corp. v. Catrett*, 447 U.S. 317, 323 (1986).  The plaintiff's

showing is sufficient when its supporting materials are such that, "if reduced to admissible

evidence," they would be "sufficient to carry [plaintiff's] burden of proof at trial."  *Id.* at 327.  In

making this showing, the plaintiff is not required to use materials that are "in a form that would

be admissible at trial."  *Id.* at 324.

  Coors' supporting materials, as detailed above in the Counter-Statement of Material Fact

section and attached hereto as exhibits, establish a genuine issue of material fact for trial on the

existence and cause of damage.  And these same materials show that any lack of mathematical

exactness in Coors' damages calculation is because of Jacobs' poor records.

  As discussed above, Jacobs consistently confuses the *fact* of damage and the *amount* of

damages.  Jacobs' motion must fail if a reasonable jury could conclude that Coors suffered

damage, without regard to the amount of damages.  The rule that precludes recovery of uncertain

and speculative damages applies only where the *fact* of damages is uncertain, not where the

*amount* is uncertain.  *Peterson v. Colorado Potato Flake & Mfg. Co.*, 435 P.2d 237, 239 (Colo.

1967).  Given its admissions in its own internal documents, Jacobs' apparent contention that

there is no evidence of damage—no evidence, in practical terms, that Coors was worse off

because of Jacobs' admitted breaches—has no merit.

Moreover, as to *amount* (even if that were relevant here), a reasonable jury could award

Coors the damages it seeks on the following evidence alone:

- Jacobs billed and was paid more than $4 million during the Planning & Analysis phase for services that included providing an estimate that construction would be completed for no more than $222.9 million, to a 100% certainty.

- That estimate is relevant not because it was a guarantee—which Coors has never contended—but because it is evidence of what the project should have cost, had Jacobs used appropriate care and skill, and carried out its contractual responsibilities.

- The Project cost $333.4 million.

- Jacobs admits that it is "entirely responsible" for an overrun of at least $100 million.

- Coors has presented evidence of $89.3 million in damages, which is less than the amount Jacobs has admitted.

Although Coors has submitted much more evidence than this in support of its opposition, these

five facts alone are sufficient to defeat Jacobs' contentions as to the amount of damages.  The

jury has "the sole prerogative and responsibility of making a reasonable finding that would

provide for a fair, equitable, and adequate award of damages."  *Peterson*, 435 P.2d at 240.

## A.      Jacobs failed to meet its initial burden of showing an absence of evidence.

Jacobs first argues that summary judgment is proper because "the record is devoid of any

admissible evidence supporting Coors' claim for specific damages allegedly caused by Jacobs'

specific breaches."  Jacobs' Memorandum of Points and Authorities in Support of its Motion for

Summary Judgment (Jacobs Memo) at 5.  Jacobs further argues, without citation to any

authority, that:  "In order to recover damages from Jacobs, Coors must produce evidence that

specifically ties each cost increase it claims as damage to a specific breach by Jacobs."  Jacobs

Memo 12.  Jacobs is wrong because that is not the law.  Coors, as explained below, is required

only to establish the fact of damage with "reasonable certainty" without impracticable linkage of

dollar amounts to each discrete breach.

　　　　Under Virginia and Colorado law,[6] the proper measure of damages for breach of contract

"is the sum that would put [the plaintiff] in the same position, as far as money can do it, as if the

contract had been performed."  *Nichols Constr. Corp. v. Virginia Machine Tool Co., LLC*, 661

S.E.2d 467, 471 (Va. 2008); *Schneiker v. Gordon*, 732 P.2d 603, 612 (Colo. 1987) (plaintiff may

recover the amount of damages that are required to place her in the same position she would have

occupied had the breach not occurred).

　　　　On negligence claims, a party is generally entitled to recover for those damages that

naturally and probably result from the negligence of another.  *Thompson v. Tartler*, 443 P.2d

365, 369 (Colo. 1968).  The negligent architect/engineer will be liable for damages that will

justly and fairly compensate the owner for the actual loss sustained.  *Kellogg v. Pizza Oven, Inc.*,

402 P.2d 633, 636 (Colo. 1965).  "The principle of making the injured party whole underlies all

negligence cases."  *Cope v. Vermeer Sales and Service of Colorado, Inc.*, 650 P.2d 1307, 1309

(Colo. 1982).  "Difficulty or uncertainty in determining the precise amount does not prevent an

award of damages."  *Id.*

---

[6] Coors has a breach of contract claim against JCS that is governed by Virginia law, and a breach
of contract claim against JEG that is governed by Colorado law.

"Damages need not be proved with such preciseness as to permit a jury to reach a verdict with mathematical certainty.  An approximation is sufficient if there is substantial evidence which, together with the reasonable inferences to be drawn therefrom, provides a reasonable basis of computation."  *Brown v. Alkire*, 295 F.2d 411, 416 (10th Cir. 1961).

"Damages are not required to be proved with mathematical exactness … an intelligent estimate or a reasonable basis of calculations is all that is required."  *Thomas P. Harkins, Inc. v. Reynolds Assocs.*, 277 S.E.2d 222, 224 (Va. 1981); *Riggs v. McMurtry*, 400 P.2d 916, 919 (Colo. 1965) (evidence must provide reasonable basis for computation of damages); *Tull*, 709 P.2d at 943) ("Although an award of damages cannot be based on mere speculation or conjecture, once the fact of damage has been established with a requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery …. And while there are conflicting views of the meaning of the reasonable certainty standard, we think the standard should be interpreted as imposing on the plaintiff the burden of proving the fact of damage by a preponderance of the evidence.").  *See Air Line Pilots Ass'n. Int'l v. Northwest Airlines*, 415 F.2d 493, 498 (8th Cir. 1969) ("Here the fact of damage has been established.  More leeway is allowable to a factfinder on the issue of the amount of damage[.]"); *Margolis v. McLeary, Inc.*, 447 F.3d 1115, 1121 (8th Cir. 2006) ("Moreover, it is the fact of damage, rather than the amount of damages, which must be proved with reasonable certainty.").

Jacobs cites *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 477 (Colo. App. 2003) for the proposition that a plaintiff must present evidence of the existence and cause of damages.  Coors has met that burden by submitting materials showing that Jacobs billed for work and rework that was not to have been billed under the contract and Coors paid the improper

invoices.  *See* **Exs. 28, 29**.  *Centric-Jones* does not support Jacobs' further argument that Coors must produce evidence that specifically ties each cost increase to a specific breach.

In *Centric-Jones*, the City sued its prime contractor over a water treatment plant project, seeking the total costs of having removed, redesigned, and rebuilt major elements of the facility. 100 P.3d at 477.  But the City "improved its position with different structural elements not part of the original design and corrected deficiencies in the original design for which [the prime contractor] was not responsible." *Id.* at 479.  Here, Coors has not improved its position, has not corrected design deficiencies, and Jacobs was responsible for the complete design and all construction management.

The court upheld a directed verdict for the prime contractor because the City failed to provide any basis on which the jury could apportion damages between either (1) the benefit of the City's bargain with the prime contractor and additional benefit to the City from rebuilding elements of the facility to new specifications, or (2) particular breaches by the contractor and design errors *of others* for which the contractor was not responsible.  The court explained that "nothing in this record excuses the City from providing the jury with a reasonable, albeit imprecise, basis on which to apportion damages to either loss of the benefit of its bargain with [the contractor] or particular breaches by [the contractor]." *Id.*

*Centric-Jones* is distinguishable because here Coors has not improved its position or benefited by rebuilding to a new design, Jacobs was responsible for all of the design, and, consequently, there are no apportionment concerns.  Coors has submitted evidence of sufficient facts to provide a reasonable basis for the jury to arrive at an intelligent estimate of the damages.

Moreover, Jacobs' argument that Coors' damages must be tied to specific contract breaches has been rejected in construction contract cases. *See Metropolitan Atlanta Rapid Transit Authority v. Green International, Inc.*, 509 S.E.2d 674, 677–78 (Ga. App. 1998), *cert. denied*, (Mar. 5, 1999); *CRS Sirrine v. Dravo Corp.*, 464 S.E.2d 897 (Ga. App. 1995). In *Metropolitan*, the defendant argued that the plaintiff's damages should be limited to only those damages that were shown to result solely from the defendant's specific breaches. 509 S.E.2d at 678. The court rejected that approach, observing that it "would establish a standard which would be almost impossible to meet, resulting in nonliability for the defendant even when it is clear that the defendant caused a substantial portion of the loss." *Id.* "[I]f a plaintiff can show with reasonable certainty the *total amount of damages* and the degree to which those damages are attributable to defendant, that is sufficient to support an award." *Id.* (emphasis added).

Furthermore, where the defendant's wrongful conduct makes the assessment of damages difficult, that party cannot escape liability by complaining that the plaintiff cannot measure its damages with exactness. *Washington Golf and Country Club, Inc. v. Briggs and Brennan Developers, Inc.*, 95 S.E.2d 233, 237 (Va. 1956) ("one whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by a plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible"); *American Industrial Leasing Co. v. Costello*, 418 P.2d 881, 886 (Colo. 1966) ("where one party's wrongful conduct makes the assessment of damages difficult, he cannot escape liability simply because it has become difficult to measure damage with exactness"); *M & B Constr. Co., Inc. v. Mitchell*, 195 S.E.2d 873, 877 (Va. 1973) (When "a defendant is liable for some damages for breach of contract and no evidence is available to show

the exact amount, the quantum may be fixed when the facts and circumstances are such as to permit an intelligent and probable estimate thereof."); *The Wyckoff Pipe & Creosoting Co., Inc. v. Saunders*, 9 S.E.2d 318, 321 (Va. 1940) (same).

Doubts as to the accuracy of damages calculations are generally resolved against the breaching party because it is "not improper, given the inherent uncertainty, to exercise generosity in favor of the injured party rather than in favor of the breaching party." *United States Naval Inst. v. Charter Communications*, 936 F.2d 692, 697 (2d Cir. 1991).

As explained in detail above, Jacobs admits that it failed to properly track changes, backcharges, and rework. *See* ¶¶ 85–93. But Jacobs argues that Coors' claims should be summarily dismissed because Coors cannot track each dollar of additional cost to a specific Jacobs contract breach. Any doubts as to the accuracy of Coors' damages are due to Jacobs' wrongful conduct.

After the Project was complete, Ric Martin, Jacobs Subcontracts Manager, stated: "We did not adequately track the causes of subcontract changes and so cannot provide attributable metrics for analysis." (**Ex. 19** at p. 4, Issue No. 8). Yet Jacobs now argues that Coors "must produce evidence that specifically ties each cost increase it claims as damage to a specific breach by Jacobs." Jacobs Memo 12. Jacobs' internal documents demonstrate that records do not exist that would allow Coors to produce such evidence because Jacobs breached its contract by failing to adequately track the causes of subcontractor changes. Construction Services Agreement, Article 10. (**Ex. 1**).

Coors' experts provided deposition testimony regarding Jacobs' inaccurate records. Coors' expert, Gunnar Sarsten, testified:

Q. You wouldn't go through and identify a specific engineering error and then track it through to determine how much was charged to fix that engineering error by the engineer and then in turn how much it cost in additional construction administration to deal with that in the field.

A. I think you know that the project records that Jacobs kept on this project would no way allow you to do that. I mean, the record keeping of rework, the record keeping on engineering errors, the record keeping on omissions, it doesn't exist. I mean, I'm convinced you can't find it. And that's part of the problems I had, and it's part of the problems FTI [Coors' other expert] has, as I can see it, it's so hard to quantify anything. And, frankly, that's attributable to – it's pretty lousy record keeping on Jacobs' part.

So it would be very hard. And you've read my opinion. My opinion has to come up with what I believe are damages in very broad terms. The record keeping on this job just doesn't allow you to do it any better.

Depo. Gunnar E. Sarsten, P.E. 164:19 to 165:14 (**Ex. 44**).

Coors' expert, Neil Gaudion of FTI, testified that Jacobs' cost records were "inadequate," that cost overruns were not "segregable" because of the way changes were tracked, and that it was impossible to determine precisely the amount of rework. "It's impossible to unscramble the egg." Depo. Neil Gaudion 109:13–21; 110:1–8; 115:2–17; 193:3–18; 256:4–21 (June 22, 2010) (excerpt of deposition transcript attached as **Ex. 45**).

Coors' expert, Paul Ficca of FTI, testified that he felt it was impossible to discretely quantify the damages with precision. Depo. Paul Ficca 92:24 to 93:20 (June 23, 2010) (excerpt of deposition transcript attached as **Ex. 46**).

Jacobs attempts to meet its initial burden by arguing that Coors failed to produce specific evidence tying each cost increase it claims as damage to a specific breach. Such evidence of certainty is not required by law—especially when Jacobs' own poor records make the assessment of damages difficult. *Harkins*, 277 S.E.2d at 224 ("We have long been committed to the view

- 42 -

that damages are not required to be proved with mathematical exactness … an intelligent

estimate or a reasonable basis of calculations is all that is required."); *Washington Golf*, 95

S.E.2d at 237 ("one whose wrongful conduct has rendered difficult the ascertainment of the

precise damages suffered by a plaintiff is not entitled to complain that they cannot be measured

with the same exactness and precision as would otherwise be possible").  Jacobs failed to meet

its burden and its motion for summary judgment should be denied.

**B.      Gunnar Sarsten is qualified to opine on damages.**

Jacobs next argues that Coors cannot meet its burden of proving damages through expert

testimony because Gunnar Sarsten is not a "damages expert" and "has never testified as a

damages expert."  Jacobs Memo 12–13.  Jacobs is wrong because Sarsten is qualified to render

expert testimony on damages and has done so in the past.

Sarsten has more than 40 years of experience in engineering and construction.  Sarsten

Aff. ¶ 4 (Doc. No. 33-13) (introduced by Jacobs as Deposition Exhibit E-2) (attached hereto as

**Ex. 47**).  Sarsten has been a registered professional engineer in 18 states, including Virginia and

Colorado.  *Id.* ¶ 5.  He is currently a registered professional engineer in Virginia.  *Id.*

Sarsten was qualified as an expert witness and testified at trial on the engineering

standard of care and damages incurred on a similarly sized multi-hundred-million-dollar piping-

intensive project.  *Raytheon Engineers & Constructors, Inc. v. Roche Carolina Inc.*, Civil Action

No. 96-CP-21-333 (South Carolina Court of Common Pleas (Florence County) June 22, 2000)

(Order attached as **Ex. 48**).  The trial judge, Hon. James E. Brogdon, Jr., wrote:  "Given Mr.

Sarsten's education, training, experience, and special knowledge of the industry, this Court found

him eminently qualified to testify as an expert witness with regard to the central issues in this

case.  Further, this Court finds his testimony to be both highly credible and enlightening in defining the standard of care and with respect to other issues."  (**Ex. 48** at 16).

Sarsten provided expert testimony on damages that the Court found to be "both credible and reasonable."  *Id.* at 24–25.  Defendant "Roche Carolina relies on the analysis and expert testimony of Mr. Sarsten to support its calculation of the B.2 Damages."  *Id.* at 24.  "Based on his education, training, experience, and analysis of the facts in this case, Mr. Sarsten testified that approximately 55% - 70% of Raytheon's increased engineering costs were due to Raytheon's breach of its contractual, professional, and other duties to Roche Carolina."  *Id.* at 25.  The Court "finds that the lower end of Mr. Sarsten's range for B.2 Damages is both credible and reasonable and concludes that Roche Carolina is entitled to recover on its B.2 claim damages caused by Raytheon breaches of its obligations in the amount of $19,667,687.39."  *Id.*

Coors does not know why Jacobs would represent to this Court that Sarsten "has never testified as a damages expert."  Jacobs Memo 13.  Jacobs' representation to the Court is incorrect.  Based on Sarsten's education, training, experience, special knowledge of the engineering and construction industry, and analysis of the Project record, he is "eminently qualified" to opine here on the engineering standard of care, contractual duties, breaches of those professional and contractual duties, and the fact and amount of damages arising from those breaches—just as he did in the *Raytheon* case.

### C.   Coors will provide the jury with sufficient data to determine Coors' damages.

Jacobs next argues that "Coors cannot meet its burden of proving the existence and cause of its alleged damages because Mr. Sarsten failed to use an accepted method of calculating

construction contract damages." Jacobs Memo 26. Jacobs argues that the method Sarsten used

is a "modified total cost method," and that such a method is disfavored. *Id.* at 27. The label

Jacobs wishes to attach to Sarsten's damages calculation is not relevant. "[T]he determination of

damages for breach of contract will always be fact specific, and no single method exists for

calculating the amount necessary to place the plaintiff in the position he would have occupied

had the breach not occurred." *Nichols Constr. Corp.*, 661 S.E.2d at 472.

Under Virginia law, direct damages are those which arise naturally or ordinarily from a

breach of contract and which, in the ordinary course of human experience, can be expected to

result from the breach. *See Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.*, 214 S.E.2d 155, 160

(Va. 1975); *The Wyckoff Pipe & Creosoting Co., Inc.*, 9 S.E.2d 318, 321 (Va. 1940) (damages

recoverable for breach of contract are such as fairly, reasonably and naturally arose from breach).

Colorado law generally provides for damages that "place the parties in the same financial

position they would have occupied had the contract terms been fulfilled." *See Colorado Nat'l

Bank of Denver v. Friedman*, 846 P.2d 159, 174 (Colo. 1993) (quoting *Republic Nat'l Life Ins.

Co. v. Red Lion Homes, Inc.*, 704 F.2d 484, 488 (10th Cir. 1983)).

Applying the same principles of law as recognized in Virginia and Colorado, i.e.,

"damages recoverable for a breach of contract are such as arise naturally and according to the

usual course of things from such breach and such as the parties contemplated, when the contract

was made, as the probable result of its breach," the Georgia Court of Appeals rejected the

argument that no recovery should be allowed because damages were proved by the "total cost

method" or "modified total cost method." *Metropolitan Atlanta Rapid Transit Authority*, 509

S.E.2d at 677–78. The court held that whether the "total cost method" was used is irrelevant to

the standard for proof of causation or proof of damages.  *Id.* at 677.  *See also United States, for*

*and on behalf of Taylor & Polk Constr., Inc. v. Mill Valley Constr., Inc.*, 29 F.3d 154, 161 (4th

Cir. 1994) (holding trial court erred by failing to allow total cost method for recovery); *AMC*

*Mechanical Contractors, Inc. v. Marriott Corp.*, 896 F.2d 545, 1990 WL 1299 at *4 (4th Cir.

1990) (unpublished) (allowing the use of the total cost method); *Nebraska Public Power District*

*v. Austin Power, Inc.*, 773 F.2d 960, 968 (8th Cir. 1985) (evidence was sufficient to present jury

issue as to whether construction contractor that had experienced cost overruns was entitled to

damages using total cost method); *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180,

351 F.2d 956, 968 (1965) ("It is sufficient if … [the plaintiff] furnishes the court with a

reasonable basis for computation [of damages], even though the result is only approximate.").

Sarsten's basis for the method he used to calculate Coors' damages is explained in detail

in his expert report:

> The method that I used to calculate the contingency that should have been
> included in Jacobs' estimate was to identify the risk associated with the project
> and the factors that alleviated or exacerbated those risks.  I then exercised my
> judgment, based on my experience, to determine the degree of cost uncertainty
> caused by those risks.  This is the same method that I used during my career as a
> construction executive, and is substantiated by industry publications.  My opinion
> as to the amount of damages caused by Jacobs' breaches is based on my
> experience and my evaluation, in light of that experience, of whether Jacobs'
> management should have been able to deal with the various issues encountered on
> the Shenandoah project without exceeding the 30% contingency.  I made this
> evaluation in the same way that I made similar evaluations of cost overruns
> throughout my career as an engineer constructor executive.

(**Ex. 43** at pp. 14–15).  *See also* **Ex. 44**, Sarsten's detailed deposition testimony on damages

318:22 to 337:14.

The Colorado Supreme Court (without using Jacobs' label) held that the use of a

modified total cost method is permissible to determine damages resulting from increased costs

on a construction project.  *Kellogg v. Pizza Oven, Inc.*, 402 P.2d 633, 635 (Colo. 1965).  In

*Kellogg*, the plaintiff sued the defendant architect, alleging that the architect failed to properly

perform architectural services in designing and supervising the construction of a restaurant

building to be occupied by the plaintiff.  *Id.* at 634.  The original estimated cost submitted by the

architect was $62,000; the actual construction cost was $92,768, resulting in a cost difference of

$30,768.  *Id.* at 636.  The jury awarded the plaintiff $21,489.  *Id.*  The court held that the

testimony and other evidence was sufficient to support the jury verdict.  *Id.*

      The court held that the damages resulting from the architect's breaches could be

calculated through the use of a modified total cost method.  Specifically, the court held that the

"measure of damages is the difference between the estimated costs of the building and the actual

cost less the following:  10% of the estimated cost deemed to be the normal variation allowed in

cost estimates, and the cost of such items as the evidence showed were caused by substantial

alterations in the original plans due to instructions of [the plaintiff]."  *Id.*

      The plaintiff in *Kellogg* was leasing the building from the owner.  But the court also held

that a modified total cost method could be used to determine construction cost overruns when a

building owner, such as Coors, brings a claim against a design professional.  The court explained

that an owner would be entitled to damages from a design professional as long as the increased

costs incurred by the owner did not result in "increasing the value of the building."  *Id.*  The

$89.3 million in additional costs that Coors claims, did not result in increasing the value of the

brewery Project because the additional costs resulted from work, rework and other factors that

were unnecessary and completely avoidable had Jacobs performed in a manner consistent with

its contract and the standard of care.  Jacobs' breaches were the cause of $89.3 million in

additional costs, and these damages are capable of being reasonably and fairly calculated through the method used by Gunnar Sarsten—a method fully supported by *Kellogg*, 402 P.2d at 636.

### D.    Coors has met its *Celotex*-Rule 56 burden of proof.

Jacobs' last argument is that Coors is attempting to shift the burden of proof on damages. Jacobs Memo 35–36. Jacobs argues that the burden of proof "does not shift during the course of trial." *Id.* at 36 (citing *Exch. Nat'l Bank v. Sparkman*, 554 P.2d 1090 (Colo. 1976); *W. Distrib. v. Diodosio*, 841 P.2d 1053 (Colo. 1992)). Neither of the cases Jacobs cites has anything to do with summary judgment—Jacobs seems to have forgotten that it moved for summary judgment and the burdens now at issue are *Celotex*-Rule 56 burdens.

Jacobs bears the initial burden and must show there is "an absence of evidence to support [Coors'] case." *Celotex*, 447 U.S. at 325. If that burden is met, and as discussed above it was not, the burden then shifts to Coors to demonstrate that there is a material issue of fact that precludes summary judgment. *Adickes*, 398 U.S. at 158–60. Assuming, for the sake of argument, that Jacobs met its initial burden, Coors is then required to "go beyond the pleadings" and present evidence in the form of affidavits, depositions, and the like designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Coors is not required to produce evidence in a form that would be admissible at trial in order to avoid summary judgment. *Id.* And Rule 56 does not require Coors to depose its own witnesses. *Id.*

Here, Coors' showing is sufficient to defeat summary judgment because its supporting materials, discussed above and attached hereto, are such that, "if reduced to admissible evidence," they would be "sufficient to carry [Coors'] burden of proof at trial." *Id.* at 327. That is, the evidence is sufficient to show: there was a contract, Jacobs breached the contract, Jacobs'

breaches caused damage to Coors, and Coors has "evidence of sufficient facts and circumstances to permit an intelligent and probable estimate" of its damages. *Harkins*, 277 S.E.2d at 224.

### Conclusion

This is not the rare case where the defendant's breaches made the plaintiff no worse off. There are at least genuine issues of material fact about the damage Jacobs caused Coors, and on the undisputed facts Jacobs is not entitled to judgment as a matter of law. Coors respectfully requests that the Court deny Jacobs' Motion for Summary Judgment and send this case to trial on the merits.

Respectfully submitted August 31, 2010.

*s/ Charles W. Surasky*
Charles W. Surasky
cwsurasky@smithcurrie.com
Robert C. Chambers
rcchambers@smithcurrie.com
John M. Mastin, Jr.
jmmastin@smithcurrie.com
SMITH, CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Avenue NE
Atlanta, Georgia 30303-1227
Tel: 404-521-3800
Fax: 404-688-0671

Randall H. Miller
randy.miller@hro.com
James N. Phillips
James.phillips@hro.com
HOLME ROBERTS & OWEN LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203-4541
Tel: 303-861-7000

*Attorneys for Plaintiff*
*Coors Brewing Company*

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on August 31, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

David G. Palmer
**GREENBERG TRAURIG LLP**
1200 17th Street, Suite 2400
Denver, Colorado 80202
Tel:   303-572-6500
Fax:   303-572-6540
Email:  palmerdg@gtlaw.com

and

Albert E. Peacock, III
Paul T. Ross
**KEESAL, YOUNG & LOGAN**
400 Oceangate
P.O. Box 1730
Long Beach, California  90801
Tel:   562-436-2000
Fax:   562-436-7416
Email:  al.peacock@kyl.com
          terry.ross@kyl.com

***Attorneys for Defendants and
Third-Party Plaintiffs
Jacobs Engineering Group Inc. and
Jacobs Construction Services, Inc.***

Christian H. Hendrickson
**SHERMAN & HOWARD L.L.C.**
633 17 Street, Suite 3000
Denver, Colorado 80202
Tel.: 303-297-2900
Fax: 303-298-0940
Email:
chendrickson@shermanhoward.com

and

Paul F. Keneally
**UNDERBERG & KESSLER LLP**
300 Bausch & Lomb Place
Rochester, New York 14604
Tel.: 585-258-2800
Fax: 585258-2821
Email:
pkeneally@underbergkessler.com

***Attorneys for Plaintiff and
Third-Party Defendant
Briggs of Burton, PLC***

*s/ John M. Mastin, Jr.*
John M. Mastin, Jr.
**SMITH, CURRIE & HANCOCK LLP**

***Attorneys for Plaintiff
Coors Brewing Company***