**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**
Senior District Judge Richard P. Matsch

Civil Action No. 1:08-cv-00985-RPM
(Consolidated w/Civil Action No. 09-cv-00271-RPM)

COORS BREWING COMPANY AND
BRIGGS OF BURTON, PLC,

       Plaintiffs,

v.

JACOBS ENGINEERING GROUP INC.,
JACOBS INDUSTRIAL SERVICES, INC., a/k/a
JACOBS CONSTRUCTION SERVICES, INC., and
JACOBS CONSTRUCTION, INC.,

       Defendants,

and

JACOBS ENGINEERING GROUP INC. and
JACOBS CONSTRUCTION SERVICES, INC.,

       Third-Party Plaintiffs,

v.

BRIGGS OF BURTON, PLC,

       Third-Party Defendant.

---

**Coors' Surreply in Response to Jacobs' Reply to Coors' Opposition to
Jacobs' Motion for Summary Judgment**

---

Coors Brewing Company respectfully submits this Surreply in response to new materials put forth for the first time in Jacobs' Reply to Coors' Opposition to Jacobs' Motion for Summary Judgment (Dkt. No. 122).

## I. Introduction

Jacobs uses new evidentiary materials attached to its Reply to support two arguments: (a) that "Coors' experts could have identified and totaled the specific amount of damages Coors purportedly suffered as a result of Jacobs' alleged wrongs" by using documents like the Contractor Correspondence Memorandum ("CCMs") and other documents attached as new Jacobs exhibits (Jacobs' Reply 12; *see* Dickinson Decl. and attached Exhibits A-1 through A-11); and (b) that "neither Coors nor its experts attempted to calculate or attribute any of the Project cost increases" to purported labor issues (Jacobs' Reply 16; *see* Peacock Decl. and attached Exhibits A-12 through A-15). Jacobs' factual assertions in its Reply—which it states are supported by these new materials—are contradicted by Jacobs' admissions in its own internal documents, by Coors' experts' sworn deposition testimony, and by the sworn deposition testimony of Jacobs' own employee as explained below.

## II. Argument

### A. Jacobs failed to properly track changes, backcharges, and rework, making it impossible for Coors' experts to do so after the fact.

Jacobs admits that it issued "'fill-me-up' change authorizations without scope change documentation." *See* Coors' Response ¶ 23, **Ex. 16**. Jacobs admits that its change control management "was broken early-on and could not be effectively corrected." *See* Coors' Response ¶ 26, **Ex. 17**. Jacobs admits that: "From the beginning, there was no attempt to scrutinize the change control process for misuse of the funding allocations and alignment with the forecasts being provided." *See* Coors' Response ¶ 81, **Ex. 10**. Jacobs admits that: "Subcontract changes were not tracked for the cause of the change" with the result that "[a]ctual reasons for the growth

in subcontract costs was not known." *See* Coors' Response ¶ 86, **Ex. 38**. But Jacobs now argues that it is entitled to summary judgment as a matter of law because Coors' experts cannot recreate the detailed accounting records, which Jacobs failed to keep, to quantify Coors' damages and apportion them dollar-by-dollar to individual contract breaches—records that Jacobs admits it failed to keep.

Coors' experts provided deposition testimony regarding Jacobs' inaccurate records. Coors' expert, Gunnar Sarsten, testified:

> Q. You wouldn't go through and identify a specific engineering error and then track it through to determine how much was charged to fix that engineering error by the engineer and then in turn how much it cost in additional construction administration to deal with that in the field.
>
> A. I think you know that the project records that Jacobs kept on this project would no way allow you to do that. I mean, the record keeping of rework, the record keeping on engineering errors, the record keeping on omissions, it doesn't exist. I mean, I'm convinced you can't find it. And that's part of the problems I had, and it's part of the problems FTI [Coors' other expert] has, as I can see it, it's so hard to quantify anything. And, frankly, that's attributable to – it's pretty lousy record keeping on Jacobs' part. So it would be very hard. And you've read my opinion. My opinion has to come up with what I believe are damages in very broad terms. The record keeping on this job just doesn't allow you to do it any better.

*See* Coors' Response 41–42 (Depo. Gunnar E. Sarsten, P.E. 164:19 to 165:14) (attached to Coors' Response as **Ex. 44**).

Coors' expert, Neil Gaudion of FTI, testified:

> Q. […] Were you able to do what you thought was an accurate detailed forensic accounting in this case?
>
> A. In this case?

>       Q. Yeah.
>
>       A. What we know is what the overruns are and how those are reported by JACS [Jacobs' accounting software] and in the Jacobs reporting structure. What we don't know is the root causes of a lot of those overruns, only because of the records that were maintained by Jacobs are inadequate.

*See* Coors' Response 42 (Depo. Neil Gaudion 109:13–21) (attached to Coors' Response as **Ex. 45**).

>       Q. But you haven't been able to and haven't done a root-cause analysis on this project?
>
>       A. Well, we know what a lot of the causes are. The problem is because of the way the change orders and CCMs in particular were administered, a lot of those costs are not segregable into a particular cause, just because of the way and the nature in which those costs were tracked.

Depo. Gaudion 110:1–8 (**Ex. 45**).

>       Q. […] Did you do any analysis to determine what portions of the $29 million figure could be back-charged to somebody under the terms of the contracts?
>
>       A. Well, we attempted to, to review the CCMs, which are the, I'll call it the underpinning of that $29 million number, to determine what were those costs and why were they incurred.
>
>       And I think, as we – as I mentioned earlier, one of the problems with those CCMs is you can't determine, in a lot of cases, especially on some of the larger ones, what components of those costs are and who should they go to and why were they incurred. And that's one of the, I'll call it, issues with the records that we were working with in terms of the CCMs.

Depo. Gaudion 115:2–17 (**Ex. 45**).

>       Q. So I take it from your answer that you can't, as you sit here today, based on your review of the record, including these CCMs, tell me whether any of the expenditures listed in them were unreasonable or were unnecessary; you just can't tell me one way

>   or the other?
>
>   A.   Well, what we know, what we know for sure is there was low efficiency and there was rework for a lot of these contracts.
>
>   The problem or the impediment to quantifying that is that the way these changes were administered, they're just wholesale funding CCMs, which don't try and unscramble the egg, so to speak, between this much was for rework, this much was maybe a change, this much was for anything. I mean, there's no effort at all to, to try and define what the money is for.

Depo. Gaudion 194:3–18 (**Ex. 45**).

>   Q.   Well, don't you think it would have been important that if there were a number of CCMs that were devoid of detail or explanation, as listed at the bottom of page 71 [in FTI's expert report] … that Coors would want to know which specific CCMs and what the total dollar value of those CCMs were as part of its claim?
>
>   A.   No. And the reason I didn't say that is because I think in several locations in the report [FTI's expert report] we talk about how these CCMs by the nature and the way they were administered, and because you don't have visibility into why the hours were incurred, what the scope was that generated these increases, because it's not there, it's, it's impossible to figure out and isolate how much was for, say, rework, how much was for poor productivity outside of the rework.
>
>   Its' hard to unscramble the egg. It's impossible to unscramble the egg.

Depo. Gaudion 256:4–21 (**Ex. 45**).

>   Q.   Okay. When you say Jacobs' CCM process was not an adequate change management process, are you just talking about the CCMs or are you talking about the CCMs and the RFIs and the trend notices and the AXWs all combined?
>
>   A.   I—that's specifically referencing the CCM process, but I would say the AXWs and the trend notices and the RFIs have some of the same issues.

> Q. The same issues being that they, quote, completely—that they often completely lacking in explanation?
>
> A. Right. Like we talked about earlier before the break, the fact that sometimes, based on my review of those records, they don't adequately define the scope or how it was quantified or those kind of things, those would apply equally to the AXWs as compared to the CCMs, as an example.

*See* Affidavit of Charles W. Surasky in Support of Coors' Surreply ¶ 3 ("Surasky Aff."), filed concurrently herewith (Depo. Neil Gaudion 99:19 to 100:10) (deposition excerpts attached to Surasky Aff. as **Ex. 49**).

> Q. Did Jacobs have a complete lack of subcontractor change management?
>
> A. I think they had a lack of subcontractor change management in the sense that they had a process, as you mentioned before, with the various forms of trend notices, AXWs, CCMs, change orders. They had, what I'll call, the tools and the processes and the forms. The problem was the implementation of all that during the course of the project that I think is the issue.

*See* Surasky Aff. ¶ 3, Depo. Gaudion 106:6–15 (**Ex. 49**).

The fact that Jacobs furnished thousands of pages of Project management documents to Coors during the course of the Project (like the new exhibits attached to Dickinson's Decl.), does not mean that Coors' experts can perform calculations with this inadequate database of numbers to track each dollar of Project cost increase to a discrete Jacobs breach. Coors' experts testified that such a calculation was not possible. Jacobs employee Paul Stoeppelwerth (the Jacobs employee specifically tasked with leading the Jacobs effort to reconcile the cost growth)[1] testified that the information just "wasn't there" to make the

---

[1] *See* Coors' Response ¶ 23, **Ex. 16**.

calculation that Jacobs now argues Coors must somehow do after the fact. Stoeppelwerth testified:

> Q. Did you ever do another analysis similar to Exhibit 260, the $84 million or any larger contemporaneous number into eight categories, rather than five categories?
>
> A. No.
>
> Q. Why not?
>
> A. We couldn't get to that level of detail. The information wasn't there.
>
> Q. Okay. And the information you're talking about is the Jacobs contemporaneous cost accounting on the [Coors] Shenandoah project?
>
> A. Yeah, if you mean like the root cause analysis for why something actually needed to be reworked?
>
> Q. Right.
>
> A. We didn't have the data, correct.

*See* Surasky Aff. ¶ 4, Depo. Paul Stoeppelwerth 55:3–18 (deposition excerpts attached to Surasky Aff. as **Ex. 50**)

> Q. In terms of analyzing the cost overruns on the [Coors] Shenandoah project, were you ever able to attribute a dollar value to engineering errors?
>
> A. No.
>
> Q. Why not?
>
> A. I think we just found it too difficult to go down that path.
>
> Q. Too difficult because there were no contemporaneous records that would allow you to figure it out?

> A. Yeah. I think there was not—it was—there was no written documentation.

*See* Surasky Aff. ¶ 4, Depo. Stoeppelwerth 58:11–22) **(Ex. 50)**

Coors' experts, and Jacobs' own employee, have testified that Jacobs' records would not allow the type of detailed calculation upon which Jacobs' Motion for Summary Judgment hinges. At a minimum, this is a disputed issue of material fact precluding summary judgment.

### B. Coors' expert, Gunnar Sarsten, examined the purported labor issues and determined they had no appreciable affect on Project cost increases.

Jacobs now argues that Coors' entire case should be dismissed because Coors' experts allegedly did not attempt to "calculate or attribute any of the Project cost increases" to purported labor problems. Jacobs' Reply 16–17. But Coors' expert, Gunnar Sarsten, testified in detail on the labor issues and his opinion is that it was not poor labor that led to the cost increases, but rather the engineering work and other Jacobs' failures, and Jacobs' records do not allow for an exact calculation of how much the purported labor issues contributed to the Project cost increases. Sarsten testified:

> Q. When the $200-per-week per diem was eventually offered, did it improve productivity on the project?
>
> A. It improved the retention of craft labor. Did it improve productivity? I would say no, because I don't—I never did blame labor for the productivity issue, I blamed the engineering work.

*See* Affidavit of Robert C. Chambers in Support of Coors' Surreply ¶ 3 ("Chambers Aff."), filed concurrently herewith (Depo. Gunnar E. Sarsten, P.E. 295:24 to 296:5) (deposition excerpts attached to Chambers Aff. as **Ex. 51**).

> Q. You mentioned earlier that you think the engineering design issues were a major, greater than 50 percent, cause for the problems on the project.
>
> What percentage would you attribute to the labor issues, both those that preceded the per diem as well as the ongoing problems that followed the per diem?
>
> A. A minor amount. For me to suggest to you that I am smart enough to say what percentages and whatnot apply to each. For one thing, the project records on this project would not—I don't think it would take anybody—no matter how many hours they spent on this job, I mean, I don't think they could answer that question.

*See* Chambers Aff. ¶ 3, Depo. Sarsten 298:10–23 (**Ex. 51**).

> Q. And what was the cause for productivity being lousy?
>
> A. Engineering.

*See* Chambers Aff. ¶ 3, Depo. Sarsten 299:13–15 (**Ex. 51**).

> Q. And another hypothetical would be lack of productivity because you have a worker that doesn't have experience working on a job like this who comes in hung over and is moving kind of slow all day long, would you agree?
>
> A. I have no evidence to think that the union labor workers that showed up on this job, especially after they did the per diem and the overtime, were any worse than the normal union labor workers that I employed all my life.

*See* Chambers Aff. ¶ 3, Depo. Sarsten 301:8–17 (**Ex. 51**).

> Q. Let me go back to my original question, and that is where did you come up with the methodology that you used to calculate the damages? The methodology being the total cost minus the approved estimated cost and then subtracting out of that difference some amount that you think was not attributable to Jacobs.
>
> A. Well, I think it's been said before that the cost

- 9 -

record keeping on this project wouldn't allow the kind of mathematical approach in adding up the pieces to establish what the damages were. So this is admittedly a pretty broadbrush approach, but—and I know you've asked a lot of questions along the way that we all wish we could answer differently as to, you know, how many dollars did the project cost more because of this item, and how many dollars did the project overrun because of that item. And I don't think the project records, as they are, would allow anybody to do that no matter how many hours they spent. I certainly wouldn't know how to do it.

So that, to me, led to a kind of a broadbrush approach as to what it would be. And so that's the approach of taking this higher contingency and saying, well, if you had this higher contingency, which I think would have been appropriate, that should cover any of the things that Coors did.

We got $56 million in here. It would cover any of the normal kinds of things that a project would experience including whatever impacts Coors would have had on the job. It should have covered any small differences between the original estimate of materials and things of that nature. All those things were, frankly, well within Jacobs' contingency, and I have a much larger contingency.

So that's what's left. And so what else do you— what else do you think caused the project to cost what it did? And my opinion is that it's all these things we talked about that were the failures of Jacobs that made it go there. And I can't come up with any other reasons.

I know that Jacobs' opinion is that labor was really bad and the productivity problems are because the labor was no good. I mean, it's fairly clear in the records that the man-hours went from 1.1 million man-hours to 2.2 million man-hours. That's pretty much where the money is. I mean, there is a little bit of money in other things, but that change from 1.1 million man-hours to 2.2 is a doubling of the craft labor expended.

I've told you what my opinion is as to why those hours went up, and I guess Jacobs is going to have an opinion that they went up because, you know, it was a union job and, you know, the union guys were so bad in this rural area. That's not my opinion. I understand somebody can have a different opinion, but

- 10 -

it's not mine.

*See* Chambers Aff. ¶ 3, Depo. Sarsten 327:5 to 328–11 (**Ex. 51**).

Jacobs and its experts may disagree with Sarsten's expert opinion, but such disagreement does not entitle Jacobs to summary judgment as a matter of law. *Diamond v. Sokol*, 468 F. Supp. 2d 626, 636 n.9 (S.D. N.Y. 2006) ("opinions of dueling experts are issues for trial; defendant cannot win summary judgment on the strength of contested expert opinion"); *In re Northwest Airlines Corp.*, 208 F.R.D. 174, 207 (E.D. Mich. 2002) ("The battle of the parties' experts … must await resolution at trial.").

### C. Jacobs' new evidence highlights the factual disputes that prevent summary judgment.

Jacobs' evidentiary materials attached to its Reply illustrate that there are disputed issues of material fact preventing summary judgment. *See Waters v. City of Chicago*, 416 F. Supp. 2d 628, 629 n.1 (N.D. Ill. 2006) ("once a party responding to a Rule 56 motion has identified a genuine issue of material fact that would preclude summary judgment … nothing that the movant can offer up by way of reply as to its version of the facts can stave off the rejection of the summary judgment motion—just as an omelette, once scrambled, cannot be stuffed back into the eggshell").

Coors submitted evidence in its Response showing that Jacobs' cost records were "inadequate," that cost overruns were not "segreable" because of the way changes were tracked, and that it was impossible to determine precisely the amount of rework. Coors' Response 41–42 (Dkt. No. 118) (citing **Exhibits 44–46** attached to Coors' Response (the exhibits are Dkt. Nos.

118-45 through 118-47).  Coors expert Neil Gaudion testified that "It's impossible to unscramble the egg."  Depo. Neil Gaudion 256:4–21 (Coors' Response 42, **Ex. 45**).

Jacobs cannot negate the existence of a genuine issue of fact by merely submitting a declaration that allegedly contradicts deposition testimony included in Coors' Response.  *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001) ("where a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken").  Jacobs' submission of new declarations and new exhibits does not assist it in establishing that there are ***no*** genuine issues of material fact.  Instead, the new materials—457 pages—confirm that genuine issues of material fact exist.  *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (refusing to credit movant's version of the facts); *Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir. 1980) (stating court's obligation to credit factual assertions in favor of the party opposing summary judgment); *Cook v. Shaw Indus.*, 953 F. Supp. 379, 383 (M.D. Ala. 1996) (observing that movant's submission of "rebuttal evidence only confirms … a material issue of fact exists").

In ruling on Jacobs' Motion for Summary Judgment, the facts must be viewed in the light most favorable to Coors and Coors must be afforded the benefit of all reasonable inferences to be drawn from the evidence.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Jacobs' new evidence simply highlights the disputed issues of material fact and confirms that its Motion for Summary Judgment must be denied.

### III. Conclusion

In its Reply, Jacobs submitted allegedly conflicting evidence in an effort to dispute Coors' factual assertions.  This contradictory evidence confirms that Jacobs' Motion for

Summary Judgment must be denied because there are genuine issues of material fact. For the foregoing reasons and those stated in Coors' Response, Jacobs' Motion for Summary Judgment should be denied.

Respectfully submitted this 7th day of October, 2010.

>s/ *Charles W. Surasky*
>Charles W. Surasky
>cwsurasky@smithcurrie.com
>Robert C. Chambers
>rcchambers@smithcurrie.com
>John M. Mastin, Jr.
>jmmastin@smithcurrie.com
>**SMITH, CURRIE & HANCOCK LLP**
>2700 Marquis One Tower
>245 Peachtree Center Avenue NE
>Atlanta, Georgia 30303-1227
>Tel: 404-521-3800
>Fax: 404-688-0671
>
>Randall H. Miller
>randy.miller@hro.com
>James N. Phillips
>james.phillips@hro.com
>**HOLME ROBERTS & OWEN LLP**
>1700 Lincoln Street, Suite 4100
>Denver, Colorado 80203-4541
>Tel: 303-861-7000
>Fax: 303-866-0200
>
>*Attorneys for Plaintiff*
>*Coors Brewing Company*

## **CERTIFICATE OF SERVICE (CM/ECF)**

      I hereby certify that on October 7, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

David G. Palmer
**GREENBERG TRAURIG LLP**
1200 17th Street, Suite 2400
Denver, Colorado 80202
Tel: 303-572-6500
Fax: 303-572-6540
Email: palmerdg@gtlaw.com

and

Albert E. Peacock, III
Paul T. Ross
**KEESAL, YOUNG & LOGAN**
400 Oceangate
P.O. Box 1730
Long Beach, California 90801
Tel: 562-436-2000
Fax: 562-436-7416
Email: al.peacock@kyl.com
       terry.ross@kyl.com

*Attorneys for Defendants and Third-Party Plaintiffs Jacobs Engineering Group Inc. and Jacobs Construction Services, Inc.*

Christian H. Hendrickson
**SHERMAN & HOWARD L.L.C.**
633 17 Street, Suite 3000
Denver, Colorado 80202
Tel.: 303-297-2900
Fax: 303-298-0940
Email: chendrickson@shermanhoward.com

and

Paul F. Keneally
**UNDERBERG & KESSLER LLP**
300 Bausch & Lomb Place
Rochester, New York 14604
Tel.: 585-258-2800
Fax: 585258-2821
Email: pkeneally@underbergkessler.com

*Attorneys for Plaintiff and Third-Party Defendant Briggs of Burton, PLC*

      **s/ *John M. Mastin, Jr.***
John M. Mastin, Jr.
jmmastin@smithcurrie.com
**SMITH, CURRIE & HANCOCK LLP**
2700 Marquis One Tower
245 Peachtree Center Avenue NE
Atlanta, Georgia 30303-1227
Telephone: 404-521-3800

*Attorneys for Plaintiff Coors Brewing Company*