**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Senior District Judge Richard P. Matsch

Civil Action No. 1:08-cv-00985-RPM

COORS BREWING COMPANY

        Plaintiff,

v.

JACOBS ENGINEERING GROUP INC. and
JACOBS CONSTRUCTION SERVICES, INC

        Defendants.

---

## FINAL PRETRIAL ORDER

---

### 1. DATE AND APPEARANCES

The Final Pretrial Conference was held in this matter on December 20, 2012 at 2:00 p.m.

Appearing for the parties were:

    a.    Plaintiff Coors Brewing Company ("Coors") represented by:

        Robert C. Chambers
        John M. Mastin, Jr.
        Smith, Currie & Hancock LLP
        2700 Marquis One Tower
        245 Peachtree Center Avenue NE
        Atlanta, GA 30303-1227
        (404) 521-3800

        -and-

        Michael J. Hofmann
        Bryan Cave HRO
        1700 Lincoln Street, Suite 4100
        Denver, CO 80203-4541
        (303) 861-7000

   b.  Defendants Jacobs Engineering Group Inc. (JEG) and Jacobs Construction

Services, Inc. (JCS) (collectively, Jacobs) represented by:

> Samuel A. Keesal, Jr.
> Albert E. Peacock III
> Elizabeth Beazley
> Terry Ross
> Keesal, Young & Logan
> 400 Oceangate
> P.O. Box 1730
> Long Beach, California  90801
> (562) 436-2000
>
> -and-
>
> David G. Palmer
> Greenberg Traurig LLP
> 1200 17th Street, Suite 2400
> Denver, CO 80202
> (303) 572-6500

## 2. JURISDICTION

This Court has jurisdiction under 18 U.S.C. § 1332.

## 3. CLAIMS AND DEFENSES

### a.  Plaintiff Coors Brewing Company's Claims:

In 2004, Jacobs Engineering Group (JEG) agreed to take on a new project for its

long-time client, Coors Brewing Company. This project—designing and building a brewery in

Virginia's Shenandoah Valley—was the most important project JEG had ever handled for its

"alliance partner," Coors Brewing Company. JEG told Coors it could accomplish the task for

approximately $210 million.

JEG made its subsidiary, Jacobs Construction Services (JCS), available to manage the project, while JEG remained responsible for "overall project management." Both JEG and JCS managed the project. Both of them badly mismanaged the project, leaving behind a record of their mismanagement, including admissions that JEG assigned a team that could not handle a "complicated and fluid" project, that JEG "grossly understaffed" the project, that JCS left key subcontractors "unmanaged," that JCS's approach to management was to let designs go to the field to be built despite knowing they were incomplete and could not be built as drawn, and that JEG and JCS set the project on a "self-destruct course" early on. The extra and unnecessary work and rework caused by JEG and JCS's mismanagement forced Coors to waste tens of millions of dollars. All this violated JEG and JCS's promises to Coors, giving rise to Coors' claims against JEG and JCS for breach of contract.

Coors will briefly explain the nature of its claims against both defendants, followed by a discussion of JEG and JCS's defenses.

1.     **Both JEG and JCS were required to manage the Brewery Project for their client, Coors.**

Under their contracts with Coors, both JEG and JCS were to manage the project. JEG's "Alliance Agreement" with Coors expressly provides that JEG had the responsibility to provide "the resources of its subsidiaries" for "construction management services." (Engineering Services Agreement ("ESA"), Amendment No. 1, Section 1.0, p. 1). All such subsidiary work had to be done "always in accordance with all terms and conditions" of the Alliance Agreement. (*Id.*, Amendment No. 1, Section 3.0).

The Shenandoah Valley brewery project was planned and executed "through the Coors/Jacobs Alliance[.]" (Exhibit B to the Construction Services Agreement ("CSA"), 3.5.1,

- 3 -

Section 1.0.) In particular, JEG made "the resources of" its subsidiary, JCS, "available" to Coors

for the construction management of the brewery project. (CSA, Exh. B, 3.5.1, Section 2.1

(providing that "JCS will be responsible for construction management services *as agreed in the*

*Coors/Jacobs Alliance*[.]") (emphasis added)).

The contract Coors signed with JEG's subsidiary provided that JEG would provide

"overall program management" for the project. That contract, usually referred to as the "CSA" in

this case, expressly provided:

> Jacobs Engineering is working in collaboration with Briggs and EnteGreat on this
> project. *Jacobs will provide overall program management including engineering,*
> *procurement, and construction management…. This being said, Jacobs has the*
> *ultimate responsibility to coordinate all of these efforts and deliver a 6 million*
> *barrel per year brewery to Coors.*

(CSA, Exh. B 3.5.1.) (emphasis added).

In fact, the CSA specified JEG's continuing project obligations under the Alliance

Agreement. JEG would, "in accordance with the latest approved revision of the Coors/Jacobs

Alliance contract," do the following:

- Manage the work of the subcontractors;

- Maintain a competent staff at the project site;

- Inspect the work of the subcontractors for defects and deficiencies;

- Determine the adequacy of the subcontractor's personnel and equipment
  and availability of material and supplies to meet the schedule.

(CSA, Exh. B, 3.5.1, Section 2.1.1).

JEG also promised that it would "ensure that the design efforts [of Briggs and JEG] are

perfectly complimentary and that interferences are being properly eliminated." (CSA, Exh. B,

3.4.4.).

The ESA, which continued in force throughout the project, also contained promises from JEG to Coors. According to the ESA, JEG would be responsible for "the professional quality" of "all ... services" provided by JEG under the ESA. (ESA, Section 3.1). "All such services ... shall be of the highest professional quality." (ESA, Section 3.1). JEG was required to "comply with the National Society of Professional Engineers Code of Ethics in performing services" under the ESA. (ESA, Section 3.1).

JCS also had overlapping management obligations for the project. Under the CSA, JCS was to "provide construction management services," "manage the subcontractors providing craft," be "responsible for the overall safety management of the project," "have a supervisor on site anytime work is being performed," and "be responsible for the overall management of the execution of the construction effort." (CSA, Exh. B, 3.5.1, Sections 2.1 and 5.0.) JCS also could not "employ any unfit person or anyone not skilled in the portion of Work to be assigned to such person." (CSA, Section 4.5(a), p. 5.) JCS was "responsible for coordinating all Work," (CSA Article 2.3), had "responsibility to direct and control the method of performance," was "fully responsible for the quality of the Work done and materials used," (CSA Article 3.4), and was "fully responsible to Coors for the acts and Work of any Subcontractor" (CSA Article 4.5(c)). JCS was also responsible for providing completed "Construction Documents" as necessary to "properly complete the construction of the Project." (CSA Article 6.2(c)).

## 2.   JEG and JCS Both Mismanaged the Project

Both JEG and JCS mismanaged the brewery project, in violation of their agreements with Coors. The evidence of JEG and JCS's mismanagement is extensive. It ranges from JEG assigning the project to an under-equipped and over-matched team, to JCS mobilizing workers

- 5 -

before productive work was available, to JEG failing to provide competent personnel even after it was told they were badly needed, to JEG allowing "Coors project needs [to be] subordinated to other corporate requirements," to JEG and JCS failing to call a time out, to JEG and JCS knowingly directing defective designs to be sent to the field.

### 3.   The Facts of this Case Establish Breaches – Willful and Intentional Breaches by JEG and JCS

A breach of contract claim requires proof of a contract, substantial performance or justified non-performance by the plaintiff, failure to perform by the defendant, and damages. *Western Dist. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992); *Brown v. Harris*, 467 S.E.2d 805, 807 (Va. 1996). Only the last two elements are contested in this case, and Coors has ample evidence to support them both.

The evidence will show that JEG and JCS breached their contracts. JEG and JCS abdicated project management and design coordination, failed to provide a competent staff, adopted a "time and materials" subcontracting strategy that the JEG-assigned team could not "pull off," and, rather than redo engineering, simply handed out cash to "field forces" to fix interferences "as they arise." Gunnar Sarsten will explain in detail why this approach to construction management is not consistent with the terms of the ESA and the CSA or with what Coors could reasonably expect from JEG (which was responsible for "overall program management") or JCS (which was responsible for "construction management services").

The evidence will show that these breaches were willful and intentional, and not the result of inadvertence, neglect, or oversight. JEG was repeatedly warned that it was "underresourcing the project," had assigned an incapable staff, had "grossly understaffed" the project, and could not "pull off" the subcontracting strategy that it adopted. The reason for all

- 6 -

this was admitted (though not shared with Coors) in January 2007, long after the damage was

done: JEG had simply "subordinated" its client's needs to "other corporate requirements."

Worse, JEG and JCS actively misled Coors about the reasons why the project's costs

were skyrocketing. JEG and JCS told Coors that material cost inflation was the cause; it was not.

JEG and JCS told Coors that labor cost inflation was the cause; it was not. The evidence at trial

will show that JCS knowingly, willfully, and intentionally breached its contract with Coors and

these breaches preclude enforcement of the limitation-of-liability provision. The evidence at

trial will show that JCS was the first (and only) party to materially breach the Construction

Services Agreement and JCS cannot therefore enforce the limitation-of-liability provision under

Virginia law. *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997) ("[i]f the first breaching party

committed a material breach … that party cannot enforce the contract").

The evidence will show that Coors was damaged by JEG and JCS's mismanagement. The

basic measure of damages is "the sum that would put [the plaintiff] in the same position, as far as

money can do it, as if the contract had been performed." *Nichols Constr. Corp. v. Virginia*

*Machine Tool Co., LLC*, 661 S.E.2d 467, 471 (Va. 2008) (alteration in original; citation and

quotation omitted). The usual remedy for defective *workmanship* in a construction case is the

cost of repairing the defective work. *See Nichols*, 661 S.E.2d at 472. Likewise, in a case where

defective construction *management* has caused unnecessary work, the measure of damages

should be the cost to the client of unnecessary work caused by the defective management.

*Pomeranz v. McDonalds Corp.*, 843 P.2d 1378, 1381 (Colo. 1993). Here, Coors incurred

needless costs for subcontractor rework, for JCS's increased construction management costs

caused by JCS's lack of competent project management, for work required to correct

subcontractor, fabricator, and equipment supplier errors, for schedule recovery expenses caused by JCS's failure to correct design errors and omissions, for field conditions when the field conditions were caused by field rework resulting from JCS's failure to correct design errors and omissions, and for rework caused by failure to correct design errors and omissions.

Neil Gaudion of FTI reviewed and analyzed the project's excess-cost documents, and calculated the costs that were incurred because of JEG and JCS's mismanagement of the project. The Court recently resolved JEG and JCS's pre-trial motion to exclude that testimony under Rule 702. *See* Order on Motions, Doc. No. 216, filed November 1, 2012.

In order to quantify the excess costs incurred by Coors as a result of JEG and JCS's failures, Mr. Gaudion employed a discrete cost and pricing methodology. This methodology directly links JEG and JCS's identification and tracking of actual costs incurred on the project to the actions (or inactions) of JEG and JCS on the project that resulted in excess costs to Coors. This discrete cost approach is widely used by FTI and others in the industry to quantify construction related damages. In most cases, the excess-cost documents that Mr. Gaudion examined contained evidence of breach and of the expense caused by the breach. Mr. Gaudion, using the methodology described above, determined that JEG and JCS caused excess costs on the project in the amount of $62,642,946.

### 4.    JEG and JCS's Defenses All Fail

To avoid responsibility for mismanaging the project, JEG and JCS have offered a number of defenses, all of which depend on ignoring the plain language of the contracts. Coors will briefly review each such defense.

### a. Management Without Supervision, or Supervision-Free Management

According to JEG and JCS, their mutual obligation to "manage" the project does not mean they have to "supervise" or "oversee" the project. *See* Doc. No. 215, pp. 11 – 12. The entire basis for this argument seems to be that the words "manage" and "supervise" have separate entries in the Merriam-Webster online dictionary. *See* Doc. No. 215, p. 12, n. 7. But one of the meanings of the word "manage" in that dictionary is "to exercise … supervisory direction of." *See Merriam-Webster Online Dictionary* (defining "manage" as "to exercise executive, administrative, and supervisory direction of") (available at http://www.merriam-webster.com/dictionary/manage). Moreover, the American Heritage Dictionary defines "manage" as "to direct or supervise." *American Heritage Dictionary of the English Language Online* (defining "manage" as "to direct or supervise (employees or other staff)") (available at http://www.ahdictionary.com/word/search.html?q=manage).

### b. JEG and JCS Misunderstand Their Responsibility for Subcontractors' Work

JEG and JCS seek to avert blame for their mismanagement of the project by (1) constructing a counter-contractual barrier between their performance and the performance of their subcontractors and (2) arguing that Coors' only remedy for JEG and JCS's *mismanagement* was for subcontractors to redo their work for Coors or give Coors a "performance bond." *See, e.g.,* Doc. No. 215, pp. 11–16. Both arguments are incorrect.

First, the supposed barrier between JEG and JCS's performance and the performance of their subcontractors does not exist. To the contrary, JCS agreed that it would be "fully responsible for the quality of the Work done and materials used," and that it would be *"fully responsible* to COORS for the acts and Work of any Subcontractor and of all persons directly or

- 9 -

indirectly engaged or employed by such Subcontractors." (CSA, Sections 3.4 & 4.5(c) (emphasis added). "Fully responsible" does not mean, as JCS argues, "not responsible at all." *See, e.g.,* Doc. No. 215, pp. 13 – 14 & n. 8. JEG likewise promised to be "solely responsible for the direction, control and supervision of its acts and those of its employees *and subcontractors*," *see* ESA Section 4.2 (emphasis added), and promised to "assume and be responsible for the acts (or failures to act) of its subcontractors[.]" *Id.*, Amendment No. 1, Section 5.3. JEG likewise agreed, in the CSA, to manage the work of subcontractors, inspect the work of subcontractors, and determine the adequacy of each subcontractor. (CSA, Exh. B, 3.5.1., Section 2.1.1). Far from relieving JEG of liability, these provisions imposed a duty on JEG when subcontractor work was performed.

Briggs was no exception to this rule. Though JEG and JCS contend that a "side letter" excused them from any liability for failing to manage Briggs or coordinate its work with other work or with field conditions, the actual text of the letter rebuts that contention. The operative text reads:

> Coors has agreed to modify the terms of Article 17 of the Agreement *so that Briggs of Burton PLC ("Briggs") and EnteGreat Inc. ("EnteGreat") including its subcontractor, Emerson ("Engineers")* retained by Contractor shall not be Required to warrant that they will remedy any defects and pay for any damage to the Project resulting from faulty materials or workmanship other than engineering. The Engineers shall only be required to warrant re-performance of their defective Work during the warranty period and will not be liable to Contractor or Coors for the repair/replacement costs associated with the Work, other than such re-performance of engineering at no cost to Coors.
>
> In addition, Coors has agreed that should there be a termination of Briggs due to default, *Briggs' liability for any additional cost to complete the Work in excess of the Subcontract price shall*

> *be limited to twenty percent (20%) of the total Task Order*
> *Value (as such terms are defined in the agreement between*
> *Contractor and Briggs).*
>
> Finally, Coors has agreed that *Briggs shall not be liable*
> for any contingent, consequential, punitive or other
> indirect damages, including damages for loss of use,
> revenue, or profit, or similar business interruption losses,
> however the same may be caused, unless such damages
> are recoverable under the insurance which Coors has
> provided as described in Sections 13.2, 13.3 and Exhibit J,
> Section 3 of the Agreement.

The letter discusses only the liability of Briggs, EnteGreat, and Emerson for issues that arise during the Article 17 warranty period—which begins after the project is complete. (CSA, Article 17, p. 18). It has nothing to do with issues that arise during the project. Nothing is said about the liability of either JEG or JCS, and nothing in the letter excuses JEG or JCS from liability for their breaches of contract.

Second, JEG and JCS argue that Coors' sole remedy for JEG and JCS's mismanagement was for Coors to obtain a "performance bond" *from the subcontractors*. (Doc. No. 215, pp. 14–15). Why the subcontractors would give a "performance bond" for the management performance of JEG and JCS is not explained. Moreover, the argument is far removed from the terms of the CSA.

CSA Article 4.5(c), on which JEG and JCS primarily rely, has to do with subcontractor defaults, not with JEG and JCS's breaches. (CSA, Article 4.5(c) ("If a bond is not required for a particular Subcontractor, COORS assumes such risks and will not hold CONTRACTOR liable for costs and expenses associated with any *default on the part of such Subcontractor* that would otherwise be insured through the procurement of a bond, notwithstanding any other provision of this Agreement.") (emphasis added). Article 17, titled "Condition of Work at Completion;

- 11 -

Warranty," has to do with "faulty materials and workmanship." After the brewery is built, Article 17 imposes an obligation on JCS and its subcontractors to "correct the Work" and "remedy any defects and pay for any damage resulting to the Project resulting from faulty materials or workmanship that appear within the shorter of a period of two (2) years from that date of delivery of materials or eighteen (18) months from the date of Mechanical Completion[.]" (CSA, Article 17.) Article 17 is a standard materials and workmanship warranty that has nothing to do with JEG or JCS's liability for mismanagement during the project. It would be strange, and unsupported by the language of the CSA, if the remedy for awful project management that caused the client to spend millions of unnecessary dollars was a warranty that the brewery would function properly.

JEG and JCS are also wrong to rely on a combination of Articles 3.5 and 4.2 to excuse them from liability. Article 3.5 imposes a duty on JCS to "perform and complete the Work in a good and workmanlike manner satisfactory and acceptable to Coors," while Article 4.2 authorizes Coors' project manager to "determine when *documents and/or materials and workmanship* are satisfactory[.]" (CSA, Articles 3.5 and 4.2.) (emphasis added). "Workmanship" means "the art of a skilled worker or craftsperson" or "the quality of something made." *See* The American Heritage Dictionary of the English Language (4th ed. 2001), p. 938. It is not a synonym for "JEG and JCS's management performance." Article 4.2 simply cannot be stretched to cover JEG and JCS's management performance.

### c. An Engineering "Do-Over" is not the Sole Remedy for Each and Every Breach of the CSA or ESA

JEG and JCS also go astray by arguing that the sole remedy for *any* breach of the ESA or CSA was for engineering work to be redone. The argument rests on a basic misunderstanding of

- 12 -

JEG and JCS's obligations: namely, their belief that they had only *design* obligations. *See, e.g.,*
Doc. No. 205, filed October 3, 2012 (asserting that "a design error or omission would be
corrected by Jacobs at no additional cost, but ***if there was field rework required as a result of***
***that, it would be borne by Coors***.") (emphases in original) (quoting testimony of Jacobs
employee Flo Mostaccero). JEG and JCS mismanaged the project. This mismanagement is JEG
and JCS's *own* "acts and omissions," not the "design acts and omissions" of Briggs or any other
party.

   **Plaintiff Coors Brewing Company's Defenses:**

   In response to Jacobs' Counterclaim–Count One: Breach of Contract: Jacobs'
counterclaim will fail for lack of proof that Jacobs properly performed its contract obligations.
Coors asserts that Jacobs did not substantially perform all of its contract obligations and that
Jacobs has been paid more than it is entitled to receive under the Construction Services
Agreement.

   In response to Jacobs' Counterclaim–Count Two: Declaratory Judgment (Liability of
Limitation), in which JEG *and* JCS seek a declaration that both JEG's and JCS's liability are
limited to the amount of JCS's fee under the Construction Services Agreement, Coors asserts
that the declaratory judgment counterclaim is not appropriate because: (a) the requested relief
would not settle the controversy between the parties; (b) the counterclaim is purely defensive and
does not seek affirmative relief; (c) the counterclaim is an affirmative defense and is therefore
redundant and moot; (d) the declaration being sought ignores Jacobs' knowing, willful, and
intentional breaches; (e) the declaration being sought ignores any defenses or exceptions to the
enforcement of the limitation of liability, such as Jacobs' willful and intentional breaches,

- 13 -

Jacobs' breach of the implied obligation of good faith and fair dealing, and Jacobs' first material

breach; and (f) the requested relief ignores JEG's liability under the Engineering Services

Agreement ( the Alliance Agreement), which does not contain the limitation-of-liability

provision contained in the Construction Services Agreement.

In response to Jacobs' Counterclaim–Count Three: Declaratory Judgment (Coors' Prior

Written Approval), Coors asserts that the declaratory judgment counterclaim is not appropriate

because: (a) the requested relief would not settle the controversy between the parties; (b) the

counterclaim is purely defensive and does not seek affirmative relief; (c) the counterclaim is an

affirmative defense and is therefore redundant and moot; (d) the declaration being sought ignores

Jacobs' knowing, willful, and intentional breaches; (e) the declaration being sought ignores the

fact that Coors did not give Jacobs a "blank check" allowing Jacobs to bill for work that should

never have been billed under any contract; and (f) the declaration being sought ignores any

defenses or exceptions to Jacobs' argument that Coors approved Jacobs' improper billings.

      b.     Defendants Jacobs

## I.    DEFENSES TO COORS' CLAIMS

### A.    COUNT FIVE:  BREACH OF THE ENGINEERING SERVICES AGREEMENT.

#### 1.    The Claim Against JEG for Breach of the ESA Has been Abandoned.

Coors is no longer asserting an independent claim against JEG under the

Engineering Services Agreement and the claim should be eliminated from the action.  First,

Coors did not identify any damages arising from a breach of the ESA; Coors' damages expert,

Mr. Gaudion, does not attribute any losses/excess Project costs to a breach of the ESA.  Mr.

Gaudion limited his analysis to breaches allegedly arising under the CSA.  (*See* Second

- 14 -

Supplemental Expert Report of FTI Consulting Inc., and Gaudion Deposition II Testimony, Docs

205-6 & 205-9.) Absent evidence of any loss attributable to a breach of the ESA, Coors cannot

move forward on a claim for breach of that agreement.

Similarly, Coors has abandoned the underlying allegations for breach of the ESA.

Specifically, Coors admits that it is no longer seeking redress for the conduct alleged to form the

basis of its claim: (1) JEG's alleged incomplete and inaccurate designs; (2) JEG's alleged failure

to correct and revise its design errors; and, (3) JEG's alleged failure to have a Virginia licensed

engineer supervise its unlicensed designers. (FAC ¶¶ 260-62, 282, 284, 285, 289-90, 296 and

321, Doc. 138). As it applies to the first two allegations, Coors admits that it is not pursuing a

claim against JEG for "bad engineering." (Opposition to Gaudion Daubert Motion Doc. 213 at p.

32.) Also, Coors' expert Gunnar Sarsten's supplemental report does not opine that JEG

provided incomplete designs or failed to correct or revise design errors. As to the third

allegation, Coors' standard of care expert, Gunnar Sarsten admitted that he was not aware of any

unlicensed JEG engineer who performed work required of a licensed engineer. Nor was he

aware of any JEG drawings that were not appropriately signed or otherwise failed to comply with

statutes, laws or regulations. (Deposition of Gunnar Sarsten II, Docs. 204-9 & 204-10 at 141,

164:11-16.) Thus, Coors is no longer contending that JEG breached the ESA on any of the three

(3) grounds alleged in the FAC.

Elimination of Coors' claim for breach of the ESA is further warranted because

the exclusive remedy is limited to the correction or revision of deficient designs. (ESA § 3.2,

Doc. 138.) Since there is no pending contention that JEG failed to correct or revise errors or

- 15 -

deficiencies with its designs, Coors as a matter of contract has no remedy for its claim for breach of the ESA.

There is no stated breach within the confines of the ESA and there are no damages stated that fall outside the negotiated contractual remedy contained in the ESA, precluding Coors from advancing a claim for relief.   The absence of any claim for breach of the ESA warrants the elimination of Count Five.   Such a result is consistent with the Court's Instructions and the law of the Tenth Circuit, both of which make clear that the purpose of the pretrial conference is to simplify the issues and avoid unnecessary proof of facts at the trial. *Berger v. Brannan*, 172 F.2d 241, 243 (10th Cir. 1949).   Equity also favors this result.   JEG cannot defend against a claim which Coors has conceded does not exist, and, JEG must not be placed in a position of having to defend against a claim which has yet to be advanced.

**2.      JEG is Not Liable for Construction Management Services under the ESA.**

It appears that Coors will attempt to allege new claims against JEG, which suggest that it was obligated to provide construction management services under the ESA.   It is not reasonable to expect JEG to defend against an unpled claim which rests on the position that JEG is bound to a contract to which it is not a party (the CSA), or that the contract it did sign binds it to terms it specifically disavows (the ESA).   First and foremost this theory is not actionable because the FAC does not allege that JEG breached the ESA by failing to provide construction management services.   Coors should not be permitted to assert a new theory for relief at this late stage.   (FAC, Doc. 138.)   Furthermore, Coors could not state such a claim. Under the ESA, the scope of services to be performed by JEG under the agreement is limited to "engineering and procurement."   (Amendment Number One to ESA, ¶ 1.0.)   In fact, the ESA

- 16 -

specifically excludes JEG as a provider of "construction services," making clear that construction management services would be made available by **separate contract** with **an appropriate subsidiary** on a **project-specific basis**.  (Amendment Number One to ESA, ¶ 1.0.) Specifically, the ESA states that JEG shall "cause to be made available the resources of its subsidiaries **for contracting with CBC** to perform construction, and construction management services on a program basis."  Because the ESA expressly excludes construction management services from its terms and excludes JEG as a provider of such services, no claim can be stated against JEG for failure to provide construction management services under the ESA.

### 3. JEG is Not Liable for Construction Management Services under the CSA.

Coors' position on JEG's role in the project has changed since the time it filed the FAC (March 8, 2011, Doc. 138).[1]  Instead of alleging a breach of the ESA (the only contract to which JEG is a party), Coors embarks on a new and different claim, one which obligates JEG to the CSA, a contract to which JEG is not a party.

Indeed, the "Scope of Services" section of Exhibit "B" makes clear that JCS, and JCS only, has contracted to provide construction management services under the CSA.  It states "**JCS will provide the construction management services** as agreed in the Coors Jacobs Alliance..."  In stark contrast, this same section states that "Jacobs Engineering" is one of the Project's architects/engineers:  specifically, it defines the "**Architect/Engineers**" as "**Jacobs**

---

[1] The Court will recall that the **very purpose for amending the complaint, the Court explained, was to "zero in on these issues with your pleading, so that we have . . . [an] attorney's signature [on] what you say you can prove.  That way, we have a clearer target."** (Transcript of February 14, 2011 Hearing, 11:5–6 (Doc. No. 133. at 22:1–5) (emphasis added).)  The fundamental purpose for amending the complaint was to establish a clear target and bind Coors to the allegations and narrow the issues for trial.

**Engineering**, Briggs, Entegreat or the Owner's [Coors'] other consultants. (Exhibit "B" Scope of Work.) This distinction is further underscored as Exhibit B defines JCS' "Construction Management Services" to include working with "Coors, **Jacobs**, **Architect/Engineers**, and subcontractors." (Id. 5 of 25 & 6 of 25.) The separation of the entities, not only makes clear that a reference to "Jacobs" is not a reference to JEG, but also makes clear that JEG, like Briggs, Entegreat, and other subcontractors, are not parties to the CSA or bound by its terms.

Coors relies on a reference to "Jacobs Engineering" in an Exhibit to the CSA; specifically the statement that "Jacobs Engineering is working in collaboration with Briggs and EnteGreat on the Project," citing CSA Exhibit B. 3.5.1 CSA. Rather than bind Jacobs Engineering to the CSA, this sentence only states that JEG would be working with the other engineers on the Project. The reference to "Jacobs Engineering" – along with other engineering contractors – in Exhibit B, does not bind JEG, Briggs, or Entegreat to the CSA, nor does it somehow obligate them to perform construction management services.

Finally, even if Exhibit "B" interjected some confusion into the contract, that confusion is dispelled by the clear terms of the CSA itself, which expressly state that JCS is the contracting party and makes no mention of JEG. In interpreting the CSA, its terms govern "without giving any consideration to and excluding the Exhibits and Construction Documents." (CSA, § 1.2(ii).) As such, any confusion about JEG's role created by Exhibit "B" is not instructive. As a matter of contract, JEG is not bound to the CSA and had no obligation to manage the Project.

4.   **JEG and JCS are Separate and Distinct Legal Entities.**

JEG and JCS are separate and distinct corporate entities that, practically speaking, perform very different roles. Coors' belatedly hopes to merge the two entities in an attempt to pierce the – long acknowledged and settled – legal veil that separates the two corporations. This theory was not pled in the FAC, was not the subject of discovery, and is not supported by any claim or fact advanced to date. The danger of allowing Coors to change the theory of its case against JEG at this late stage of the proceedings is evidenced by the discussion above. If this theory had been advanced in the FAC, JEG could have availed itself of the opportunity to move for judgment on the pleadings and/or summary judgment, and the parties could have fully briefed the Court on the merits of their respective positions. But now those opportunities have passed and Coors functionally is asking the Court to amend the complaint for a second time by way of the pretrial conference order so as to allege grounds on which it either attempts to bind JEG to the CSA or convert the ESA to a construction management services contract (or both). Coors has not requested JCS or JEG to produce a single employee or former employee at trial; indeed, as it stands, all JCS and JEG personnel will testify by deposition. None were questioned at their respective depositions as to JEG's purported role as a construction manager under the CSA or regarding corporate formalities, and no discovery was conducted on those subjects. Thus, Coors hopes to capitalize on its new theory by leaving its proof to the Coors' witnesses they intend to call live (whose deposition testimony is similarly vacant on the subject and who presumably have no first hand knowledge of such facts), functionally obligating JEG to wait to hear the evidence on the subject and decide at that time how it intends to rebut the testimony. Clearly, the purpose of discovery, due process, and the pretrial rules and procedures are not served by

permitting Coors to change its theory of the case now. Such rules are intended to prevent trial by ambush and to limit the issues to be tried. As such, Coors' latest theory, which was not the subject of discovery and which is not found in the FAC, should not advance to trial.

For all of these reasons, the Court should decline to include claims or allegations in the final Pretrial Order which were not contained in the FAC. Okland Oil Co. v. Knight, 92 Fed. Appx. 589, 601 (10th Cir. 2003). "Such a practice deprives one's adversary of fair notice, possibly discovery, and the opportunity for motion practice, and is subject to abuse by those who employ a sporting theory of justice. The laudable purpose of Fed. R. Civ. P. 16 is to avoid surprise, not foment it." Id. citing Wilson v. Muckala 303 F.3d 1207, 1215-16 (10th Cir. 2002.)

### 5.  **Contractual Defenses.**

#### a.  **JEG's Liability is Limited to Reperformance of its Services.**

JEG's obligations are defined by and limited to the express terms of the ESA. (ESA, § 3.5 and Amendment 1.) On February 14, 2011, this Court granted JEG's Motion for Judgment on the Pleadings on Defendants' Contractual Limitations of Liability. (See Doc. 131.) In so holding, the Court upheld the validity of the contractual liability limiting provisions contained in the ESA under Colorado law. The ESA limits JEG's liability for all claims that arise "[d]uring the performance of its services and for a period of twelve (12) months after its services are completed" to "correct[ing] or revis[ing] any errors or deficiencies in its designs, drawings, specifications or other services" without additional compensation. (ESA § 3.2.) Section 3.2 expressly provides that it will provide the "exclusive remedies for deficiencies in the services, whether asserted on the basis of contract, negligence, or otherwise." (ESA § 3.2.) These liability limitations were repeated and made crystal clear in Section 8.4 of the ESA.

- 20 -

### b.      The ESA Protects JEG from Liability.

The ESA sets forth numerous conditions precedent to recovery, including, but not

limited to:

- Coors must prove that its claims do not arise from inaccurate data or work supplied by Coors (ESA, § 3.2).
- Coors must establish that JEG failed to correct or revise an error or deficiency without additional compensation and that Coors paid to correct or revise the deficiency (ESA, § 3.2).

It is Coors' burden to establish that each condition precedent has in fact been

satisfied.

### c.      Coors Cannot Establish Causation

Coors has not and cannot link any breach of the ESA to any particular damage.

Moreover, it has not distinguished between damages caused by its own failings, or the failings of

others for which JEG is not responsible:

- Coors' damages, if any, were caused by the failings of others for which JEG has no liability.  Where there is evidence of damage from several causes, the burden is on Coors to show within a reasonable degree of certainty the share of damages for which a defendant is responsible.
- Coors damages, if any, were caused by its own failings.  JEG is not liable for decisions made by, or work undertaken by Coors. Section 3.2 provides that Coors assumes responsibility for the accuracy of its input into the Project, and for its own work, and that "JE shall have no obligation to verify the accuracy of any such data or work supplied by CBC." (CSA § 3.2.)  Furthermore, by way of example only, Coors undertook contractual responsibility to "make the

- 21 -

final decision on choice of design for any portion of the work" (ESA § 15.3) and to approve or reject Project costs (ESA § 14.2.)  This is consistent with cost-reimbursable nature of the contract, pursuant to which Coors assumed responsibility for the Project costs.  (ESA § 6.1.)

**6.**  **First Affirmative Defense: Coors claims are barred in whole or in part by the doctrines of estoppel, ratification, release and waiver.**

For similar reasons discussed throughout, Coors' claims against JEG for breach of the ESA are barred in whole or in part by the doctrines of release, waiver, ratification and estoppel.  Indeed, Coors was fully informed and actively involved in every step of the Project, and JEG relied on Coors' acceptance, ratification, waiver and approval of Project costs, changes, and work, often based on Coors' own decisions.

**7.**  **Second Affirmative Defense:  Mutual Mistake.**

Insofar as the ESA is founded in a mutual mistake of facts that are the very basis of the agreement, the agreement is void.

**8.**  **Third Affirmative Defense:  Coors failed to mitigate its damages.**

Coors has a duty to take reasonable steps under the circumstances to mitigate or minimize its damages.  Damages, if any, caused by Coors' failure to take such reasonable steps cannot be awarded to the plaintiff.

**9.**  **Fourth Affirmative Defense:  Force Majeure.**

Defendant, JEG, raises the force majeure or "act of God" defense as it relates to labor and material cost increases resulting from Hurricanes Katrina and Rita.

**B.**    **JCS IS NOT LIABLE FOR BREACH OF THE CONSTRUCTION SERVICES AGREEMENT.**

Coors agrees that the brewery was properly constructed.  It only complains that certain Project costs should not have been incurred.  However, the CSA is a "cost plus fee" type contract which places the financial risk on Coors for increased Project costs.  This type of arrangement is typical when owners (like Coors) are involved in the Project and partner with the construction manager (here, JCS) to control costs by retaining ultimate decision-making authority on al Project-related matters.  Coors opted for this type of contract and as a result the CSA is drafted to protect JCS from liability for costs.  In return, JCS is compensated with a minimal fee 1.3% of the Total Installed Cost, a fee which tracks its risk.  A risk limited to the re-performance of deficient work and the return of the fee earned.  It is undisputed that Coors received a state of the art brewery that produces exemplary beer at a very reasonable cost.  It is further undisputed that Coors approved each and every dollar spent on the brewery and had complete control over the purse strings.  It also is undisputed that Coors withheld payment of a portion of JCS' fee notwithstanding the success of the Project.

Critically, Coors is not contending that JCS profited from any increase in Project costs; rather, it simply is attempting to offset the total cost of the brewery by proceeding against JCS for the amount it allegedly overpaid others.  In doing so, it is trying to avoid the contract terms that form the basis of the arrangement between the parties, terms which protect JCS from this type of claim.

- 23 -

1.     **Contractual Defenses.**

    a.     **The Damages Recoverable for Breach of the CSA Are Limited.**

        (1)     **As a Fundamental Matter, JCS' Liability is Limited to its Fee.**

On February 14, 2011, this Court granted JCS' Motion for Judgment on the Pleadings on its Contractual Limitation of Liability. (See Doc. 131.) Coors has withheld a portion of the fee. Thus, at most, JCS is only potentially liable for the fee it received. (CSA § 23.2.)

        (2)     **JCS is not liable for consequential losses.**

Article 22 of the CSA provides that neither JCS nor Coors shall be liable for special, indirect or consequential damages, including damages for economic loss (such as business interruption or loss of profits), however the same may be caused. Pursuant to Article 22, Coors has waived any claim to recover special, indirect or consequential damages, including but not limited to, those costs associated with schedule recovery and business interruption. Coors claim for "schedule recovery" losses is simply a disguised claim for lost profits, and is barred by Article 22.

    b.     **The CSA Protects JCS from Liability.**

        (1)     **Conditions Precedent to Recovery.**

The CSA sets forth several conditions precedent to Coors' recovery in this action, including but not limited to:

- Coors must establish that the Project Work and costs that form the basis of its claim for recovery are not the subject of Coors' pre-

approved change documents.  (CSA, § 6.2(g))  The evidence will establish unequivocally that Coors approved every Project cost.

- Coors must establish that the Project Work and costs that form the basis of its claims were not accepted by Coors' Project Manager as satisfactory.  (CSA, §§ 3.5, 4.2 and 6.2)

- Coors must establish that JCS failed to "without additional compensation, correct or revise any errors or deficiencies in the designs, drawings, or specifications."  (CSA, § 6(g))

- Coors must establish that it notified JCS of a deficiency with its drawings and specifications and provided JS with the opportunity to rework such documents at no additional cost to Coors.  (CSA, § 6.2(a))

- Coors must establish that its damages, if any, were not caused by the failings of others for which JCS has no liability.

- Coors must establish that its damages, if any, were not caused by its own failings.  Coors cannot pass onto JCS liability for Project costs that arose by virtue of its own decisions and work.  Under the CSA, JCS' contractual obligations are limited to its performance of the "Work."  (CSA § 3.5.)  "Work" is expressly defined to exclude "any work performed by Coors."  (CSA § 1.16.)  As such, any work performed by Coors falls outside the scope of the CSA, and cannot form the basis of Coors' claim for breach of the contract.  Coors also assumed a high level of contractual responsibility and decision-making authority with respect to the Project.  (See e.g., § 3.5 (approval of all Work); § 4.1 (right to engage separate contractors); § 4.2 (approve or reject Work as satisfactory); § 4.4 (right to change the project manager); § 4.5(b) (approval of all subcontractors); § 5.1 (approval of all changes to the schedule); § 5.2 (to review and approve monthly schedules); § 6.2(a) (duty to review and accept or reject designs as

non-compliant and in need of rework); § 8 (duty to furnish certain materials and equipment).  Coors exercised this authority and more.

- Coors must establish that its claimed damages do not arise from downstream field work occasioned by a design error.  Under the plain language of the CSA, JCS agreed to correct or revise any errors or deficiencies in its designs, drawings or specifications, but the parties agreed and intended that the downstream costs associated with field rework arising from JCS' design work were born by Coors under the contract, including the cost of subcontractor rework required to make changes at the field level.  (CSA § 6(g).)

    (2)    **JCS Did Not Warrant Subcontractor Work and Did Not Agree to Indemnify Coors for Costs Associated with Subcontractor Work**

- Article 17:   The CSA contains no provision in which JCS promised to indemnify Coors for the work of subcontractors.  To the contrary, in Article 17, JCS promised to procure warranties from the subcontractors that would run to Coors' benefit, and to assist Coors in the enforcement of those warranties.  Those warranties included a promise by the subcontractors to re-perform their deficient work at no cost to Coors and (except for Briggs, Entegreat and Emerson) to pay for damages arising from their faulty workmanship.  As agreed to by Side Letter Agreement between Coors and JCS and reflected in the subcontracts with Briggs and Entegreat, those subcontractors were required to re-perform their deficient work at no cost to Coors, not to pay for damages.  Coors assumed the responsibility for any cost associated therewith.  As it applies to both, there is no allegation that JCS failed to obtain the requisite warranties or failed to assist Coors in the enforcement thereof, and as such, there could be no breach of contract arising from subcontractor performance for faulty workmanship.

- Section 4.5(c):  Pursuant to Article 4.5(c), Coors assumed the risks and waived all claims against JCS based upon costs and expenses associated with any default on the part of a Subcontractor that would otherwise be insured through the procurement of a bond.  A performance bond guarantees timely completion of construction without defects.  Travelers Indem. Co. v. Hennepin County, 918 F.2d 66, 68 (8th Cir. 1990).  Coors did not require any bonds insuring against costs arising from subcontractor defaults and thus waived its right to recover those costs from JCS.

### (3)     Coors Cannot Establish Causation.

Coors has not linked any particular contractual breach to any particular damage. The Total Cost and Modified Total Cost methods of calculating damages must be rejected. Coors relies on the Modified Total Cost method to calculate its damages. The Total Cost Method was rejected by this Court (Doc. No. 198).  While Coors claims to have linked the alleged breaches with the categories of damages recited n the FAC, that link is nothing more than an allocation of the difference between the estimated Project cost and the actual cost, thus a simple restatement of the Total Cost Method.  (See Doc. 205) The Defendants are in the process of taking additional deposition testimony from Mr. Gaudion and correspondingly are reserving their right to advance another Daubert motion.

### (4)     Coors failed to designate a qualified expert to testify as to breach, causation and damages.

Coors cannot shift the burden of proof at trial as it has failed to designate experts competent to testify on the necessary elements of its claims for relief. Further,  Coors did not designate an expert to link any particular breach to any particular damage.  The computations and analysis necessary to allocate particular Project costs to particular breaches are beyond

- 27 -

common knowledge, and Coors cannot sustain its burden at trial absent expert opinion on causation.

 2. **First Affirmative Defense:  Coors' Claims are Barred in Whole or in Part by the Doctrines of Estoppel, Release, Ratification and Waiver.**

Coors' claims are barred by the doctrines of release, waiver, ratification, and estoppel.  If, for example, Coors had disapproved of the subcontractors, the form of the subcontracts, expenditures to make up time on the Project, or changes to the Project, Coors could have said so.  Coors had the contractual authority to approve (or disapprove) of subcontractors, to approve (or reject) subcontracts, to approve (or disapprove) Project changes and Project costs, and even to terminate the Agreement and JCS.  But, it did not do so.  Rather, Coors waited until after the Project was completed, and after it was in receipt of an award-winning and exceptional quality brewery, to advance its complaints.  Because Coors failed to take timely and reasonable measures to limit Project costs and ensure that the Project was completed as it so desired, its claims are barred.

 3. **Second Affirmative Defense:  Coors failed to mitigate its damages, if any.**

By contract, Coors was involved with the decision-making process from the outset of the Project and either made or approved the decisions that now form the basis of its claims.  It did so, knowing such changes would increase costs and not minimize expenditures.

 4. **Third Affirmative Defense:  Coors' claims are barred by the doctrine of "frustration of purpose".**

JCS is excused from his failure to perform a contract if performance became impossible after the contract was made.

5.   **Fourth Affirmative Defense:  Mutual Mistake.**

Where in an agreement a mutual mistake is made by both parties in a matter which is the cause or subject of the contract, such mistake is good ground in equity for rescinding the agreement, even after it has been fully executed.

6.   **Fifth Affirmative Defense:  Force majeure.**

Defendant, JCS, raises the force majeure or "act of God" defense as it relates to labor and material cost increases resulting from Hurricanes Katrina and Rita.  An "act of God" is defined as any accident due to natural causes directly and exclusively without human intervention, such that it could not have been prevented by any amount of foresight and care reasonably to have been expected.

C.   **COORS' ALLEGATIONS OF "DELIBERATE, WILLFUL, AND KNOWING" ARE NOT ACTIONABLE.**

Coors alleges that either JEG or JCS deliberately, willfully and knowingly breached the Agreements.  Yet, there are no actionable claims sounding in tort and there is no legal difference between a breach and an intentional breach.  In Virginia, a breach of contract, even when accompanied by ulterior motive, malice or even willful intent to injure, does not support an award of damages outside of the contract Kalmar Corp. v. Haley, 224 Va 699 (1983). In Colorado, courts have carved out a narrow exception whereby, upon a showing of a wanton and willful breach of contract, a plaintiff may be entitled to *non-economic damages that were foreseeable at the time of contracting.*  Giampapa v. Am. Family Mut. Ins. Co., 64 P.2d 230, 242 (Colo. 2003).  The cases that apply this narrow exception do so in cases where public safety is at issue.  Id. The Colorado Rule simply has no application here.  As has long been resolved by

this Court and conceded by Coors, Coors has no claim for non-economic damages (it concedes the brewery poses no safety danger, is in fine working order, there has been no damage to person or property, and there certainly is no claim of emotional distress damages).

Furthermore, the allegations of intentional breach that were advanced in the FAC have been abandoned, and those now asserted in the proposed pretrial conference order are new. Therefore, the Court should eliminate the allegations contained in the FAC from this action and preclude Coors from moving forward with its most recent theory of intentional breach.

**D.      THE FIRST MATERIAL BREACH RULE IS NOT INSTRUCTIVE.**

Coors seeks to revisit the Court's ruling on the enforceability of the liability limitation provision in the CSA by arguing that JCS committed the first material breach. Yet, Coors has already advanced this very same argument and it has been rejected by the Court. In its Opposition to Jacobs' Motion for Judgment on the Pleadings on Contractual Limitation of Liability, Coors previously argued that the CSA's limitation of liability was unenforceable because of an alleged first material breach by JCS. (Doc. 79, p. 24.) The Court ruled against Coors, expressly holding that the liability limitation was valid and enforceable. (Doc. 131 & 133, 5:21–6:1.) Moreover, the "first material breach rule" is inapplicable to claims for breach of a construction services contract. Virginia courts uniformly apply principles of substantial performance and offsets to claims concerning the breach of a construction services contract. See Kirk Reid Co., Inc. v. Fine, 205 Va. 778, 787–89 (Va. 1965); Psychiatric Solutions of Va., Inc. v. Finnerty, 54 Va. App. 173, 191 (Va. Cir. Ct. 2009) (substantial performance is the inverse of material breach—there can be no material breach where there is substantial performance); Erlich v. Hendrick Constr. Co., 217 Va. 108, 115 (Va. 1976) (Virginia Supreme Court enforced

damages limitations against both parties to a construction contract where the parties filed offsetting claims against one another).

**E.   COORS HAS NOT STATED, AND CANNOT STATE, A CLAIM FOR BREACH OF AN IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

There is no pending claim for breach of an implied covenant of good faith and fair dealing, yet Coors continues to advance the claim.  Under Colorado and Virginia law, where the contract defines the rights of the parties, the implied covenant of good faith and fair dealing is inapplicable.  Ward's Equip v. New Holland N. Am., 254 Va. 379, 385 (Va. 1997).

**F.   JEG AND JCS ARE ENTITLED TO AN AWARD OF FEES AND COSTS.**

JEG and JCS are entitled to recoup their fees and costs expended in defending this action.  As such, the Defendants respectfully request that the Court order Coors to pay JEG and JCS an amount equal to the fees and costs incurred in defending this action.

**II.   JEG'S AND JCS'S CLAIMS AGAINST COORS**

**A.   JEG AND JCS ASSERT THREE COUNTERCLAIMS AGAINST COORS.**

**1.   Breach of the CSA.**

Coors is in breach of Section 1.5 of the CSA, as it has failed to pay JCS the agreed upon remuneration.  Section 1.5 of the CSA is titled "Contract Sum" and provides that "Contract Sum is that amount to be paid, on a cost plus incentive basis, to CONTRACTOR [JCS] for the performance of the Work.  The provisions relating to the Contract Sum and commercial agreement are set forth on Exhibit A."  Exhibit A provides in part that "CONTRACTOR SHALL BE PAID ON A COST PLUS FEE (FIXED AND INCENTIVE) BASIS AS DESCRIBED BELOW."  With respect to the "Fee," Exhibit A

provides that "A maximum Fee of 1.3% of Total Installed Cost (TIC) as defined below will be paid by COORS . . . ."

Coors has paid JCS approximately $2.7 million in fee.  Based on Coors' allegation in paragraph 265 of its First Amended Complaint that the "total installed cost" of the Project exceeded $333,000,000, JCS is entitled to receive, and Coors is obligated to pay, approximately $4.3 million in fee.  Accordingly, Coors owes, but has not paid, JCS an additional approximately $1.6 million in fee.  Furthermore, JCS requests recovery of its fees and costs.

### 2.      **Declaratory Relief:  Contractual Liability Limitations.**

JEG and JCS seek a declaration that their liability, if any, is limited by the clear and unambiguous language of their contracts with Coors.   On February 14, 2011, this Court granted JCS' and JEG's Motions for Judgment on the Pleadings on Defendants' Contractual Limitations of Liability.  (See Doc. 131.)  In so holding, the Court upheld the validity of the contractual liability limiting provisions contained in Section 23.2 of the CSA and article 3.2 of the ESA.

### 3.      **Declaratory Relief:  Preapproved Changes.**

As indicated above, under both Colorado and Virginia law, declaratory relief is appropriate to resolve controversies affecting a party's contractual rights or obligations.  JCS seeks a declaration that, in accordance with Sections 3.5, 4.2 and 6.2(g) of the CSA, Coors waived and/or released all claims arising from (1) changes or substitutions of work where Coors provided its prior written approval; and/or, (2) work that was deemed satisfactory by Coors' Project Manager.

Section 6.2(g) provides that where JCS brings a "change or substitution of specific Work to COORS' attention and COORS grants its prior approval for such change or substitution of Work," Coors thereby waives its rights under the CSA to pursue a claim on that basis. (CSA § 6.2(g).) Consistent with this contractual term, before authorizing changes and substitutions to subcontractor Work that would increase Project costs, JCS submitted to Coors change documents, Coors either approved or rejected. JCS relied on Coors' authorization and would not have authorized the subcontractors to perform the work and/or purchase the materials had Coors rejected the requested change.

The CSA also contains a satisfaction clause, pursuant to which JCS' obligation to perform "in a good and workmanlike manner satisfactory and acceptable to COORS" is discharged upon acceptance by Coors' Project Manager. (CSA §§ 3.5 and 4.2) JCS' performance was measured throughout the Project, as its Work was submitted to Coors' Project Manager, John Stonebraker, and either accepted or rejected. Specifically, Section 4.2 provides that Coors' Project Manager is to inspect JCS' Work "to determine when documents and/or materials and workmanship are satisfactory for acceptance in the COORS Project Manager's judgment or to reject Work and materials not in compliance with the Agreement Documents." (CSA § 4.2) Under its express language, Coors' Project Manager has the contractual responsibility to review JCS' Work and accept it, or reject it. Work that is accepted at his sole discretion, is deemed satisfactory under the contract, thereby discharging JCS' obligations under Section 3.5.

Similarly, Section 6.2 sets forth a procedure for JCS to submit its design drawings for Coors' approval or rejection. Critically, Coors obligation to review JCS' drawings, and to

either accept the drawings or reject them with comments is essential to the liability scheme under the Agreement. As articulated throughout, JCS had an obligation to rework its designs at no additional compensation to Coors. Sections 4.2 and 6.2 are intended to provide JCS with notice of perceived deficiencies so that it has the opportunity to rework the designs at no additional compensation as required. Coors cannot "post hoc" feign dissatisfaction with JCS' work, where it has previously deemed that work satisfactory. Such a result would deprive Jacobs of the opportunity to re-perform and avail itself of its contractual protections. (CSA § 6.2(a).)

    4.  <u>**Fees and Costs.**</u>

    The Defendants respectfully request that the Court award JEG and JCS their fees and costs.

<h2 style="text-align:center">4. STIPULATIONS</h2>

    The following facts are undisputed:

    1.  Coors and JEG entered into an Engineering Services Agreement (Agreement No. 67CE574274) (the "Engineering Services Agreement") on May 17, 1999 under which JEG provided planning, estimating, engineering, technical support, and related administrative services for Coors' capital projects.

    2.  The Engineering Services Agreement has been amended a number of times.

    3.  The Engineering Services Agreement is governed by Colorado law.

    4.  Coors and JCS entered into a Construction Services Agreement (Agreement No. 7500059134) (the "Construction Services Agreement") on April 11, 2005 for the expansion of Coors' facilities in Elkton, Virginia (the "Project").

    5.  The Construction Services Agreement is governed by Virginia law.

6.      Construction of the Project is now complete, and the brewery is functioning well.

## 5. PENDING MOTIONS

Plaintiff states:  There are no pending motions.

Defendants state:  The Defendants have no motions pending at this time.  However, the deposition of Coors' expert Neil Gaudion is ongoing.  Moreover, Defendants understand that Coors will not produce two current employees, Mark Dwyer and Zane Barnes, for trial.  Mr. Dwyer and Mr. Barnes are integral to the issues in this case and Defendants seek their production at trial.  (Fed. R. Civ. Proc. 45; Mason v. Texaco, Inc., 741 F. Supp. 1472, 1504 (D. Kan. 1990) aff'd and remanded, 948 F.2d 1546 (10th Cir. 1991).)  Furthermore, Coors objection is not well taken as Coors produced Mr. Dwyer for deposition in Denver.

## 6. WITNESSES

*See* attached Tab A for Plaintiff Coors' Witness List.

*See* attached Tab B for Defendants' Witness List.

## 7. EXHIBITS

a.      Exhibit Lists:

(1)      Plaintiff Coors: *see* attached Exhibit List, Tab C.

(2)      Defendants: *see* attached Exhibit Lists, Tabs D & E.

b.      Copies of exhibits have been exchanged.  Rule 901 objections were filed on December 14, 2012.

## 8. DISCOVERY

*a) Discovery:*

At the time of this submission, expert discovery is ongoing.

- 35 -

*b) Deposition Exhibits:*

Defendants State:

Throughout the depositions, the parties have taken great pains to maintain consecutive numbering of the deposition exhibits to facilitate exhibit handling at trial. The parties then agreed to utilize that numbering system at trial. Defendants have proposed that the parties prepare one set of joint deposition exhibit binders. This would minimize the duplication of exhibits and reduce the number of exhibit binders at trial. Defendants understand that Coors objects to this method of exhibit preparation, and asks that the Court to resolve the dispute.

Plaintiff Coors States:

Combining defendants' Tab D (their "deposition trial exhibits") with Coors' exhibits (Tab C) does not reduce the number of exhibits or "binders" that will be present at trial. The defendants have told Coors that they have removed Coors' exhibits from their Tab D. Accordingly, combining the parties' separate exhibits would simply impose on Coors the obligation to manage the defendants' unwieldy "deposition trial exhibits," require Coors to prepare thousands of additional pages for electronic presentation, and more than double the length of Coors' exhibit list. Each party should be responsible for its own exhibits.

## 9. SPECIAL ISSUES

Coors lists the following special issues that the Court may wish to consider before trial:

(a) If Jacobs Engineering contends at trial that no contract governed the management services that Jacobs Engineering actually provided on the project, then Coors submits that its unjust enrichment claim against Jacobs Engineering is viable, and should be tried.

Defendants identify the following legal issues that the Court may wish to consider prior to trial:

1.      Whether Coors can maintain claims for relief premised on allegations outside the FAC.

2.      Whether Coors can proceed to trial on a new theory that merges JEG and JCS in an attempt to pierce the legal veil that separates the two corporations. The Defendants contend that this theory was not pled in the FAC, was not the subject of discovery, and is not supported by any claim or fact advanced to date, and as such, that it should not be permitted at trial.

3.      Whether Coors may proceed against JEG and JCS on a theory of joint and several liability for damages arising from breaches of distinct contracts (the ESA and CSA). The Defendants contend that (a) a theory of joint and several liability is a tort principle that has no application in this contract dispute; (b) Colorado and Virginia courts do not apply joint and several liability to contract disputes; rather, under the law of both states, it is Coors' burden to establish specific contractual breaches and causally link each breach to a particular damage; and, (c) even if the tort principle were applied, it would be Coors' burden to establish that it is not feasible to distinguish the damages caused by JEG from the damages caused by JCS – it has not and could not meet this standard.

4.      Whether Coors can shift the burden of proof given that (a) it has failed to designate expert testimony as to the element of causation (b) Neil Gaudion (Coors' purported damages expert), affirmatively testified that he did not calculate damages such that any particular breach could be linked to any particular Project cost (c) Mr. Gaudion failed to use a reliable

- 37 -

methodology to calculate damages (d) Mr. Gaudion is not qualified to testify as to the standard

of care for engineering professionals or the engineering/design work performed on this Project;

(e) Mr. Gaudion's opinions supplant the role of the judge and jury, interpreting the meaning of

the contracts and applying its interpretation of the law to the facts; (f)  Mr. Gaudion admits that if

his legal conclusions are incorrect, so too are his damages calculations; (g) Mr. Gaudion's

opinions are not based on sufficient facts or data; (h) Gunnar Sarsten (Coors' purported liability

expert) is not qualified; (i) Mr. Sarsten's opinions are not based on sufficient admissible facts or

data; (j) Mr. Sarsten's opinions of breach are not relevant as they are disconnected from the facts

alleged in the FAC and the terms of the ESA and CSA; (k) Mr. Sarsten's opinions are not

reliable as they are based on unsupportable readings of the contract and allege claims for breach

of contract that are disconnected from the actual terms and conditions of the ESA and CSA.;

(l) Mr. Gaudion's damages calculations are untethered to Mr. Sarsten's opinions regarding

breach; (m) both Mr. Gaudion and Mr. Sarsten offer opinion testimony outside of the scope of

proper 702 opinion testimony; and, (n) both Mr. Gaudion and Mr. Sarsten failed to consider

Coors' obligations under the contracts under a misguided view of the first material breach rule,

which does not apply here.  See Jacobs Motions to Exclude the Expert Reports and Testimony of

FTI Consulting/Neil Gaudion and Gunnar Sarsten (Doc Nos. 204, 205, 214, 215 and supporting

documents.)

       5.       Whether Coors is limited to its expert opinions and whether those expert

opinions can rely on facts outside of the First Amended Complaint ("FAC"). (Daubert, 509 U.S.

579; Fed. R. Evid., Rule 401.)

6.      Whether, at trial, Coors is limited to those opinions of breach and damage set forth in its expert's supplemental reports (dated July 31, 2012).  The Defendants contend that Coors and its experts are confined to the opinions set forth in those reports, and that they are precluded from advancing claims outside those reports, even if they are advanced in the FAC. Fed. R. Civ. Proc. 26(a)(2)(B)(i); Coumerlith v. Tricam Industries, Inc., 2007 U.S. Dist. LEXIS 8861, at *3 (D. Colo. Feb. 7, 2007) (citing Fed. R. Civ. Proc. 37(c)(1)); Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002).  Fiber Optic Designs, Inc. v. New England Pottery, LLC, 262 F.R.D. 586, 595 (D. Colo. Dec. 4, 2009) (citing Ciomber v. Cooperative Plus, Inc., 527 F.3d 635, 641-42 (7th Cir. 2008); Woodworker's Supply, Inc. v. Principal Mutual Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999); Scholl v. Pateder, 2011 U.S. Dist. LEXIS 93958, at *8-9 (D. Colo. Aug. 22, 2011).

7.      Whether industry standards can supplant the express contractual terms. Defendants contend that expert testimony that applies industry practice in contravention of the express contract terms is not relevant to the action and is inadmissible.  See Hutton Contr. Co. v. City of Coffeyville, 2004 U.S. Dist. LEXIS 19580, at * 37-38 (D. Kan. Sept. 24, 2004) (citing Questar Pipeline Co. v. Grynberg, 201 F.3d 1277, 1288 (10th Cir. 2000)).

8.      Whether Coors can proceed on Count Five, alleging that JEG is in breach of the ESA.  The Defendants' contend that Coors cannot proceed to trial on Count Five given that (a) Coors admits that its claims are not based on any error or omission associated with a JEG design or drawing (See Doc 213, p. 32) (Deposition of Gunnar Sarsten II, Docs. 204-9 & 204-10 at 141, 164:11-16); (b) Coors' damages expert, FTI Consulting, Inc., has not attributed any damage to a breach by JEG of the ESA (Docs. 205-6, 205-7 & Ex. D at p.1) (Docs. 205-6 & 205-

- 39 -

9 - Gaudion Deposition II, 128:22-129:21); and, (c) Coors offers no expert opinions as to causation that could link any damage to work performed by JEG under the ESA.

9.      Whether, under the ESA, JEG's duties are limited to engineering and procurement and that it only warrants the services it provides under the ESA, which don't include services provided by JCS under the CSA. The Defendants contend that JEG's duties are defined and limited by the ESA and that Coors' belated attempt to interject extra-contractual duties is not supported by the language of the agreement itself, and therefore, is insufficient to state a breach.

10.      Whether Coors may proceed on a claim for "excess" Project costs under the CSA, where Coors provided its prior written authorization for the change or substitution of Work and/or Project cost. Defendants contend that, pursuant to clause 6.2(g) of the CSA, Coors waived any right to pursue a claim where its prior written authorization was provided. (CSA, § 6.2(g).)

11.      Whether Coors may proceed on a claim for breach of the CSA based on documents, Work, or materials, where Coors' Project Manager deemed them "satisfactory for acceptance in the COORS Project Manager's judgment." Defendants contend that the CSA contains a "satisfaction clause" whereby, JCS's obligation to "perform and complete the Work in a good and workmanlike manner satisfactory and acceptable to Coors" is discharged   upon the Project Manager's acceptance of the Work. (CSA §§ 3.5 & 4.2.)

12.      Whether Coors is entitled to recover consequential damages. Defendants contend that Coors is not entitled to recover consequential damages, including those coined "schedule recovery." (CSA, Article 22; ESA, § 5.1.)

13.     Whether Coors may recover Project costs occasioned by its own (or concurrent) acts, work, or decisions.  The Defendants contend that Coors is precluded by contract and by law from recovering Project costs occasioned by its own (or concurrent) acts, work or decisions.  (ESA, § 3.2; CSA, § 1.16; see also   Westminster, 100 P.3d at 478; Notations to Virginia Model Jury Instructions – Civil Instruction No. 45-510 citing TechDyn Sys. v. Whittaker Corp., 427 S.E. 2d 334, 337-38 (1974).

14.     Whether Coors is entitled to recover amounts in excess of the liability limitations contained in the ESA and CSA.  On February 14, 2011 the Court granted JCS' and JEG's Motions for Judgment on the Pleadings on Defendants' Contractual Limitations of Liability holding these provisions enforceable.  (See Doc. 131.)  The FAC does not allege any damages that fall outside of the liability limitations.  Furthermore, Coors experts have not identified any breaches or damages that would fall outside of the liability limitations contained in the ESA and CSA.

15.     Whether Coors is entitled to proceed with a claim against JCS to recover costs associated with work performed by subcontractors, where Coors failed to require a bond. The Defendants contend that, pursuant to Section 4.5(c), where Coors elected not to require that a subcontractor obtain a performance, payment or other form of bond, it assumed all responsibility for costs and expenses associated with that subcontractor's work.

16.     Whether JCS's liability for the acts of subcontractors is limited to its obligations under Article 17 to (a) procure warranties and (b) assist Coors with the enforcement of those warranties.  The Defendants contend that, contrary to Coors assertion otherwise, JCS did not agree to indemnify Coors for the acts, omissions and Project costs associated with

- 41 -

subcontractor work, and furthermore, that the CSA defines and limit's JCS's liability in Article 17.

17.     Whether and to what extent the Side Letter Agreement limits JCS's liability, if any, for the acts, omissions and Work of Briggs of Burton, Emerson and Entegreat. The Defendants contend that the Side Letter Agreement between JCS and Coors modified its Article 17 obligations requiring only that JCS obtain a warranty from the designated subcontractors to re-perform their work at no cost to Coors, leaving the cost of field work or damages resulting therefrom to Coors.

18.     Whether JCS is responsible under the CSA for the downstream field rework or construction costs associated with its design errors or omissions.  The Defendants contend that pursuant to Section 6(g) of the CSA, JCS's sole obligation was to "without additional compensation, correct or revise any errors or deficiencies in the designs, drawings or specifications," and is not liable for the downstream costs of field rework or construction costs associated therewith.  Indeed, the provision of the CSA that would have held JCS liable for the cost of downstream costs, such as field rework, was removed from the CSA.

19.     Whether Coors' allegations of intentional breach of either the ESA or CSA would permit recovery of economic damages outside of the contracts.  The Defendants contend that they do not, as (a) in Virginia, a breach of contract, even when accompanied by ulterior motive, malice or even willful intent to injure, does not support an award of damages outside of the contract (Kalmar Corp., 224 Va 699); and, (b) in Colorado the willful and wanton doctrine only permits recovery of *non-economic damages that were foreseeable at the time of contracting* upon a showing of a wanton and willful breach (Giampapa, 64 P.2d at 242) and the

cases which apply that rule only do where public safety is at issue.  The Colorado Rule clearly has no application here.  As has long been resolved by this Court and conceded by Coors, Coors has no claim for non-economic damages (it concedes the brewery poses no safety danger, is in fine working order, there has been no damage to person or property, and there is certainly no claim of emotional distress) and it has not pleaded with specificity any request for non-economic special damages as required.  DeKevorkian v. Lionbridge, 2006 U.S. Dist. LEXIS 4194 *11 (D. Colo. Jan. 26, 2006); Fed. R. Civ. Proc. 9(g); Colo. R. Civ. Proc. 9(g).

## 10. SETTLEMENT

Counsel certify that:

a.       The parties discussed in good faith settlement of this lawsuit through telephone conferences and other correspondence during the period of October to December of 2007.  The parties have conducted two mediations, one in April 2008 and one in December 2009.  In-house counsel for Coors and Jacobs met in person on November 29, 2011 to discuss in good faith settlement of the case and continue to have settlement discussions.

b.       The participants in the various settlement discussions included outside and in-house counsel for the parties.

c.       The parties were promptly informed of all offers of settlement.

d.       Counsel do not intend to hold future settlement conferences.

e.       It appears to Coors and Jacobs counsel that there is little possibility of settlement.

f.       There is currently no date set for a settlement conference before the magistrate judge or other alternative dispute resolution method.

## 11. OFFER OF JUDGMENT

Counsel acknowledge familiarity with the provisions of Rule 68 of the Federal Rules of

Civil Procedure (Offer of Judgment) and have discussed it with the clients against whom claims

are made in this case.

## 12. EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and

the trial, and may not be amended except by consent of the parties and approval by the court or

by order of the court to *prevent manifest injustice.* The pleadings will be deemed merged herein.

This Final Pretrial Order supersedes the Second Amended Scheduling Order. In the event of

ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of

the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13. TRIAL AND ESTIMATED TRIAL TIME;
## FURTHER TRIAL PREPARATION PROCEEDINGS

(1) Trial is to a jury; (2) trial is set to start on January 14, 2013; Coors estimates the trial

will take four weeks, Jacobs estimates the trial will take six to eight weeks, and (3) the trial will

be held in Courtroom A of the Byron White United States Courthouse, 1823 Stout Street,

Denver, Colorado.

DATED this **20** day of December, 2012.

BY THE COURT:

Hon. Richard P. Matsch, Senior Judge

FINAL PRETRIAL ORDER SUBMITTED:

- 44 -

s/Robert C. Chambers
Robert C. Chambers
John M. Mastin, Jr.
SMITH, CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, GA 30303-1227
Tel:  404-521-3800
Fax:  404-688-0671
Email:  rcchambers@smithcurrie.com
          jmmastin@smithcurrie.com

and

Michael J. Hofmann
BRYAN CAVE HRO
1700 Lincoln Street, Suite 4100
Denver, CO 80203-4541
Tel:  303-861-7000
Fax:  303-866-0200
Email:  michael.hofmann@bryancave.com

**Attorneys for Plaintiff**
**Coors Brewing Company**

s/Albert E. Peacock III
Samuel A. Keesal, Jr.
Albert E. Peacock III
Paul T. Ross
Elizabeth P. Beazley
KEESAL, YOUNG & LOGAN
400 Oceangate
P.O. Box 1730
Long Beach, California  90801
Tel:  562-436-2000
Fax:  562-436-7416
Email:  skip.keesal@kyl.com
          al.peacock@kyl.com
          terry.ross@kyl.com
          elilzabeth.beazley@kyl.com

and

David G. Palmer
GREENBERG TRAURIG LLP
1200 17th Street, Suite 2400
Denver, Colorado 80202
Tel:  303-572-6500
Fax:  303-572-6540
Email:  palmerdg@gtlaw.com

**Attorneys for Defendants**
**Jacobs Engineering Group Inc. and**
**Jacobs Construction Services, Inc.**